ORIGINAL

2 +, CT

22

7/16/0

FILED
HARRISBURG, PA

JUL 1 5 2002

MARY E. D'ANDREA, CL
Per _____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRY BOYD WILKINSON and SHARON WILKINSON, husband and wife,<br><br>Plaintiffs<br><br>v.<br><br>NORFOLK SOUTHERN RAILWAY COMPANY and CONSOLIDATED RAIL CORPORATION,<br>Defendants<br><br>v.<br><br>GPS TERMINAL SERVICES, INC.,<br>Third Party Defendant | : : : : : : : : : : : : : : : | CIVIL ACTION<br><br><br>JURY TRIAL DEMANDED<br><br>JUDGE SYLVIA H. RAMBO<br><br><br>NO. 01-CV-1146 |

## APPENDIX OF EXHIBITS

"A"   Deposition Transcript of Terry Boyd Wilkinson dated June 10, 2002;

"B"   Answers of Third Party Defendant, GPS Terminal Services, Inc., to Requests of Admissions of Norfolk Southern Railway Company and Consolidated Rail Corporation, Defendants; and

"C    Terminal Services and Maintenance Agreement - Harrisburg Intermodal Terminal dated March 6, 1996 between GPS and Consolidated Rail Corporation.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TERRY BOYD WILKINSON and
SHARON WILKINSON, husband
and wife,

   Plaintiffs

   v.

NORFOLK SOUTHERN RAILWAY
COMPANY and CONSOLIDATED
RAIL CORPORATION,

   Defendants

   v.

GPS TERMINAL SERVICES, INC.,
 Third Party Defendant

:  CIVIL ACTION
:
:
:
:
:
:
:  JURY TRIAL DEMANDED
:
:  JUDGE SYLVIA H. RAMBO
:
:
:  NO. 01-CV-1146
:
:
:
:

## <u>CERTIFICATE OF SERVICE</u>

  **AND NOW,** on the date stated below, I, **Craig J. Staudenmaier, Esquire,** of the firm of Nauman, Smith, Shissler & Hall, LLP, hereby certify that I this day served the foregoing **APPENDIX OF EXHIBITS,** by depositing a copy of the same in the United States Mail, first class, postage prepaid, at Harrisburg, Pennsylvania, addressed to the following:

Lawrence A. Katz, Esquire
Robert E. Myers, Esquire
**COFFEY & KAYE**
Two Bala Plaza, Suite 718
Bala Cynwyd, PA  19004

Jeffrey B. Rettig, Esquire
Hartman, Osborne & Rettig, P.C.
126-128 Walnut Street
Harrisburg, PA  17101

NAUMAN, SMITH, SHISSLER & HALL, LLP

By: _____

**Craig J. Staudenmaier, Esquire**
**Supreme Court ID# 34996**

200 North Third Street, P. O. Box 840
Harrisburg, PA  17108-0840
Telephone:  (717) 236-3010
Counsel for Norfolk Southern Railway
Company and Consolidated Rail
Corporation, Defendants

Date:  July 15, 2002

JUN 2 4

# In The Matter Of:

*Terry Boyd Wilkinson  &  Sharon Wilkinson   v.*
*Norfolk Southern Railway Company, et al.*

---

*Terry Boyd Wilkinson*
*June 10, 2002*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File TW061002.V1, 169 Pages*
*Min-U-Script® File ID: 2138006397*

## Word Index included with this Min-U-Script®

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkin
June 10, 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TERRY BOYD WILKINSON and . CIVIL ACTION
SHARON WILKINSON, husband .
and wife, .

    Plaintiffs .

           . JURY TRIAL DEMANDED

  vs. .

NORFOLK SOUTHERN RAILWAY .
COMPANY and CONSOLIDATED .
RAIL CORPORATION, . JUDGE SYLVIA H. RAMBO

    Defendants .

  vs. . No. 01-CV-1146

GPS TERMINAL SERVICES, .
INC., .

    Third Party .
    Defendant .

Deposition of: TERRY BOYD WILKINSON

Taken by : Defendants
Date : June 10, 2002, 1:00 p.m.
Place : Hartman, Osborne & Rettig
    126-128 Walnut Street
    Harrisburg, Pennsylvania
By : Susan L. Petrilla, Notary Public
Registered Professional Reporter

**Page 2**

APPEARANCES:

  COFFEY & KAYE
  By: ROBERT E. MYERS, ESQ.
    For - Plaintiffs

  NAUMAN, SMITH, SHISSLER & HALL, LLP
  By: CRAIG J. STAUDENMAIER, ESQ.
    For - Defendants

  HARTMAN, OSBORNE & RETTIG
  By: JEFFREY B. RETTIG, ESQ.
    For - Third Party Defendant

ALSO PRESENT:
    SHARON WILKINSON

INDEX

WITNESS

TERRY BOYD WILKINSON    Examination

By Mr. Staudenmaier    4, 155
By Mr. Rettig    107, 164, 167
By Mr. Myers    132, 167

EXHIBITS

| Wilkinson Deposition | | Marked | Identified |
| --- | --- | --- | --- |
| Exhibit Number | | | |
| 1 | Series of photocopies of photographs - Group A, 1-4 | 56 | 56 |
| 2 | Series of photocopies of photographs - Group B, 1, 2, 5 and 6 | 56 | 57 |
| 3 | Series of photocopies of photographs - Group B, 1 and 1 | 63 | 63 |
| 4 | Employer's Report of Occupational Injury or Disease | 68 | 68 |
| 5 | Association of American Railroads Intermodal Trailer and Container Securement Manual | 73 | 73 |
| 6 | Memo dated November 13, 1998, Anthony to All Terminal Services Employees | 74 | 74 |
| 7 | Employee Class History dated February 7, 2002 | 75 | 75 |

**Page**

[1]          **STIPULATION**

[2] It is hereby stipulated by and between

[3] counsel for the respective parties that reading,

[4] signing, sealing, certification and filing are

[5] hereby waived; and all objections except as to

[6] the form of the question are reserved to the

[7] time of trial.

[8]

[9]    TERRY BOYD WILKINSON, called as a witness,

[10] having been duly sworn, testified as follows:

[11]          **EXAMINATION**

[12]       **BY MR. STAUDENMAIER:**

[13]  **Q:** Mr. Wilkinson, would you please state your full

[14] name and current address?

[15]  **A:** My name is Terry Boyd Wilkinson. My address is

[16] 572 Landisburg Road, Landisburg, Pennsylvania.

[17]  **Q:** And, Mr. Wilkinson, are you the Terry Boyd

[18] Wilkinson who is a plaintiff in an action

[19] brought in the Middle District Court, docketed

[20] to No. 01-CV-1146, by you and Sharon Wilkinson

[21] against Norfolk Southern Railway Company and

[22] Consolidated Rail Corporation?

[23]  **A:** Yes, I am.

[24]  **Q:** Mr. Wilkinson, before we actually get into the

[25] meat or heart of the deposition, there's a few

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 5

[1] sort of guidelines I want you to keep in mind.
[2] I introduced myself earlier. My name is Craig
[3] Staudenmaier. I'm a lawyer representing Norfolk
[4] Southern and Conrail. I'm going to ask you a
[5] series of questions today. Some of the other
[6] lawyers in the room may have questions also.
[7] But before I get into my questions, just so you
[8] understand, there's a couple sort of things to
[9] keep in mind so that you'll know what to expect
[10] from me and vice versa.
[11] First of all, as you see, we have a
[12] stenographer here, so everything that we say is
[13] taken down stenographically. For that reason,
[14] whenever I ask you a question, please make sure
[15] your answers are in words. Avoid shaking your
[16] head or nodding. Don't use hand gestures, but
[17] make sure everything you tell me is put into
[18] words so that she can take them down and
[19] transcribe them.
[20] Also, if I ask you a question that involves
[21] a yes or a no answer, please make sure you say
[22] yes or no and avoid things like uh-huh or
[23] huh-uh, those types of things, because you can
[24] imagine when she goes to transcribe them, it
[25] might be a little more difficult for her to know

Page 6

[1] which way it went.
[2] Also, if I ask you a question for any
[3] reason that's unclear to you, whether you're not
[4] sure about what I mean in terms of time or place
[5] or I use a phrase or term or the whole question
[6] for any reason is unclear to you, please tell me
[7] and tell me what's unclear about it, and I'll
[8] try to restate it so we can clear up the
[9] confusion. Okay?
[10] A: Yes.
[11] Q: Also, I would ask you — and I'll try to
[12] remember this, too, because sometimes I
[13] forget — please wait until I'm finished asking
[14] my question before you begin to answer, because
[15] here again, that stenographer machine is like a
[16] harpsichord, she can only take one person at a
[17] time, she can't play chords. You have to wait
[18] until I'm finished and I in turn will try to
[19] remember to wait until you're finished answering
[20] before I go to my next question.
[21] (Discussion held off the record.)
[22] BY MR. STAUDENMAIER:
[23] Q: Mr. Wilkinson, do you have any type of physical
[24] problem today that makes it difficult for you to
[25] hear my voice, understand my questions and

Page 7

[1] answer them today?
[2] A: No, sir.
[3] Q: Are you currently taking any type of
[4] medication — and it can either be prescription,
[5] nonprescription, over-the-counter, whatever —
[6] that in your opinion would make it difficult
[7] today for you to hear my voice, understand my
[8] questions and answer them?
[9] A: No, sir.
[10] Q: Mr. Wilkinson, I have your date of birth as
[11] February 19th, 1948. Is that correct?
[12] A: Yes, sir.
[13] Q: Now, earlier you gave me your address. Do you
[14] live there alone?
[15] A: No, sir.
[16] Q: With whom do you live?
[17] A: My wife, Sharon Wilkinson, and five — four
[18] children.
[19] Q: Do you want to give me the children's names,
[20] please?
[21] A: Frankie.
[22] Q: And give me their last names.
[23] A: Good.
[24] Q: Okay.
[25] A: Erin Good.

Page 8

[1] Q: Is that E-r-i-n?
[2] A: Yes.
[3] Q: And who else?
[4] A: Christopher Good.
[5] Q: And the last one?
[6] A: Edwin Wilkinson.
[7] Q: And do you want to give me a quick rundown, how
[8] old is Frankie?
[9] A: 22.
[10] Q: Is that a female or male?
[11] A: Male.
[12] Q: And Erin?
[13] A: Female, and she's 19.
[14] Q: And Christopher?
[15] A: 15.
[16] Q: And Edwin?
[17] A: Eight.
[18] Q: And were all four of those children living with
[19] you back at the time of this accident in June of
[20] 1999?
[21] A: Yes, sir.
[22] Q: Does anyone else live with you at the address
[23] you gave besides these four children and your
[24] wife, Sharon?
[25] A: No, sir.

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkin
June 10, 2

Page 9

[1] **Q:** Now, the three children that have the last name
[2] of Good, are they from Sharon's previous
[3] marriage or what's the status?

[4] **A:** Yes, sir, they're from a previous marriage.

[5] **Q:** From Sharon?

[6] **A:** From Sharon, yes.

[7] **Q:** And is Edwin the only child that you and Sharon
[8] have together?

[9] **A:** Yes, sir.

[10] **Q:** Do you have any other children, you personally?

[11] **A:** Yes, sir, I have three daughters.

[12] **Q:** Did they live with you at any time around June
[13] '99 or since then?

[14] **A:** No, sir.

[15] **Q:** Are they grown?

[16] **A:** Yes.

[17] **Q:** Let me ask it this way. Are they all over the
[18] age of 18?

[19] **A:** Yes, sir.

[20] **Q:** Are they all over the age of 21?

[21] **A:** Yes, sir.

[22] (Discussion held off the record.)

[23] **BY MR. STAUDENMAIER:**

[24] **Q:** The two older children, Frankie and Erin, have
[25] they lived with you continuously since June of

Page 10

[1] '99?

[2] **A:** No.

[3] **Q:** Tell me about the arrangements.

[4] **A:** Frank was on his own, had his own apartment, so
[5] he was in an apartment. And Erin is in college
[6] right now. Well, she's out of it for the
[7] summer, but she's in college.

[8] **Q:** Where does she go to college?

[9] **A:** She goes to Bloomsburg University.

[10] **Q:** What year did she just finish?

[11] **A:** Her junior year.

[12] **Q:** And now you said Frankie had an apartment?

[13] **A:** Yes.

[14] **Q:** That's changed?

[15] **A:** Yes, he's back home again.

[16] **Q:** Now, in June of '99 when your accident happened,
[17] was he living with you then?

[18] **A:** Yes, he was.

[19] **Q:** So sometime between then and now he was out on
[20] his own and came back?

[21] **A:** Yes.

[22] **Q:** When was that period he was out on his own?

[23] **A:** I really couldn't tell you. I have no idea.

[24] **Q:** And Christopher is in high school, junior high?

[25] **A:** Yes.

Page

[1] **Q:** What grade?

[2] **A:** He will be a sophomore this year.

[3] **Q:** What grade is Edwin in?

[4] **A:** He just finished second and will be going into
[5] third.

[6] **Q:** Just to make sure I clarify this, back in June
[7] of '99 when your accident happened, Frankie was
[8] not living with you. Correct?

[9] **A:** No.

[10] **Q:** Were you contributing to his support at all back
[11] at that time in June of '99 in any way?

[12] **A:** Yes, if he was at home at that time. I'm not
[13] sure if he was.

[14] **Q:** Well, we need to try to clarify somehow. And I
[15] understand — I'm not asking you for precise
[16] dates, but let me maybe try it this way. We're
[17] almost exactly three years since your accident,
[18] okay, because today is June the 10th, I think.
[19] In that three-year period, of the three years,
[20] approximately how much time was Frankie living
[21] with you at your home as opposed to being —

[22] **A:** On his own?

[23] **Q:** — living elsewhere? Would it be like half,
[24] two-thirds, one-third, you tell me?

[25] **A:** I'd say in that time, I believe he was there

Page

[1] most of the time, three-quarters of the time.

[2] **Q:** Now, with Erin, were you contributing to her
[3] support back in June of '99?

[4] **A:** Yes, sir.

[5] **Q:** Did that change at all from then until now?

[6] **A:** No, sir.

[7] **Q:** And what about with regard to Christopher, the
[8] same question?

[9] **A:** Yes, sir.

[10] **Q:** Now, what about their natural father, does he
[11] contribute in any manner to their support?

[12] **A:** Yes, he pays child support.

[13] **Q:** And if you know, is that pursuant to a court
[14] order or an agreement between him and Sharon or
[15] is there another arrangement?

[16] **A:** Yes, sir, that's through a court order.

[17] **Q:** The three daughters that you mentioned, in June
[18] of '99 and up until now, do you contribute to
[19] their support? And understand, I don't mean
[20] birthday gifts and things like that, but in
[21] terms of helping to contribute to their support,
[22] have you done it from the time of your accident
[23] up until now?

[24] **A:** No, sir.

[25] **Q:** Mr. Wilkinson, did you attend high school?

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

**Page 13**

[1]  A: Yes, sir.

[2]  Q: Did you graduate?

[3]  A: Yes, sir.

[4]  Q: What year?

[5]  A: 1966.

[6]  Q: What high school did you graduate from?

[7]  A: Trevorton High School.

[8]  Q: And where is that located?

[9]  A: Trevorton, Pennsylvania.

[10]  Q: Do you have any education, formalized education?

[11] By that I mean college, junior college,

[12] vo-technical, business school, anything of that

[13] nature?

[14]  A: No, sir.

[15]  Q: At some point in time, it's my understanding

[16] that you came to work for Pennsylvania Truck

[17] Lines?

[18]  A: Yes, sir.

[19]  Q: Do you recall when that was?

[20]  A: In 1987.

[21]  Q: Prior to 1987, had you ever worked in the

[22] trucking industry at all?

[23]  A: Prior to, yes.

[24]  Q: What about in intermodal trucking or intermodal

[25] transportation at all?

**Page 14**

[1]  A: No, sir.

[2]  Q: So what was your experience in trucking prior to

[3]  '87?

[4]  A: I don't understand the question.

[5]  Q: You said that you didn't work in intermodal

[6] transportation, but you had worked in trucking?

[7]  A: Yes.

[8]  Q: So tell me what it is you did in trucking

[9] previous to working for Pennsylvania Truck

[10] Lines?

[11]  A: I drove a truck and delivered the merchandise

[12] that we handled to different destinations and

[13] then unloaded the trucks.

[14]  Q: Had you ever had any involvement with railroads

[15] prior to 1987?

[16]  A: No, sir.

[17]  Q: Did you ever have any relatives that worked for

[18] a railroad? And it's basically immediate

[19] family; mother, father, brothers, sisters,

[20] aunts, uncles, that type.

[21]  A: No, sir.

[22]  Q: When you came to work for Pennsylvania Truck

[23] Lines in 1987, what were your job duties then?

[24]  A: I was a truck driver and also a yard person.

[25]  Q: Did you do any over-the-road driving or was it

**Page 15**

[1] just within the yard in terms of your driving?

[2]  A: It was some over-the-road.

[3]  Q: And what were your yard responsibilities?

[4]  A: My yard duties were being a groundman, preparing

[5] the trailers to load, and basically placing the

[6] trailers there at the cars to be loaded.

[7]  Q: Did you have to use pry bars and raise and lower

[8] hitches when you worked for Pennsylvania Truck

[9] Lines?

[10]  A: Yes, sir.

[11]  Q: Tell me what was involved with that, what kind

[12] of equipment you used and when you had to do

[13] that type of work?

[14]  A: With Pennsylvania Truck Lines?

[15]  Q: Yes, Pennsylvania Truck Lines for now.

[16]  A: Yes, as a groundman, you were assigned with the

[17] machine, which is called a packer, which unloads

[18] the trailer from the rail car. And as the

[19] packer clamped, you had a five-foot bar that you

[20] opened up the hitch after the machine took the

[21] pressure off these hitches. So we did use a pry

[22] bar with PTL.

[23]  Q: You said it was a five-inch pry bar?

[24]  A: No, five foot.

[25]  Q: And was that just one person would use the pry

**Page 16**

[1] bar or was it —

[2]  A: Yes.

[3]  Q: — more than one? Did you use any other type of

[4] equipment that involved working with hitches

[5] other than the pry bar?

[6]  A: Sledgehammers.

[7]  Q: And what did you use the sledgehammer for?

[8]  A: To knock down the hitches.

[9]  Q: Tell me what you mean by that?

[10]  A: Well, some trailers were longer than the space

[11] available on the car and the car sometimes had

[12] collapsible hitches. And them collapsible

[13] hitches, you would hit with a sledgehammer to

[14] collapse them. That trailer would no longer be

[15] able to fit on the car.

[16]  Q: Now, tell me the process of how you'd go about

[17] it. If you tell me you hit them with a

[18] sledgehammer, I can have a bunch of visions

[19] about how you do that. Tell me the process you

[20] used to do that.

[21]  A: There's a mechanism in the back of the hitch and

[22] it knocks the safety latch from the support of

[23] that hitch, and you hit this spring-loaded

[24] device that knocks the pin out and then the

[25] hitch clamps as it folds up.

**Min-U-Script®**    Filius & McLucas Reporting Service, Inc.

Terry Boyd Wilkinson & Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Case 1:01-cv-81170-SHR — Document 22   Filed 07/15/2002   Page 9 of 107

Terry Boyd Wilkin
June 10, 2

Page 17

[1] Q: Did you have to use the sledgehammer in
[2] conjunction with the pry bar or were they used
[3] separately?

[4] A: Separately.

[5] Q: Tell me the occasions when you would use the pry
[6] bar as opposed to when you would use the
[7] sledgehammer?

[8] A: The pry bar was used all the time, loading and
[9] unloading of the trailers. We did not use a
[10] sledgehammer — only when we were loading.

[11] Q: When you went to work for Pennsylvania Truck
[12] Lines, did you receive any formal training on
[13] how to do your job or was it basically just
[14] on-the-job type training? In other words, did
[15] you have to attend any classes or did you have
[16] to go out with other workers and watch them or,
[17] you know?

[18] A: Yes, we had railroad films that we were shown
[19] and then taken out by experienced employees and
[20] shown.

[21] Q: You said railroad films. What do you mean by
[22] that?

[23] A: Railroad instructional films.

[24] Q: And what did they involve? What subjects did
[25] they cover?

Page 18

[1] A: Opening, locking, putting a hitch down, putting
[2] them up. What to look for when they're broken.
[3] I mean, as far as what they call an auxiliary
[4] lock. That was one of our functions, to make
[5] sure that auxiliary lock wasn't broken, which is
[6] a safety device to keep the trailer, if it would
[7] slip out of the jaws, to keep it in the hitch.

[8] Q: Can you tell me approximately how many of those
[9] films you viewed? Was it one film or?

[10] A: At that time, it was only one film.

[11] Q: And then how long did you spend out with you
[12] said more experienced employees showing you what
[13] to do? About how long did that take?

[14] A: A day.

[15] Q: Now, when you worked for Pennsylvania Truck
[16] Lines, I'm correct, am I not, that at the time
[17] you worked for them they were owned by Conrail?
[18] Were you aware of that?

[19] A: Yes, sir.

[20] Q: And then it's my understanding that at some
[21] point in time, Pennsylvania Truck Lines went out
[22] of business and another company came in to do
[23] the intermodal work. Is that your
[24] understanding?

[25] A: No, sir, Pennsylvania Truck Lines was owned by

Page 1

[1] the railroad, and then it was sold to railroad
[2] employees and then operated not being owned by
[3] per se the railroad, but other individuals,
[4] which continued as PTL for a certain amount of
[5] time until this other company came in.

[6] Q: And did you continue to work for them —

[7] A: Yes.

[8] Q: — under that arrangement? Did your duties at
[9] all change when that ownership interest changed?

[10] A: The ownership in Pennsylvania Truck Lines?

[11] Q: Yes.

[12] A: No, basically, they stayed the same.

[13] Q: Do you recall when that was that PTL became —
[14] I'm going to use the term "divested" from the
[15] railroad?

[16] A: No, sir, I don't.

[17] Q: Did you receive any other training during the
[18] time that you worked for Pennsylvania Truck
[19] Lines in your job responsibilities? Let me just
[20] clarify it so you know what I'm talking about.
[21] You told me about the films you saw and sort of
[22] being shown by the other employees. And we've
[23] talked about the fact that Pennsylvania Truck
[24] Lines changed ownership. Did you have to
[25] receive any other training beyond the film that

Page 2

[1] you mentioned and the day of sort of on-the-job
[2] training you received when you started?

[3] A: Not with Pennsylvania Truck Lines.

[4] Q: Now, at some point in time, Pennsylvania Truck
[5] Lines no longer does the intermodal work at the
[6] Harrisburg yard. Correct?

[7] A: Yes, sir.

[8] Q: It's my understanding another company called
[9] Pacific Rail Services begins to do that work.
[10] Is that your recollection?

[11] A: That's correct.

[12] Q: Do you recall when that was?

[13] A: 1992.

[14] Q: And I believe that's sort of referred to as
[15] PacRail. Is that?

[16] A: Correct.

[17] Q: Did you go right from working for PTL to PacRail
[18] or was there a period of time when you didn't
[19] work?

[20] A: Yes, there was.

[21] Q: How long was that period of time?

[22] A: I'd say eight months, nine months, in between
[23] there somewhere.

[24] Q: Did you work during that eight or nine months?

[25] A: Yes, sir, I did.

Page 21

[1]   Q: Where did you work?

[2]   A: Chemical Leamen.

[3]   Q: Can you spell the last part?

[4]   A: L-e-a-m-a-n — or e-n, I'm sorry.

[5]   Q: And what did you do for them?

[6]   A: I was a truck driver.

[7]   Q: And what did the company do? What was their

[8]  product?

[9]   A: We hauled chemicals. But as work arised, I did

[10] work — as work was available, I would be called

[11] in to the rail yard.

[12]   Q: So were you working both places during this

[13] eight or nine months?

[14]   A: Yes.

[15]   Q: Can you give me a percentage or a fraction

[16] during the eight or nine months how much you

[17] worked at PacRail and how much for the trucking

[18] company, Chemical?

[19]   A: I worked more for Chemical Leamen at that time.

[20]   Q: And then at some point in time, you became

[21] full-time at PacRail?

[22]   A: Yes, as the work warranted it. Yes, I did.

[23]   Q: And do you recall when that was?

[24]   A: No, sir, I can't.

[25]   Q: When you began to work, I guess first part-time

Page 22

[1] for PacRail, did they require that you undertake

[2] any new or additional training on your job

[3] duties or view any more films or have any more

[4] training for employees, anything of that nature?

[5]   A: Yes, sir, they required us to look at one of

[6] their railroad tapes. And — Because then for

[7] myself, there was no need to be taken out and

[8] have another individual show us.

[9]   Q: And did you have to look at these additional

[10] tapes during the time you were working part-time

[11] or was that when you became full-time or both?

[12]   A: Both.

[13]   Q: Did they have a regular basis when they would

[14] have you review these films? Was it yearly or

[15] every two years or was there no regularity to it

[16] at all?

[17]   A: No, there was no basis.

[18]   Q: Now, you refer to them as railroad tapes. I

[19] just want to make sure I know what you mean by

[20] that. Were they films or tapes that you

[21] understood were made by the railroad or ones

[22] that showed railroad operations or what do you

[23] mean by railroad tapes?

[24]   A: They were made by the railroad and given to the

[25] company to be shown.

Page 23

[1]   Q: And what types of things did those tapes cover?

[2] I'm talking about the ones you saw at PacRail.

[3]   A: Basically positioning as far as being around the

[4] equipment.

[5]   Q: What types of equipment are you talking about?

[6]   A: The packer. That's the machine that unloads the

[7] rail cars. Unlocking and just knocking them

[8] down, making sure the auxiliary lock-up is up.

[9] Basically, the same tape as it was with PTL.

[10]   Q: And tell me the things that those films showed,

[11] as you recall, about how to position yourself

[12] when dealing with hitches and knocking them

[13] down. What did it tell you to do?

[14]   A: Basically, that film was to make sure that you

[15] were clear of the machine when you were — when

[16] the machine was in movement. That was its main

[17] objective. And to be able to give clear,

[18] incisive signs to the operator of the machine.

[19]   Q: Did those tapes cover anything about opening or

[20] unlocking hitches and lowering them or not?

[21]   A: Yes, sir, they showed what the hitch looked

[22] like. There's numerous hitches, so they showed

[23] numerous hitches and at what part of that hitch

[24] you would go to to unlock that particular type

[25] of hitch.

Page 24

[1]   Q: Did they cover the use of pry bars in operating

[2] hitches at all?

[3]   A: Only where you insert them.

[4]   Q: And what did the film demonstrate or show you

[5] about using pry bars in hitches?

[6]   A: They just showed you where to insert your bar.

[7]   Q: Is that something that you knew before that or

[8] did these films show that to you for the first

[9] time?

[10]   A: No, that was already known from experience in

[11] the — and the previous tape from PTL.

[12]   Q: Other than those films, did you have any

[13] other — and I'm talking about — Well, strike

[14] that. You said at some point in time then, you

[15] began to work full-time for PacRail?

[16]   A: Yes.

[17]   Q: And it's your recollection that was about eight

[18] or nine months after PacRail took over?

[19]   A: Approximately.

[20]   Q: And when you say full-time to me, how many hours

[21] do you mean?

[22]   A: Over 40, 40 and over.

[23]   Q: Once you went full-time, did you receive any

[24] other training or instruction from PacRail on

[25] any of your job duties?

Page 25

[1] **A:** The only thing that was changed when I worked
[2] for PacRail, we went from, as I mentioned, a
[3] five-foot pry bar down to a two-foot pry bar.
[4] And then our work habits changed because we no
[5] longer stayed with the machine.
[6] **Q:** Tell me what you mean by that.
[7] **A:** Well, when you had the five-foot pry bar when it
[8] was Pennsylvania Truck Lines, we were with the
[9] machine constantly.
[10] **Q:** And when you say the machine, you're talking
[11] about the packer?
[12] **A:** Packer, yes, sir. That packer would grab hold
[13] of the trailer and take the pressure off the
[14] hitch, and you could stand on the ground with
[15] the five-foot bar and reach that unlocking
[16] device and open it, because the machine took
[17] that force away from the jaws.
[18] **Q:** Now, tell me how that — Well, besides the
[19] difference in the length of the pry bar, how did
[20] that change with PacRail then?
[21] **A:** PacRail changed it to a two-foot pry bar. You
[22] no longer needed to be with the machine. You
[23] went out and had to open up the trucks with a
[24] two-foot pry bar. You no longer had the machine
[25] to take that pressure off them hitches.

Page 26

[1] **Q:** And how did that change the way you did your
[2] job, if at all?
[3] **A:** It meant that with the shorter bar, I had to
[4] climb up on the rail cars to open the hitches.
[5] **Q:** And the two-foot pry bar that you referred to,
[6] was that supplied to you by PacRail?
[7] **A:** Yes, sir.
[8] **Q:** And the instructions — well, I shouldn't say
[9] instructions — strike that. The changes, I
[10] think you used the word in your work habit that
[11] came about, in other words, that you didn't stay
[12] with the packer and that you used a two-foot pry
[13] bar, were those changes that were communicated
[14] to you by PacRail? In other words, this is the
[15] way you're going to do the job from now on?
[16] **A:** Yes, sir.
[17] **Q:** And do you remember, was that verbally or in
[18] writing, do you remember?
[19] **A:** That was verbally.
[20] **Q:** And do you remember who the person was who
[21] instructed you that's the way things were going
[22] to be done?
[23] **A:** No, sir, I can't remember his name anymore.
[24] **Q:** Was he a PacRail person?
[25] **A:** Yes, he was, and he was from New Jersey.

Page ...

[1] **Q:** Now, you said that you no longer had to stay
[2] with the packer. And you said before that you
[3] always worked right alongside the machine, so to
[4] speak. How then did it change what you did in
[5] that respect? In other words, if you're no
[6] longer with the machine, you have a shorter bar,
[7] tell me what it is you do now as opposed to what
[8] you did before.
[9] **A:** The change was that because we used the shorter
[10] bar, we actually crawled up on the rail car,
[11] opened the hitch and cranked the dolly legs of
[12] the trailer unit down to the floor, that when
[13] the machine later came along and picked it up
[14] off the rail car and set it down that it was
[15] already finished, whereas before we stayed with
[16] the machine. He'd do it and drop it off the car
[17] and we'd still stand around and crank the dolly
[18] legs down. So everything that we did with the
[19] shorter bar was basically on the rail car.
[20] **Q:** Now, were there any other changes in your work
[21] procedures that you recall when you went full
[22] time at PacRail other than what you've just
[23] described?
[24] **A:** No, sir.
[25] **Q:** Now, at some point in time, PacRail no longer

Page ...

[1] does the intermodal work and a company called
[2] GPS Terminal Services, Inc., which we're going
[3] to call GPS, takes over those operations. Is
[4] that your understanding?
[5] **A:** Yes, sir.
[6] **Q:** Did you continue to work for GPS or was there —
[7] Did you get laid off or what happened?
[8] **A:** Yes, sir, there was about a two-week time frame
[9] until I went to work for GPS.
[10] **Q:** And when you went to work for GPS, did you
[11] actually have to fill out an application or
[12] anything or did you —
[13] **A:** Yes, sir.
[14] **Q:** — walk right in the door, so to speak?
[15] **A:** No, sir.
[16] **Q:** You filled out an application?
[17] **A:** Yes, sir, I did.
[18] **Q:** And after this two-week time frame, did you then
[19] go back to work for — excuse me — did you then
[20] begin to work for GPS full-time? By that I mean
[21] what you said before, 40 plus hours?
[22] **A:** Yes, sir.
[23] **Q:** Was there ever a point in time — Strike that.
[24] Do you remember when GPS took over?
[25] **A:** In 1996.

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

Page 29

[1]    Q: Was there ever a period of time after you
[2] started working full-time for GPS that you were
[3] furloughed or laid off for any period of time up
[4] until the time of your accident? And I'm
[5] excluding vacations and sick time off.
[6]    A: No, sir.
[7]    Q: When you began to work for GPS, did they require
[8] that you view any instructional films or videos?
[9]    A: Yes, sir.
[10]    Q: And tell me about those.
[11]    A: They were basically the same tapes that were
[12] shown to us previously by Pennsylvania Truck
[13] Lines and PacRail, Pacific Rail.
[14]    Q: Now, you said tapes. Were there more than one?
[15]    A: Yes, sir.
[16]    Q: And if you began working for them sometime in
[17] '96, when is it you viewed those tapes? And I
[18] don't expect you to give me an exact time, but
[19] was it right after you started, was it every
[20] year, every month, every six months?
[21]    A: It was basically right after I began my
[22] employment with GPS.
[23]    Q: And other than that time, have you since had to
[24] view any other tapes or view those tapes again
[25] since you first started working for them?

Page 30

[1]    A: Not to my recollection or knowledge.
[2]    Q: Other than the tapes or films, have you had to
[3] undergo any other type of training from GPS
[4] about anything associated with your job duties?
[5] I want you to concentrate on from '96 up until
[6] the time of your accident.
[7]    A: No, sir.
[8]    Q: Did anything about your work habits that you had
[9] change with GPS as opposed to the way you had
[10] done things with PacRail?
[11]    A: No, sir.
[12]    Q: So you still used the two-foot bar?
[13]    A: Yes, sir.
[14]    Q: And you didn't have to stay with the machine,
[15] the packer?
[16]    A: Yes, sir.
[17]    Q: When you worked for GPS, were you ever given any
[18] type of a safety book or any book of safety
[19] instructions or rules that you had to follow
[20] when you were working for GPS?
[21]    A: Not that I recall.
[22]    Q: I'm not sure if I asked this or not. I
[23] apologize if I'm repeating it. Other than the
[24] films and tapes you mentioned, did GPS require
[25] you to undergo any other type of training or

Page 31

[1] instruction when they took over the intermodal
[2] operations?
[3]    A: Not that I can remember.
[4]    Q: Other than the films and tapes that you
[5] mentioned, did either Conrail or Norfolk
[6] Southern ever require you to attend any type of
[7] classes or seminars on how to perform your work
[8] or safety rules or safety instructions?
[9]    A: No, not that I can recall. All I know is that
[10] the tapes were provided by the railroad.
[11]    Q: Now, what I want to concentrate on now, Mr.
[12] Wilkinson, is your accident was back in June of
[13] '99, so I want you to tell me sort of what a
[14] typical day was for you prior to your accident.
[15] In other words, did you work a certain shift,
[16] where did you report for work, that type of
[17] thing, and then I'll ask you some questions once
[18] we get past those.
[19]    Did you work a particular shift back in
[20] June of '99?
[21]    A: Yes, sir, I did, 4:00 a.m. to 2:00 p.m. shift.
[22]    Q: And was that — what days of the week?
[23]    A: That I'm not sure. I think I worked Tuesday
[24] through Saturday.
[25]    Q: And Sunday and Monday were your days off?

Page 32

[1]    A: Yes, sir.
[2]    Q: Where did you report for work?
[3]    A: Before I started work, where I went to?
[4]    Q: Right, in other words, when you showed up for
[5] work that morning, where would you go first?
[6]    A: We'd go first to our trailer, our little area
[7] where we had our clothing.
[8]    Q: And then did you change clothes?
[9]    A: Yes, sir.
[10]    Q: Once you did that, then where would you go?
[11]    A: Then we'd go to the railroad programmer to find
[12] out where our work was, on what track, what had
[13] to be done, where it had to be — if there was
[14] trains to be unloaded or stuff to be loaded.
[15]    Q: Now, you said that "we" went to the railroad
[16] programmer. I have a vision in my mind of a
[17] bunch of people going to see this. How did that
[18] work physically? Did you actually go to
[19] someone's office or did you go to a computer
[20] screen or how did you —
[21]    A: No, sir, we usually went to the office where the
[22] programmer was. He's the one that controlled
[23] what had to be loaded or what needed to be
[24] unloaded.
[25]    Q: Do you remember who that was back in June of

Case 2:01-cv-00815-SJF   Document 22   Filed 07/15/2002   Page 13 of 107

Wilkinson & Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilki
June 10, 2

Page 33

[1] '99?

[2] **A:** No, sir, I don't.

[3] **Q:** Did you ever know his name?

[4] **A:** I probably know his name, but I don't know who

[5] was working at that time.

[6] **Q:** And this railroad programmer, as you called him,

[7] he would tell you what in terms of?

[8] **A:** Our assignments, what train came in that had to

[9] be unloaded or what trailers had to be loaded

[10] for the outbound train.

[11] **Q:** And are you the one that would go and get those

[12] instructions or would somebody else go and then

[13] communicate those back to you?

[14] **A:** At times, I did. Other times, other people

[15] would.

[16] **Q:** And how is it determined who would get those

[17] instructions?

[18] **A:** Usually the working foreman would do that.

[19] **Q:** Now, tell me what you mean by a working foreman?

[20] **A:** He's just an employee that is called — in

[21] charge of getting the work assignments and

[22] distributing the men to where the work had to be

[23] done.

[24] **Q:** And how was it determined like who would —

[25] Well, strike that. Was it always the same

Page 34

[1] person that acted as the working foreman on your

[2] shift or did it change?

[3] **A:** No, sir. Whoever went up to the railroad's

[4] office to find out where and that, all they did

[5] was relay the message back to the other workers.

[6] **Q:** But how was it determined who did that?

[7] **A:** I don't understand your question.

[8] **Q:** Well, I asked you if it was always the same

[9] person and you said, no, it was whoever would go

[10] up to get the instructions. I'm asking how was

[11] it determined who would do that?

[12] **A:** Well, some days the working foreman didn't work.

[13] He might have had a day off. So just somebody

[14] that would have a little more experience would

[15] just go get the work assignments.

[16] **Q:** Well, I'll tell you what's confusing me, Mr.

[17] Wilkinson, is this. On your shift, you're not

[18] the only person working. Correct?

[19] **A:** Yes, sir.

[20] **Q:** How many other people would be working that same

[21] shift from GPS?

[22] **A:** Four to five.

[23] **Q:** So I'm envisioning that four or five of you

[24] arrive at work that day, that morning. There

[25] has to be some method of determining who's going

Page

[1] to get to the programmer and who's going to do

[2] something else. How is that done?

[3] **A:** Sometimes the working foreman would do it or at

[4] times everyone would go to the office and would

[5] be up there and get the work assignment right

[6] there.

[7] **Q:** Who was the working foreman back in June of '99

[8] **A:** I could have been the working foreman, because I

[9] was a working foreman, or it could have been

[10] someone else, because I don't remember whether I

[11] was or I wasn't.

[12] **Q:** Well, if it wasn't you, who else could it have

[13] been?

[14] **A:** William Wilkinson.

[15] **Q:** William Wilkinson?

[16] **A:** Yes.

[17] **Q:** Is that a relation to you?

[18] **A:** No, sir.

[19] **Q:** Who else?

[20] **A:** Jack Dressler.

[21] **Q:** Anyone else?

[22] **A:** No, sir.

[23] **Q:** And was that something — I understand you're

[24] telling me you don't remember who it was that

[25] day, but is that a job that's bid into or are

Page

[1] you assigned that job? In other words, how do

[2] you know who the working foreman is that day?

[3] **A:** Working foreman, it's a position that is

[4] assigned by GPS.

[5] **Q:** Once you receive the information from the

[6] programmer about which train has to be loaded

[7] and unloaded, it's my understanding there's

[8] different jobs on each shift. There's people

[9] called groundmen that you mentioned before,

[10] there's packer operators, there's jockey truck

[11] drivers. Does that sound correct?

[12] **A:** Partially.

[13] **Q:** Tell me where I'm wrong.

[14] **A:** From the time that that two-foot bar went into

[15] effect, we all opened up the tracks and we all

[16] jockeyed. So there wasn't per se certain

[17] individuals that just jockeyed or certain

[18] individuals that just opened up tracks.

[19] **Q:** Okay, I see what you're saying. Am I correct,

[20] then, on any given shift, was each person

[21] capable of performing all of those jobs?

[22] **A:** Yes, sir.

[23] **Q:** So you could be a packer operator?

[24] **A:** Jockey operator.

[25] **Q:** Or a groundman?

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

---

Page 37

[1]  A: Right. Well, the term actually "groundman"
[2] disappeared with that two-foot bar. Or I mean
[3] with the five-foot bar, excuse me. Actually, we
[4] all opened up the tracks. Other than the
[5] machine operator, because he would start —
[6] after we'd start unlocking the track, he would
[7] start immediately dropping the trailers and
[8] loading the trailers.
[9]  Q: Well, I'll tell you what's confusing, Mr.
[10] Wilkinson — and maybe it's just because I don't
[11] understand how it worked — but, as I understand
[12] it, on your shift there were four or five men
[13] that would show up for work?
[14]  A: Yes, sir.
[15]  Q: And once you got the information as to which
[16] trains need to be loaded and unloaded, at some
[17] point in time somebody has to say, okay, I'm
[18] going to work the packer, I'm going to unlock
[19] the hitch. At some point in time a decision has
[20] to be made who's going to do what. Otherwise,
[21] we'll have five guys climbing on the packer.
[22]  So how did you go about making that
[23] decision? Was it seniority or did the working
[24] foreman say, okay, you do this, you do that? I
[25] mean, how did that happen?

Page 38

[1]  A: Your working foreman assigns your assignments,
[2] but we all shared the same duties. Usually as
[3] far as the machine operator, he would be the
[4] person that was the best qualified on the
[5] machine. And usually we all shared the same
[6] duties. We all opened up the tracks together,
[7] we all jockeyed together. It wasn't one person
[8] being assigned to just opening up the tracks.
[9] On occasion, it might have been, but most of the
[10] time we all shared the duties, other than the
[11] machine operator.
[12]  Q: I understand you could all perform the work, but
[13] I still have no understanding of how it was
[14] decided on that day, at that shift, who would do
[15] what. How is that determined?
[16]  A: Well, first of all, it was determined — The
[17] work was determined by the railroad's programmer
[18] where the work was done. So now we knew where
[19] all the work had to be done. One individual
[20] would get in the machine. The rest of them
[21] individuals would go out to the track with their
[22] bars and unlock the track.
[23]  Q: So at some point in time, one man decides to
[24] operate the machine?
[25]  A: No, usually that's assigned. In other words,

Page 39

[1] that's — usually he's termed the machine
[2] operator.
[3]  Q: Do you remember who that was on the day of your
[4] accident?
[5]  A: Not really. It could have been Norm Zaleck, it
[6] could have been Jack Dressler, I'm not sure.
[7]  Q: And then the remaining men do what then?
[8]  A: Jockey, pull the trailers away.
[9]  Q: And I'm correct, am I not, that the programmer
[10] doesn't say, okay, today, Terry Wilkinson,
[11] you're going to be the groundman and, Jack
[12] Dressler, you're going to be the machine
[13] operator, that's determined among the men on
[14] that shift. Correct?
[15]  A: Yes.
[16]  Q: Now — Strike that. Let's start again. On the
[17] day of your accident — and we're told that's
[18] June 15th, '99 — were you working 4:00 to 2:00?
[19] Was it 4:00 to 2:00 you told me was your shift?
[20]  MR. MYERS: 4:00 to 2:00.
[21]  A: Yes, sir.
[22]  BY MR. STAUDENMAIER:
[23]  Q: You were assigned to work that shift?
[24]  A: Yes, sir.
[25]  Q: When you reported that morning, tell me what you

Page 40

[1] did when you got to work and where you went from
[2] there.
[3]  A: As I said before, we went into our trailer,
[4] changed our clothes. I'm not — I can't
[5] remember if I had gone up, if I was the working
[6] foreman, to find out where the train was at or
[7] where it was placed on the tracks to do the
[8] work.
[9]  After we did get the assignment from the
[10] programmer and find out where the trains were
[11] and where we were supposed to go to unload the
[12] train, we went out and started opening up the
[13] hitches. And then at which point I started at
[14] one end of the track and started unlocking it,
[15] and I got into that one bad hitch and that's
[16] when I hurt myself.
[17]  Q: All right, now, let me back you up. You said
[18] you came in and you said you may have been the
[19] person that went —
[20]  A: Yes, I don't remember.
[21]  Q: And, basically, the programmer tells you where
[22] the train is located?
[23]  A: Yes, they tell us where to go, what has to be
[24] done.
[25]  Q: And just so — You say tell you where to go.

---

Min-U-Script®    Filius  &  McLucas Reporting Service, Inc.

Gregory Wilkinson & Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkin
June 10, 2

Page 41

[1] A: Yes.

[2] Q: Do they tell you where the train is located [3] you're supposed to work on?

[4] A: Yes, they tell us what they need unloaded or [5] what has to be put back on.

[6] Q: And when you say that, in terms of do they tell [7] you which trailers have to be removed from the [8] train and which have to be put back on? Is [9] that —

[10] A: Yes, sir.

[11] Q: — a fair way to say it? And then you said you [12] got those instructions and then you went?

[13] A: And began unlocking the train.

[14] Q: Where was the train located that you were [15] working on?

[16] A: I think it was on Track 14.

[17] Q: Now, when you say Track 14, which track are you [18] talking about, just to make sure that your [19] designations and the railroad's designations [20] match up?

[21] A: As compared to the railroad office, it would be [22] the track to your right side by the rail mill.

[23] MR. MYERS: By the what?

[24] A: By the rail mill.

[25] BY MR. STAUDENMAIER:

Page 42

[1] Q: And did you start on one end of that train or [2] the other?

[3] A: Yes, sir.

[4] Q: Did you start on the end closer to the railroad [5] office or closer to the PacRail office?

[6] A: That day, I started closer to the railroad [7] office.

[8] Q: And you were going along and you were doing [9] what?

[10] A: Opening up the hitches, using my bar to open up [11] the hitches, and cranking the dolly legs.

[12] Q: Now, when you use the term "open up the [13] hitches," what do you mean? In other words, [14] what's the purpose of what you're doing? What [15] does it do that aides in —

[16] A: Opening up a hitch consists of unlocking a pin [17] that leaves the jaws open to slide that trailer [18] out from the machine.

[19] Q: And when you're doing this, tell me how you — [20] Well, first of all, how do you get from where [21] the programmer tells you the location of the [22] train to where you actually start doing your [23] work? Do you walk, do you ride?

[24] A: We usually drive our jockeys to the programmer's [25] or the railroad's office or programmer's. Well,

Pag

[1] it's the railroad's office, but the programmer [2] is in there.

[3] Q: Is that your recollection of what you did that [4] morning?

[5] A: Yes.

[6] Q: And did you ride one of the jockey — or drive [7] one of the jockey tractors from the railroad [8] office to where the train was?

[9] A: The track, yes.

[10] Q: Were you alone or with someone?

[11] A: We all worked alone, because one person would [12] start at one end of the track, one person at the [13] other end of the track and one person in the [14] middle.

[15] Q: And did you actually start at the end of the [16] train or did you start somewhere into the train?

[17] A: At the end of the train.

[18] Q: And you said you began unlocking the hitches?

[19] A: Yes, sir.

[20] Q: To do that, tell me physically how you get from [21] your jockey tractor to where the hitch is [22] located to unlock it?

[23] A: You walk.

[24] Q: Tell me what happened. I mean, you're in the [25] jockey truck?

Page

[1] A: I'm in the jockey truck. I park the jockey and [2] walk to the rail car, crawl up on the rail car, [3] insert the bar, snap it open, crank the dolly [4] legs, then proceed to the next car to do the [5] same operation.

[6] Q: And did your accident happen on the first one [7] you did?

[8] A: No, sir.

[9] Q: Can you give me approximately how many you had [10] done until you reached that particular car?

[11] A: No, sir, I don't remember.

[12] Q: Do you remember the designation of the car you [13] were working on where your accident happened?

[14] A: I don't understand.

[15] Q: The make, name, anything of that nature?

[16] A: No, sir, I don't.

[17] Q: Tell me what happened when you got up onto the [18] rail car where your accident happened.

[19] A: How?

[20] Q: Tell me what happened.

[21] A: As I was putting — It was dark, you couldn't [22] see, so I put what I assumed into the female [23] slot for your bar, and I gave a quick snap and [24] the bar slipped out. And I went to catch myself [25] and that's when I tore my shoulder rotator cuff.

Case 1:01-cv-01140-SHR    Document 22    Filed 07/15/2002    Page 16 of 107

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

**Page 45**

[1] **Q:** Okay, now, let me back up a minute. When you
[2] got to this rail car where you were going to
[3] unlock this hitch, do you step from rail car to
[4] rail car or do you have to climb down each one
[5] and back up again?

[6] **A:** You have to climb up and down each individual
[7] car.

[8] **Q:** And did you climb up onto this one?

[9] **A:** Yes, sir, I did.

[10] **Q:** Now, the rail car you were working on, was there
[11] one or more trailers on it?

[12] **A:** I really don't remember.

[13] **Q:** Do you remember whether you were on the end of
[14] the car closer to the railroad office or closer
[15] to the GPS office?

[16] **A:** I think towards the GPS office.

[17] **Q:** Now, you said you climbed up. How do you go
[18] about inserting the bar into this mechanism?

[19] **A:** You usually use one hand to balance it and the
[20] other one to kind of hit the hole to insert your
[21] bar. And then once it was in, then you would
[22] get to the fullest point of the bar where you
[23] get the most leverage that you could use your
[24] body weight and your force to snap this pin out
[25] or open up the jaws.

**Page 46**

[1] **Q:** Do you move the bar like back and forth
[2] horizontally or do you move it up and down
[3] vertically?

[4] **A:** You usually pull it towards you, because you
[5] have more force. Basically, that's up to —
[6] Individuals would do it differently.

[7] **Q:** But I'm asking when you do it.

[8] **A:** When I do it, I pull it towards me.

[9] **Q:** And is that what you did that day?

[10] **A:** Yes, sir.

[11] **Q:** Now, how do you know where to insert it? By
[12] "it" I mean the bar.

[13] **A:** It's basically in that situation, you're
[14] guessing. But doing it so many times, you just
[15] basically have the general knowledge right where
[16] that opening is.

[17] **Q:** Did you actually see the opening that you
[18] inserted the bar into —

[19] **A:** No, sir.

[20] **Q:** — before you put it in?

[21] **A:** No. I mean, there's a point until you can see,
[22] but it's dark. I mean, it's like guesswork.

[23] **Q:** So when you inserted the bar, did you actually
[24] see the end of the bar go into the unlocking
[25] female end that you mentioned?

**Page 47**

[1] **A:** You can tell.

[2] **Q:** Well, no, my question was, did you actually see
[3] the end of the bar go into the female end?

[4] **A:** No, sir.

[5] **Q:** And you put the bar in and then you pulled it
[6] towards you?

[7] **A:** Yes, sir.

[8] **Q:** And when you pulled it towards you, what
[9] happened?

[10] **A:** At that point when I was back at my full
[11] momentum, the bar came out.

[12] **Q:** And when you say it came out, how did it come
[13] out?

[14] **A:** It just popped right out. And being that I was
[15] on both legs, the force was going to take me off
[16] the car.

[17] **Q:** And what did you do?

[18] **A:** I reached out and grabbed the trailer above me
[19] to keep me from going off the car.

[20] **Q:** I'm sorry, you grabbed the trailer above you?

[21] **A:** Yes, sir.

[22] **Q:** I don't understand what you mean by that.

[23] **A:** The trailer above me. There's a trailer above
[24] the hitch. In other words, the trailer is
[25] sitting on that hitch.

**Page 48**

[1] **MR. MYERS:** Showing you the picture, which
[2] is what?

[3] **BY MR. STAUDENMAIER:**

[4] **Q:** Well, let's do it this way. Let's back up a
[5] minute. Was there more — Well, I've asked you
[6] if there was more than one trailer on the car
[7] and you said you don't remember. Correct?

[8] **A:** Yes, sir.

[9] **Q:** And this wasn't a double-stacked container, was
[10] it?

[11] **A:** No, sir.

[12] **Q:** And when you say you grabbed the trailer above
[13] you, did you grab onto the trailer that was on
[14] the rail car?

[15] **A:** Yes, sir. Yes, sir.

[16] **Q:** And I'm not sure I understand what you mean by
[17] above you.

[18] **A:** Well, you're between the trailer and the floor
[19] of the rail car.

[20] **Q:** And are you standing up?

[21] **A:** No, it's not enough room.

[22] **Q:** Are you kneeling?

[23] **A:** You're kneeling on both knees. I was on both
[24] knees.

[25] **Q:** So you're kneeling down and your knees are on

Page 49

[1] the floor of the rail car?

[2] A: Yes, sir.

[3] Q: And when you're kneeling down like that, can you
[4] see underneath the trailer or is the body of the
[5] trailer still below your level of sight?

[6] A: No, sir, the trailer is above me.

[7] Q: How far above you?

[8] A: Three and a half to four feet, in that area.

[9] Q: And so you were on your knees, you inserted the
[10] bar, you pulled it towards you, and you said it
[11] came out. And then you said you grabbed the
[12] trailer above you. How did you grab for it?

[13] A: I extended my arm out like this to keep me from
[14] falling backwards.

[15] Q: You're motioning with your right arm?

[16] A: Yes, sir.

[17] Q: When you kneeled down, was the trailer to your
[18] right or to the left of you?

[19] A: It's above you.

[20] Q: But is it to your right or to your left or are
[21] you actually physically underneath the trailer?

[22] A: You are underneath the trailer physically.

[23] Q: So you climb up on the rail car and you kneel
[24] down and you actually position yourself
[25] underneath the trailer?

Page 50

[1] A: Yes, sir.

[2] Q: Are you able to be on your knees and have your
[3] torso straight up —

[4] A: No, sir.

[5] Q: — or do you have to hunch over?

[6] A: No, sir, you have to hump over.

[7] Q: How tall are you, Mr. Wilkinson?

[8] A: Six foot.

[9] Q: What did you grab onto?

[10] A: I either caught what they call a fifth wheel
[11] plate on the trailer or what they call a floor
[12] support. They're like just support for the
[13] flooring of the trailer. I don't remember what
[14] I grabbed, but.

[15] Q: And you grabbed it with your?

[16] A: Right hand.

[17] Q: How did you extend your arm? Was it directly
[18] out to your side, above you, below you? How did
[19] you do it?

[20] A: It was extended out on an angle above me.

[21] Q: What about your left hand, your left arm?

[22] A: I think that was going back like this.

[23] Q: When you say "back like this," you placed your
[24] left hand behind you?

[25] A: Yes, sir.

Page ...

[1] Q: At like a 45-degree angle?

[2] A: Yes, sir.

[3] Q: And what was the purpose of doing that?

[4] A: That was to make sure — I was going to support
[5] my fall. But I wasn't — It was to support the
[6] fall. Also, it gave me an indication if there
[7] was more flooring back there or if I was going
[8] on the ground.

[9] Q: If you're on your knees and you're underneath
[10] the trailer, how is it you thought you were
[11] going to fall on the ground?

[12] A: Because if I didn't catch myself, the momentum
[13] would have took me off that car.

[14] Q: You said you were underneath the trailer. Were
[15] you entirely underneath the trailer or was there
[16] a part of your body that was beyond the edge of
[17] the trailer?

[18] A: Each — I don't remember my exact positioning as
[19] far as the end of the trailer, because each
[20] individual hitch has a certain and different
[21] distance from the end of the car and its
[22] position into the car. In other words, some can
[23] be in from the end further than others. And
[24] there's a reason behind that, that they can load
[25] refrigerator units or containers on. So each

Page 5...

[1] individual car has a different spacing from the
[2] upright of that hitch to the end of the car.

[3] Q: I understand what you're telling me and I'm just
[4] trying to get a handle on where you were with
[5] relation Let's do it this way. The way
[6] that the trailer was situated on the rail car,
[7] we're going to call the hitch, where the hitch
[8] is located, I'm going to call that towards the
[9] front end of the trailer. Does that seem like a
[10] fair statement to you?

[11] A: Usually.

[12] Q: And the wheels would be towards the back. Does
[13] that sound —

[14] A: Right.

[15] Q: Now, when you placed yourself under the trailer
[16] to open the hitch, as you've described it, were
[17] you between the hitch and the wheels or were you
[18] between the hitch and the front of the trailer?

[19] A: The hitch and the front of the trailer.

[20] Q: Is it your recollection that the front of the
[21] trailer where the hitch was was closer to the
[22] railroad office or closer to GPS's office?

[23] A: I'd say closer to GPS's office.

[24] Q: And which way was the front of the — Does that
[25] mean the front of the trailer was facing GPS's

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

---

Page 53

[1] office?

[2]   A: Yes.

[3]   Q: You said the bar that you were using was two

[4] feet long?

[5]   A: Roughly in that area, two feet.

[6]   Q: And just because in the complaint, it refers to

[7] it I think as closer to three feet, like 33

[8] inches, which I'm just asking

[9]   A: Yes, it could have been.

[10]   (Discussion held off the record.)

[11]        BY MR. STAUDENMAIER:

[12]   Q: And when you kneeled down and you went to place

[13] the bar, were you facing GPS's office or the

[14] railroad office?

[15]   A: The railroad office.

[16]   Q: Okay, you described for us, then you said you

[17] grabbed with your right arm and put your left

[18] hand behind you. After the bar came out, what

[19] happened to your body? Did you end up, were you

[20] still on your knees, did you fall backwards,

[21] sideways, forwards, did you stay still, what

[22] happened?

[23]   A: I was on my knees. At that point when I caught

[24] the trailer to prevent me from going off the

[25] car, I had this pop in my shoulder. I got

---

Page 54

[1] extreme pain down my arm and then my arm went

[2] completely numb.

[3]   Q: Did you hit your arm on anything?

[4]   A: Not that I recall.

[5]   Q: Did you hit your arm with the bar?

[6]   A: Not that I recall.

[7]   Q: Did you ever come off of the rail car at all?

[8]   A: No, sir.

[9]   Q: And by that I mean —

[10]   A: Fall off?

[11]   Q: — while this was happening, did you fall off?

[12]   MR. MYERS: I'm saying he's here, isn't he?

[13]   A: No, sir.

[14]        BY MR. STAUDENMAIER:

[15]   Q: Then what did you do?

[16]   A: I sat there for a minute until I got feeling

[17] back in my arm and the pain went away. Well, I

[18] mean, it just was a streak of pain right down to

[19] my hands. And then I sat there, just kind of

[20] recovered a little bit. And then I put my hand

[21] up to feel that hitch and that's when I could

[22] tell that it was flared out. It was just a

[23] sloppy bar that wouldn't take our bars. It was

[24] just flared out.

[25]   Q: Well, tell me what you mean it was flared out.

---

Page 55

[1]   A: It was misshaped, it was deformed.

[2]   Q: How was it misshapen?

[3]   A: It was just a sloppy, flared out thing. It was

[4] just ugly looking.

[5]   Q: What shape is it supposed to be?

[6]   A: It's supposed to be square or rectangle.

[7]   Q: And what shape was it then?

[8]   A: It was flared out, just bent and cracked.

[9]   Q: How was it bent?

[10]   A: I really just felt the ends. It was just

[11] flared, mushroomed out.

[12]   Q: Could you see the unlocking hole or whatever you

[13] want to call it?

[14]   A: No, sir. That's why I felt it. I was feeling

[15] up there.

[16]   Q: Did you ever at any time see physically what it

[17] looked like with your eyes?

[18]   A: Probably later in the day. I think I went back

[19] to look at that car.

[20]   Q: And did you take any photographs of it?

[21]   A: No, sir, I didn't.

[22]   Q: And when you went back, did you go back with

[23] anyone else to look at it?

[24]   A: No, sir, because I didn't think the injury was

[25] the extent it was.

---

Page 56

[1]   Q: While you were performing your job there on the

[2] rail car when your accident happened, was there

[3] anyone else there with you?

[4]   A: No, sir.

[5]   Q: Was there anyone from the railroad present?

[6]   A: No, sir.

[7]   MR. STAUDENMAIER: There's some photos

[8] here, Bob, that we don't have from before.

[9] These two. Do you know why?

[10]   MR. MYERS: No. I don't do discovery.

[11]        BY MR. STAUDENMAIER:

[12]   Q: Let's do it this way first. Mr. Wilkinson, I'm

[13] going to show you —

[14]   MR. STAUDENMAIER: Why don't you mark

[15] these.

[16]   MR. MYERS: I did bring all them with me

[17] today.

[18]   MR. STAUDENMAIER: We're glad.

[19]   (Wilkinson Deposition Exhibit Nos. 1 and 2

[20] produced and marked for identification.)

[21]        BY MR. STAUDENMAIER:

[22]   Q: Mr. Wilkinson, what I'm showing you is marked

[23] Wilkinson Exhibit 1 and 2. And Wilkinson 1 is a

[24] photocopy of four Polaroid photographs. And

[25] they're marked in the upper left-hand corner of

---

Terry Boyd Wilkinson & Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkin...
June 10, 2...

Page 57

[1] each photograph Group A, one, two, three and
[2] four. And then Wilkinson 2 is another set of
[3] four photocopies of four Polaroid photographs.
[4] The top two photographs are marked B, one and —
[5] looks like one and one, but I'm going to say one
[6] and two to make it easier. The photograph on
[7] the left at the top we'll say is number one and
[8] the photograph on the top right is number two.
[9] And then the bottom two photographs are marked
[10] Group A, five and six. Okay? And then, Mr.
[11] Wilkinson, these are the Polaroids that go with
[12] them.
[13]   (Discussion held off the record.)
[14]           BY MR. STAUDENMAIER:
[15]   Q: Mr. Wilkinson, have you ever seen those
[16] Polaroids before today?
[17]   A: Yes, sir.
[18]   Q: When did you see them?
[19]   A: I took the pictures.
[20]   Q: When did you take those pictures?
[21]   A: This past year, past summer. This past summer.
[22]   Q: So it would be the summer of 2001?
[23]   A: Yes, somewhere in there.
[24]   Q: Where did you take those pictures?
[25]   A: They were taken at Rutherford.

Page 58

[1]   Q: And is that the rail yard that you currently
[2] work at —
[3]   A: Right now, yes.
[4]   Q: — for GPS?
[5]   A: Yes.
[6]   Q: Now, are those photographs, any of them, of the
[7] hitch that was involved in your accident?
[8]   A: No, sir.
[9]   Q: Was there anyone else present with you when you
[10] took those photographs?
[11]   A: No, sir.
[12]   Q: Mr. Wilkinson, let's look at Wilkinson No. 1
[13] first. Well, 1 and 2 are the photographs.
[14] Some are marked Group B and some are marked
[15] Group A. What's the difference between Group A
[16] and Group B?
[17]   A: Group A is all the style hitches I believe that
[18] I tried to mate with that particular bar
[19] unlocking device.
[20]   Q: I'm sorry, I'm not sure I understand what you
[21] mean.
[22]   A: These are all the same unlocking devices. This
[23] is a different type of unlocking device.
[24]   Q: Group A, the six photographs all show the same
[25] type of unlocking device?

Page ...

[1]   A: Correct.
[2]   Q: Are Group A all the same type of hitch?
[3]   A: Yes, I believe. I'm not sure, I believe they
[4] are.
[5]   Q: And Group B is a different type of unlocking
[6] mechanism. Is that what you're saying?
[7]   A: Yes, sir, it is.
[8]   Q: Are the two photographs shown as Group B the
[9] same type of hitch?
[10]   A: No, sir, they're different.
[11]   Q: Let's talk about Group A first then. Group A,
[12] photograph number one shows a hitch and then
[13] someone has put an ellipse with some arrows on
[14] the photograph?
[15]   A: Yes, sir, I did that.
[16]   Q: And what —
[17]   A: That was representing a good unlocking device.
[18]   Q: Tell me what you mean by a good unlocking
[19] device.
[20]   A: A good square rectangle receiver that isn't bent
[21] too much. There is a little bend in it, in that
[22] hitching device.
[23]   Q: And what about photograph number two?
[24]   A: That's a bad unlocking device because it's
[25] cracked. Right there you can see the crack and

Page ...

[1] it's flared and flaring out.
[2]   Q: And the crack you referred to, you're referring
[3] to the lower left-hand corner of the square or
[4] rectangle in the middle of the photograph?
[5]   A: Yes, sir.
[6]   Q: And what about picture number three?
[7]   A: Okay, that unlocking device is flaring out and
[8] it's also bent down. They are supposed to be
[9] straight.
[10]   Q: And, here again, you're referring to the small
[11] square rectangle on that side of the photograph?
[12]   A: Right.
[13]   Q: What about photograph number four on Exhibit No.
[14] 1?
[15]   A: Number four, that's a bar completely missing in
[16] that hitching device. So at that point you
[17] would have to crawl underneath the car,
[18] underneath, have the machine grab ahold of it,
[19] the trailer that's sitting on that device, and
[20] insert your bar through that hole there, and
[21] there's a little pin that you would try to get
[22] your bar under. And when that machine took that
[23] pressure off, you would be able to open it.
[24]   Q: What about on Exhibit No. 2, picture number five
[25] of Group A?

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

---

Page 61

[1] **A:** That bar is completely misshaped. It's bent
[2] down, it's bent in there.
[3] **Q:** And by the "bar," what are you referring to?
[4] **A:** This —
[5] **Q:** I'll tell you what, why don't you just circle it
[6] with this pen on Exhibit No. 2.
[7] **A:** This is the complete bar from this end to this
[8] end.
[9] **Q:** Why don't you just circle it. Make it dark
[10] enough so we can see.
[11] **A:** (Witness complies.)
[12] **Q:** And just do me a favor. Off to the right of
[13] that, put a little arrow thing and put "bar" so
[14] we know when we read it what you're referring
[15] to.
[16] **A:** (Witness complies.)
[17] **Q:** Then picture number six on Exhibit 2?
[18] **A:** Okay, that's basically the receiver's flared
[19] out. The bar is bent down. There it's kind of
[20] bent up in the center. Just a misshaped,
[21] misformed unlocking device.
[22] **Q:** And then let's go to Group B, two pictures of
[23] Group B on Exhibit No. 2. Let's take the
[24] picture in the upper left-hand corner first.
[25] What does that show?

---

Page 62

[1] **A:** That looks like a — That's a different hitch,
[2] different particular style of hitch, that you
[3] would use an upswing motion to open that hitch.
[4] That picture there —
[5] **Q:** Well, now, wait, now you're referring to the
[6] picture in the upper right-hand corner. Go
[7] ahead.
[8] **A:** Let me start all over again.
[9] **Q:** Okay.
[10] **A:** This is a normal hitch.
[11] **Q:** And you're referring to the picture in the upper
[12] left-hand corner of Exhibit 2?
[13] **A:** Yes, which is different than Group A.
[14] **Q:** Okay. And the picture in the upper right-hand
[15] corner of Exhibit No. 2?
[16] **A:** This is the same as this hitch, but you can see
[17] that this bar is bent up against the trailer,
[18] which this has a trailer here. This is your
[19] fifth wheel plate, and it's bent up there into
[20] the plate.
[21] **Q:** Now, are you able to tell me with certainty
[22] which of the type that you were working on at
[23] the time your accident happened?
[24] **A:** These.
[25] **Q:** You're referring to Group A?

---

Page 63

[1] **A:** Yes, sir.
[2] **Q:** And how are you sure it's that type as opposed
[3] to Group B?
[4] **A:** Group B, this particular hitch on this —
[5] probably this particular car, you didn't have to
[6] crawl up on the car. You could stand on the
[7] ground and open it. These are usually on spine
[8] cars.
[9] **Q:** You're referring to Group B as opposed to Group
[10] A, which are used for what type of cars?
[11] **A:** They're different. They're what we refer to as
[12] a flat car.
[13] **Q:** In your job, would you see one more than the
[14] other? Was there more Group A than Group B or
[15] are they evenly or what?
[16] **A:** You see more of the Group A.
[17]     (Wilkinson Deposition Exhibit No. 3
[18] produced and marked for identification.)
[19]     **BY MR. STAUDENMAIER:**
[20] **Q:** Today your counsel has given us two other
[21] photographs, and we'll make photocopies of these
[22] in a minute. We'll mark these as Wilkinson
[23] Exhibit No. 3. And they're also marked as Group
[24] A one and two.
[25]     Have you seen these photographs before

---

Page 64

[1] today?
[2] **A:** Yes, sir.
[3] **Q:** Who took these photographs?
[4] **A:** I did, sir.
[5] **Q:** And when did you take these photographs?
[6] **A:** The same time that I took them.
[7] **Q:** And by "them" you mean Exhibit 1 and 2?
[8] **A:** Yes, sir.
[9] **Q:** And what are we looking in Exhibit No. 3, Group
[10] A, pictures one and two?
[11] **A:** Okay, this bar is totally — My opinion, it's
[12] destroyed. It's just completely separated from
[13] the bar at this end.
[14] **Q:** And you're referring to the — Well, in Group A,
[15] picture number two on Exhibit 3, someone has
[16] placed a pen mark?
[17] **A:** Right, that picture was taken close up, but it's
[18] exactly the same as that. And that was to
[19] represent the separation, instead of being
[20] square how it's separated from the bar. As you
[21] can see the flat part on Group 1, that
[22] totally —
[23] **Q:** Hold on, wait here. You're referring to picture
[24] number one in Group A?
[25] **A:** Yes.

---

**Min-U-Script®**    Filius  &  McLucas Reporting Service, Inc.

Floyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilki
June 10,

Page 65

[1] Q: Which is on Exhibit No. 1. Go ahead.

[2] A: As you can see, Group A, number one picture,
[3] that it's totally intact with that bar. That's
[4] not even intact.

[5] Q: And are either picture on Exhibit No. 3 — and
[6] that would be the two there — are either of
[7] those a picture of the hitch that your accident
[8] occurred on?

[9] A: No, sir.

[10] Q: Now, as you go along that evening and you're
[11] doing your unlocking, are you checking out the
[12] unlocking mechanism before you insert the bar?

[13] A: You can't check it out because it's — at that
[14] time of the morning, it was too dark.

[15] Q: Does GPS have flashlights available for you to
[16] use?

[17] A: They did at one time provide flashlights, but
[18] they — that happened sometime after the
[19] distribution of flashlights and which were never
[20] replaced.

[21] Q: So your testimony is that that evening there
[22] were no flashlights available for you to use
[23] from GPS?

[24] A: No, sir.

[25] Q: Before you go about unlocking a hitch, how do

Page 66

[1] you determine whether or not it's in proper
[2] condition for you to open it up or lock or
[3] unlock it at that time?

[4] A: If it's daylight, you can see it.

[5] Q: I'm talking about like you're working from 4:00
[6] to 2:00 in the afternoon.

[7] A: You can't determine that, I mean, unless
[8] something like that happens. In other words,
[9] you're not looking at — You can't see it.
[10] You're just shoving your bar in that receiver
[11] and opening it. And it's more judgment putting
[12] that bar in than anything.

[13] Q: How do you know what type of locking or
[14] unlocking mechanism you're dealing with?

[15] A: By the car, by this hitch.

[16] Q: So you can tell by the rail car and the hitch as
[17] to what type you're dealing with?

[18] A: Basically more by the hitch, because sometimes
[19] these hitches are replaced on cars and they
[20] might put a different type hitch on that car.
[21] But usually by this hitch, the way it's made.

[22] Q: Do you remember the type of car that you were
[23] working on when your accident happened, type of
[24] rail car?

[25] A: No, sir, I don't.

Pa

[1] Q: What did you do then after your accident had
[2] occurred? You told us you were on the car, your
[3] leg — excuse me — your arm hurting and then
[4] you said it went numb. Then what did you do?

[5] A: I crawled back off the car.

[6] Q: And then what did you do after that?

[7] A: I continued my duties for that day.

[8] Q: Did you get that hitch unlocked?

[9] A: That I can't remember, because Probably
[10] not. We probably had to bring the machine back,
[11] but I don't remember.

[12] Q: And I don't want you to guess or assume, Mr.
[13] Wilkinson, only tell me what you remember. Do
[14] you remember unlocking that hitch?

[15] A: No, sir, I don't.

[16] Q: Did you report your accident to anyone?

[17] A: Yes, sir, I did.

[18] Q: And who did you report to?

[19] A: To my supervisor, which he came in between 7:00
[20] and 8:00.

[21] Q: And who would that be?

[22] A: That would have been Larry Heckert.

[23] Q: And what did you tell Mr. Heckert?

[24] A: I just told him that I hurt my arm unlocking the
[25] train and — I just notified him that I injured

Page

[1] my arm.

[2] Q: Did you notify anyone from the railroad?

[3] A: No, sir.

[4] Q: Did Mr. Heckert make out any kind of report?

[5] A: Yes, sir, he did. I'm not sure. Wait, let me
[6] think. I think I filled out the report the next
[7] day, because at that point I thought it might
[8] have been just muscle. I really don't remember.

[9] Q: Now, you say that you recall, though, Mr.
[10] Heckert preparing some kind of a report —

[11] A: Yes, sir.

[12] Q: — or did you actually have to fill it out? I'm
[13] not sure how it works.

[14] A: That I'm not sure.

[15] Q: Did you ever have to write anything down as to
[16] what happened or —

[17] A: Yeah, I think I had to describe it. I don't
[18] even remember if I wrote the description of what
[19] happened.

[20] (Wilkinson Deposition Exhibit No. 4
[21] produced and marked for identification.)

[22] BY MR. STAUDENMAIER:

[23] Q: Mr. Wilkinson, I'll show you what's been marked
[24] as Wilkinson Exhibit No. 4, and that's a copy of
[25] a report that was provided to us by GPS. Have

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 69

[1] you ever seen that document before?

[2] A: Yes, sir, I did.

[3] Q: And is that the report you referred to that you

[4] spoke to Mr. Heckert about?

[5] A: Yes, sir.

[6] Q: And the writing on that report, is that yours?

[7] A: Yes, sir.

[8] Q: On the second page under — it says type of

[9] injury, it says pulled muscles, right shoulder.

[10] You wrote that in there? I'm at the very top of

[11] the page.

[12] A: Yes.

[13] Q: Then underneath that — Well, let's go two lines

[14] underneath that. It says cause of injury and

[15] you have, bar slipped out of hitch locking bar.

[16] Is that what you put in there?

[17] A: Yes.

[18] Q: And then underneath that, it says, did injury or

[19] illness occur on employer's premises, and you

[20] checked yes. Correct?

[21] A: Yes, I did. Now, wait a minute. Yes.

[22] Q: And then it says, what state, and it has Pa.

[23] And the next section over says, were safeguards

[24] or safety equipment provided? You've checked

[25] yes. Do you see that?

Page 70

[1] A: Yes, sir.

[2] Q: What type of safety equipment or safeguards were

[3] provided that you were referring to?

[4] A: That's reflective material, reflective vests,

[5] hard hat, steel-tip shoes.

[6] Q: And then the next block over says, were

[7] safeguards or safety equipment used, and you've

[8] checked yes. Correct?

[9] A: Yes.

[10] Q: And what safeguards or safety equipment were you

[11] referring to?

[12] A: My clothing.

[13] Q: That's the reflective material?

[14] A: Yes.

[15] Q: And the hard hat?

[16] A: Yes.

[17] Q: And the steel-tip shoes?

[18] A: Yes.

[19] Q: And the bar that you were using that night to

[20] unlock the hitches, that was a bar that was

[21] supplied to you by GPS?

[22] A: Yes.

[23] Q: That's not a bar that was given to you by the

[24] railroad. Correct?

[25] A: Correct.

Page 71

[1] Q: And, in fact, it's my understanding that GPS

[2] manufactures those bars or makes them in their

[3] shop. Is that correct?

[4] A: Yes.

[5] Q: And is that your understanding of where the bar

[6] was made that you were using?

[7] A: Yes.

[8] Q: Did you ever have to fill out any other type of

[9] report other than what I've shown you as

[10] Wilkinson Exhibit No. 4?

[11] A: I'm not sure. I don't recall if I did or I

[12] didn't.

[13] Q: Besides your attorneys, did anyone ever speak to

[14] you in person or over the telephone about what

[15] happened the day of your accident and what you

[16] saw or did, that type of thing?

[17] A: No, sir.

[18] Q: Did you ever report your accident directly to

[19] anyone at the railroad?

[20] A: I don't remember, but I don't — I don't recall.

[21] I doubt it. I think I reported to Larry

[22] Heckert.

[23] Q: And on the day of your accident, you were

[24] employed by GPS. Correct?

[25] A: Yes.

Page 72

[1] Q: And am I correct that GPS paid your wages?

[2] A: Yes.

[3] Q: And this may seem like a silly question, but

[4] when you got your paycheck, did it have GPS or

[5] some GPS entity on the paycheck?

[6] A: Yes, sir, it did.

[7] Q: And at the time your accident happened, am I

[8] also correct that there were not any Conrail or

[9] Norfolk Southern people — because you're right

[10] near split date — there was no one there when

[11] you were working telling you what to do, what

[12] equipment to use, that type of thing. Correct?

[13] A: We were told what — by Conrail what track to

[14] unload.

[15] Q: But I guess I just want to make sure, because I

[16] think you told me earlier that there was no one

[17] there when your accident happened?

[18] A: Right, correct.

[19] Q: And I just want to clarify that when your

[20] accident occurred, there were no railroad

[21] employees present saying, okay, Mr. Wilkinson,

[22] you know, do it this way. Correct?

[23] A: Correct.

[24] Q: They weren't telling you what equipment to use.

[25] Correct?

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilki
June 10,

Page 73

[1] **A:** Correct.

[2]    (Wilkinson Deposition Exhibit No. 5

[3] produced and marked for identification.)

[4]       **BY MR. STAUDENMAIER:**

[5]    **Q:** Mr. Wilkinson, I'm going to show you what's been

[6] marked as Wilkinson Exhibit No. 5, and it's

[7] titled, "Intermodal Trailer and Container

[8] Securement Manual." Have you ever seen that

[9] document before today?

[10]    **A:** I may have. It does look familiar, but I

[11] don't — I can't remember.

[12]    **Q:** Do you recall where you saw it or is it your

[13] recollection you saw it somewhere in particular,

[14] you're just not sure?

[15]    **A:** I don't remember where I saw it, when I saw it,

[16] but it does look familiar.

[17]    **Q:** Were you ever given any kind of printed or

[18] written materials about the procedures you were

[19] supposed to use as you went along unlocking

[20] hitches in terms of how you were supposed to do

[21] it?

[22]    **A:** Not that I remember.

[23]    **Q:** We've talked about where the train was located

[24] you were working on. Do you recall any

[25] landmarks that would tell us approximately where

Page 74

[1] you were along the track when the accident

[2] happened, on what particular car you were on? I

[3] don't know if there's any kind of landmark

[4] around the area that you recall or not.

[5]    **A:** Not that I can remember.

[6]    **Q:** So if I were to take you out there today and

[7] say, okay, show me the spot where your injury

[8] happened, would you be able to do that in terms

[9] of where the car was located?

[10]    **A:** Not precisely, no.

[11]    **Q:** Can you give me an approximate location? I know

[12] we're talking about Track 14.

[13]    **A:** Right. Okay, I'm trying to — Their poles are

[14] marked over there.

[15]    **MR. MYERS:** He's not asking you to guess.

[16] If you know, you know.

[17]    **A:** That I couldn't....

[18]    (Wilkinson Deposition Exhibit No. 6

[19] produced and marked for identification.)

[20]       **BY MR. STAUDENMAIER:**

[21]    **Q:** Mr. Wilkinson, I'll show you what's been marked

[22] as Wilkinson Exhibit No. 6, and it's a notice on

[23] GPS letterhead from a David Anthony. It's dated

[24] November 13th, 1998. Do you know who Mr.

[25] Anthony was?

Pa

[1]    **A:** Yes, he was the owner of GPS.

[2]    **Q:** And it appears as if — that someone has signed

[3] it in the bottom left-hand corner. Is that your

[4] signature?

[5]    **A:** Yes, sir, it is.

[6]    **Q:** And it's regarding maintaining a professional

[7] attitude. Do you recall seeing this document

[8] and signing it?

[9]    **A:** I don't remember the document, but I definitely

[10] signed that.

[11]    **Q:** Do you remember the reason why you had to sign

[12] this document?

[13]    **A:** Not really.

[14]    **Q:** Was there any event or anything that you recall

[15] sparked the publishing of this document?

[16]    **A:** No, sir, I really don't.

[17]    (Wilkinson Deposition Exhibit No. 7

[18] produced and marked for identification.)

[19]       **BY MR. STAUDENMAIER:**

[20]    **Q:** Mr. Wilkinson, I'll show you what's been marked

[21] as Wilkinson Exhibit No. 7. And this is a

[22] document that was provided to us by GPS and it

[23] shows a list of — Well, it's entitled "Employee

[24] Class History." It goes from April the 11th of

[25] '96 up through January of 2002. Basically, it

Page

[1] gives — has your name, Terry Wilkinson,

[2] yardman, Rutherford under department. And what

[3] I want to ask you is, back on April 18th of '96,

[4] it says that you completed a class in hitch

[5] inspection and securement.

[6]    Do you recall taking a class back then? On

[7] the third line down it says, hitch inspection

[8] and securement; status, completed; class date,

[9] 4/18/96. Do you recall?

[10]    **A:** No, sir, I don't. I could have, but I don't

[11] recall.

[12]    **Q:** And then if we go about a little beyond halfway

[13] down again in capital letters, it has hitch

[14] inspection and securement. I put a little mark

[15] next to it there. It has, completed, grade 95.

[16] Perfect score.

[17]    **MR. MYERS:** Unless it's out of a thousand.

[18]       **BY MR. STAUDENMAIER:**

[19]    **Q:** I doubt it. Class date, 2/24/99. Do you

[20] remember having a class and having taken an exam

[21] of some type about hitch inspection and

[22] securement?

[23]    **A:** I probably did, but I don't remember.

[24]    **Q:** Do you remember anything about that class or

[25] course, what it covered regarding hitch

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 77

[1] inspection and securement?

[2] **A:** No, my memory is poor.

[3] **Q:** And then it says you took another one or

[4] completed another one on February 1st of 2001.

[5] That was last year. Do you recall that class?

[6] **A:** Yes, that was a written exam.

[7] **Q:** And then another one on December 31st of 2001.

[8] Do you see that indicated, also? The third line

[9] from the bottom, I guess. It says, hitch

[10] inspection and securement, completed 12/31/01.

[11] **A:** Oh, okay, yes.

[12] **Q:** Do you recall that class? That was just a

[13] couple months ago.

[14] **A:** Yes.

[15] **Q:** Can you tell me what they covered in that class

[16] in December that you took, December of 2001?

[17] **A:** They were just the procedures of opening up a

[18] hitch.

[19] **Q:** And what were the procedures they discussed?

[20] **A:** That I can't remember. I don't remember.

[21] **Q:** Did you have to take an exam for that one, too?

[22] **A:** Yes.

[23] **Q:** Were you ever told the results of that exam?

[24] They don't have them listed here.

[25] **A:** No, they usually gave you the answers for that

Page 78

[1] exam. Not only that, but this is wrong.

[2] **Q:** What's wrong about it?

[3] **A:** Employee Terry Wilkinson, yardman at Rutherford.

[4] **Q:** What's incorrect?

[5] **A:** In 1996, I was not at Rutherford, or '99.

[6] **Q:** Well, I think if you look up at the top, it

[7] says, employee class history, February 7, 2002.

[8] I think it was produced February 7th of 2002.

[9] **A:** Okay, I see, yes.

[10] **Q:** But just so we're clear, you're saying back in

[11] '96, you didn't work at Rutherford. Is that

[12] what you're saying?

[13] **A:** Correct.

[14] **Q:** When did you begin working at Rutherford?

[15] **A:** When they opened up. I'm not sure, August.

[16] **Q:** Was that last year?

[17] **A:** August.

[18] **Q:** 2000?

[19] **A:** 2000.

[20] **Q:** After your accident, Mr. Wilkinson, did you

[21] continue to work?

[22] **A:** Yes, sir.

[23] **Q:** Did you finish your shift that day?

[24] **A:** Yes, I did.

[25] **Q:** What about the following day, June the 16th?

Page 79

[1] **A:** I think I reported — I think I reported to

[2] Larry Heckert. I really can't remember.

[3] **Q:** Let me ask it this way. Have you ever missed

[4] any time from work from the time of the accident

[5] until today because of any injuries you claim

[6] you suffered as a result of that accident?

[7] **A:** Yes, I did.

[8] **Q:** Tell me, if you can, what those time periods

[9] were? And if you're not certain of specific

[10] dates, you can tell me things like, you know,

[11] it's when I had this surgery or I remember it

[12] was Christmastime and it was about two weeks.

[13] Just give me some approximation, because I don't

[14] have any exact information on that.

[15] **MR. MYERS:** Do we have anything from

[16] workmen's comp from the employer on that?

[17] **MR. RETTIG:** I thought there were.

[18] (Discussion held off the record.)

[19] **BY MR. STAUDENMAIER:**

[20] **Q:** Well, let me ask you this. When do you recall

[21] missing work because of this accident?

[22] **A:** I definitely missed work after the first

[23] surgery.

[24] **Q:** And you had two surgeries. Correct?

[25] **A:** That's correct.

Page 80

[1] **Q:** One was in August of '99?

[2] **A:** Yes.

[3] **Q:** About how long were you off?

[4] **A:** At least approximately two weeks.

[5] **Q:** And then you had another surgery in April of

[6] 2000?

[7] **A:** Correct.

[8] **Q:** And how long were you off then?

[9] **A:** To July — the end of July, in that area.

[10] **Q:** Have you had any other surgeries other than

[11] those two?

[12] **A:** Prior or after them two?

[13] **Q:** From June of '99 until today, have you had any

[14] other surgeries besides the one in August of '99

[15] and the one in April of 2000?

[16] **A:** No, none that I — No.

[17] **Q:** Surgeries are something that usually stick in

[18] your mind.

[19] **MR. MYERS:** He had knee surgery in the

[20] past.

[21] **A:** In the past. That's why I was asking before or

[22] after.

[23] **BY MR. STAUDENMAIER:**

[24] **Q:** Was that before or after your accident, your

[25] knee surgery?

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

Norfolk Southern Railway Company, et al.

Page 81

[1] A: My knee surgery was before that surgery.

[2] Q: Before the August '99 surgery?

[3] A: Yes.

[4] Q: And what knee was it?

[5] A: It was my left knee.

[6] Q: And what was the reason for you having surgery

[7] on your left knee?

[8] MR. MYERS: It hurt.

[9] A: I tore the cartilage.

[10] MR. STAUDENMAIER: We'll swear you in

[11] later.

[12] MR. MYERS: Okay.

[13] BY MR. STAUDENMAIER:

[14] Q: How did you tear the cartilage?

[15] A: At work.

[16] Q: How did that happen?

[17] A: I slipped and fell.

[18] Q: You have to give me a little more than that.

[19] You slipped and fell where doing what?

[20] A: In the rail yard walking along the track from

[21] the — I don't know what they call it, they're

[22] stones.

[23] Q: On the ballast?

[24] A: Yes.

[25] Q: When did that happen, when did you slip and

Page 82

[1] fall?

[2] A: I really have no clue. '97, '98.

[3] Q: So it was a couple years before this accident?

[4] A: Yes, yes.

[5] Q: Have you had any surgeries regarding your knee

[6] since then?

[7] A: No, sir.

[8] Q: Have you missed any other work other than the

[9] two time periods we've talked about around your

[10] surgeries?

[11] A: Yes, I broke my foot prior to that knee surgery.

[12] Q: So that would have been prior to June of '99,

[13] you broke your foot?

[14] A: Yes.

[15] Q: I want to concentrate on the time from the date

[16] of your accident until today. Have you missed

[17] any other time from work other than the two

[18] surgeries? And I'm excluding vacations. Other

[19] than the two surgeries we've talked about?

[20] A: No, sir. Repeat that, please.

[21] Q: From the date of the accident until today —

[22] that's the time period I'm talking about —

[23] other than the surgery in August of '99 and

[24] April of 2000, have you missed any other time

[25] from work during that time other than for

Page

[1] vacations?

[2] A: Only for them two surgeries.

[3] Q: Now, Mr. Wilkinson, in response to some

[4] questions that we submitted to your attorneys,

[5] they gave us some answers. And one of them we

[6] asked about was people who might know something

[7] about your accident or conditions regarding your

[8] accident and there was a list of names that we

[9] got. And I want to ask you what these people

[10] might know about your accident or anything

[11] dealing with this litigation, okay? I'm just

[12] going to go down the line and they're really in

[13] no particular order, just the way I wrote them

[14] down.

[15] The first is Larry Heckert?

[16] A: Yes.

[17] Q: Now, you mentioned he was the gentleman that you

[18] reported your accident to?

[19] A: Yes.

[20] Q: Anything else that you know that he knows about

[21] concerning your accident or anything regarding

[22] litigation which brings us here today?

[23] A: Other than me making the report out to him and

[24] notifying him of that accident.

[25] Q: Norm Zaleck?

Page

[1] A: He worked that day and he knew of the accident,

[2] but he was not there.

[3] Q: Jack Dressler?

[4] A: Yes, he worked that day.

[5] Q: Rich or Rick Hunter?

[6] A: I believe he worked that day. I'm not sure.

[7] Q: Tim Gross?

[8] A: I believe he worked that day.

[9] Q: Dan Bradley?

[10] A: He was the terminal supervisor at the time.

[11] Q: And who did he work for?

[12] A: GPS.

[13] Q: And Dale Baucum? And I think that's

[14] B-a-u-c-u-m.

[15] A: I think he was — At that point, he was a head

[16] of maintenance supervisor.

[17] Q: And what would either Mr. Bradley or Mr. Baucum

[18] know about the accident?

[19] A: Other than the report that was filled out.

[20] Q: Is there anyone else that you know of that I

[21] haven't mentioned that may have been working

[22] that day or may know something about your

[23] accident or what occurred or conditions at that

[24] time?

[25] A: I'm not sure. Only the people that would have

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

---

**Page 85**

[1] worked that shift, and I cannot remember who
[2] particularly worked that shift that day.
[3]    Q: Your lawyer has also provided some information
[4] under a category that said other individuals
[5] with information relative to plaintiff's
[6] damages, and they listed Erin and Christopher
[7] Good, the two children that live with you.
[8]    A: Yes.
[9]    Q: What would they know about your injuries or your
[10] damages that they might —
[11]    A: Other than them seeing me in a shoulder support,
[12] whatever went with the surgery and the pain that
[13] I was in.
[14]    (Recess taken.)
[15]         BY MR. STAUDENMAIER:
[16]    Q: Mr. Wilkinson, what I want to do is I've been
[17] provided with medical records for you. And what
[18] I basically want to do is just go through a list
[19] of doctors and hospitals and physical therapy
[20] people that I've been told you've seen. And I
[21] want to make sure my list is complete and then I
[22] want to ask you a couple of questions about
[23] those.
[24]    It's my understanding that two days after
[25] your accident, you went to the Holy Spirit

**Page 86**

[1] emergency room. Is that correct?
[2]    A: Yes.
[3]    Q: And did you ever have any other trips to the
[4] emergency room at Holy Spirit for injuries that
[5] you think happened from your accident other than
[6] that visit on June 17th?
[7]    A: Just dealing with that accident?
[8]    Q: Correct.
[9]    A: No.
[10]    Q: And then I understand you went to Concentra
[11] Medical Services, I think, or Managed Care
[12] Services I guess is the correct name?
[13]    A: Yes, sir.
[14]    Q: And the first day I have you going to see them
[15] is June 23rd of 1999 or about eight days after
[16] your accident. Does that sound about right?
[17]    A: That sounds about right. I'm really not sure of
[18] the date.
[19]    Q: And what was your reason for going to Concentra?
[20]    A: At that point, it was for therapy, because at
[21] that point it was only known as a muscle pull.
[22]    Q: And at some point in time you go to see Dr.
[23] Rychak. Correct?
[24]    A: Concentra sent me to — My condition wasn't
[25] getting any better. Concentra sent me for an

**Page 87**

[1] M.R.I. of my shoulder, which indicated at that
[2] point that I had a full tear — rotator cuff,
[3] rotator cuff.
[4]    Q: And do you then go to see Dr. Rychak? Do you
[5] know who Dr. Rychak is when I say his name?
[6]    A: Yes, I do.
[7]    Q: I have the first day you saw him was July 13th,
[8] 1999?
[9]    MR. MYERS: You're asking him if that's the
[10] specific day or if he recalls going to him?
[11]    MR. STAUDENMAIER: No, I just want to see
[12] if that sounds about right.
[13]    A: I'm not sure of the date.
[14]         BY MR. STAUDENMAIER:
[15]    Q: And then I also have that you saw Dr. Black at
[16] Hershey Medical Center?
[17]    A: Yes, sir.
[18]    Q: You were referred there by Dr. Rychak. Correct?
[19]    A: Yes, sir.
[20]    Q: Have you seen any other doctors other than Dr.
[21] Rychak and Dr. Black for any conditions
[22] regarding your shoulder injury?
[23]    A: Yes, your doctor last week.
[24]    Q: Dr. Yarus. Other than Dr. Yarus?
[25]    A: No.

**Page 88**

[1]    Q: And Dr. Rychak performed the two surgeries you
[2] spoke of earlier?
[3]    A: Yes, sir.
[4]    Q: Has any other doctor performed any surgery on
[5] you other than those two by Dr. Rychak?
[6]    MR. MYERS: In this accident?
[7]         BY MR. STAUDENMAIER:
[8]    Q: For this accident?
[9]    A: No, sir.
[10]    Q: Now, the last date that I show that you had any
[11] type of physical therapy at Concentra was
[12] October of 2000. It would have been about six
[13] months after your second surgery. Does that
[14] sound right?
[15]    A: After the surgery, I think I went to — Is it
[16] Central Pennsylvania Rehabilitation? I don't
[17] think I went back to Concentra for therapy after
[18] the first surgery because of the convenience.
[19]    Q: You think the physical therapy you went to was
[20] at another location or another PT place?
[21]    A: Yes.
[22]    Q: But does it sound like October of 2000?
[23]    A: No.
[24]    Q: When do you think you stopped physical therapy?
[25]    A: I went to physical therapy after the first

---

Min-U-Script®        Filius & McLucas Reporting Service, Inc.

Case 1:01-cv-01140-SHR Document 33   v: Filed 07/15/2002   Page 27 of 107

Norfolk Southern Railway Company, et al.                    Terry Boyd Wilkin
                                                                   June 10, 2

Page 89

[1] surgery at Central Pennsylvania.

[2]  Q: I guess what I'm trying to do, Mr. Wilkinson, is

[3] just make sure that the records I have are

[4] complete. Have you had any physical therapy

[5] this year regarding your shoulder injury?

[6]  A: This year?

[7]  Q: Yes.

[8]  A: 2002?

[9]  Q: Yes.

[10]  A: No.

[11]  Q: Did you have any physical therapy in 2001 for

[12] your shoulder injuries?

[13]  A: No.

[14]  Q: Did you have any in 2000?

[15]  A: Yes.

[16]  Q: If your surgery was in April of 2000?

[17]  A: Yes.

[18]  Q: Do you have any recollection of when you

[19] stopped?

[20]  A: There might have been some in the year 2001,

[21] because I think my release from my check was in

[22] February, somewhere in that area.

[23]  Q: And you had some physical therapy after your

[24] first operation in 1999?

[25]  A: Yes.

Page 90

[1]  Q: Have you had any other physical therapy?

[2]  A: No. Had enough.

[3]  Q: Now, I want to talk about Dr. Rychak. As I said

[4] before, the records I have show you started with

[5] him in July of '99. The records I have also

[6] show that in February of 2001, so February of

[7] last year, that he discharged you from care?

[8]  A: Yes.

[9]  Q: And that you did see him once in October of last

[10] year?

[11]  A: October or August, I'm not sure.

[12]  Q: Other than that one visit, have you seen Dr.

[13] Rychak since February of 2001?

[14]  A: No, sir.

[15]  Q: Are you currently seeing any physicians

[16] regarding any of the injuries you suffered to

[17] your right shoulder?

[18]  A: No, sir, I'm not.

[19]  Q: Are you seeing anyone with regard to your left

[20] knee?

[21]  A: No, sir, I'm not.

[22]  Q: I want to talk about your work at GPS. Did the

[23] type of work you did change at all from before

[24] the date of your accident and after your

[25] accident; in other words, the work assignments

Page

[1] you had or the type of work that you did?

[2]  A: Yes.

[3]  Q: Tell me how it changed.

[4]  A: I was put on light duty.

[5]  Q: And tell me what that means or what it entails.

[6]  A: It means light duty where you're not doing the

[7] physical work that you were expected to do in

[8] your job duties without being — before the

[9] injury.

[10]  Q: Did your position change at all?

[11]  A: Yes, sir, it did.

[12]  Q: Tell me the designation. Are you called

[13] something now you weren't called then?

[14]  A: After the return to work after the second

[15] surgery, I was brought back and I just in-gated

[16] trailers that came into the Rutherford yard.

[17] And then as a little more time went on, then I

[18] became a programmer at Rutherford. And after a

[19] certain period of time after that, I became the

[20] nighttime supervisor.

[21]  Q: Now, you said you became a programmer at

[22] Rutherford?

[23]  A: Yes, sir. Yes, sir, I did.

[24]  Q: And did your duties as a programmer, were they

[25] similar to the duties of the railroad programmer

Page

[1] you referred to earlier?

[2]  A: Yes, sir.

[3]  Q: When did you start doing the programmer job?

[4]  A: Sometime in the year 2001.

[5]  Q: Then you said at some point you became —

[6]   (Discussion held off the record.)

[7]      BY MR. STAUDENMAIER:

[8]  Q: At what point in time did you become — And I

[9] think you said nighttime supervisor. Is that

[10] the term you used?

[11]  A: Yes, a nighttime supervisor.

[12]  Q: When did that occur?

[13]  A: A month, two months ago, maybe longer.

[14]  Q: Tell me the difference between being a

[15] programmer and then being nighttime supervisor?

[16]  A: A programmer is an individual that basically

[17] delegates the work to the yard people, what he's

[18] loading, what trailers he's loading, prints out

[19] the list of trailers that have to be loaded on

[20] the car and also informs him what track the

[21] train is on. Basically, he sets up their work.

[22]  Q: Then what do you do now as nighttime supervisor?

[23]  A: Basically help him with any problems or if

[24] there's any problems that arise that I can

[25] assist them.

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

**Page 93**

[1]  Q: And who is "them"?

[2]  A: Well, the programmer, the gate clerks, the

[3] billing clerk.

[4]  Q: And, I'm sorry, what shift do you work now as

[5] nighttime supervisor?

[6]  A: I don't really have a shift, but I usually start

[7] at 5:00 in the evening to 3:00 in the morning

[8] or, if there's a problem, maybe longer.

[9]  Q: And did that result in an increase in your pay?

[10]  A: No, sir. Increase in more hours.

[11]  Q: Are you paid hourly or are you salaried now?

[12]  A: I'm paid hourly.

[13]  Q: And, I'm sorry, you said you worked normally

[14] 5:00 p.m. to 3:00 a.m. Is that five days a

[15] week, six days a week, seven?

[16]  A: Five days a week.

[17]  Q: And if you work past 3:00 a.m., are you paid for

[18] that time, paid overtime, or are you on a strict

[19] salary basis?

[20]  A: No, it's just a 40-hour work week and anything

[21] over the 40 hours would be overtime.

[22]  Q: And are you in charge during the time you were

[23] there in terms of — Are you the highest ranking

[24] GPS person there while you're there from 5:00

[25] p.m. to 3:00 a.m.?

**Page 94**

[1]  A: Yes, sir.

[2]  Q: And does the job that you did as programmer, did

[3] that conform with any restrictions that Dr.

[4] Rychak had put on you with regard to your injury

[5] or did that require you to do things beyond what

[6] he indicated you could do physically when you

[7] were the programmer?

[8]  A: I don't understand what you're saying.

[9]  Q: Well, it's my understanding you had the

[10] surgeries and Dr. Rychak then said you could go

[11] back to work?

[12]  A: On light duty.

[13]  Q: And the job you did, was there light-duty work

[14] available for you when you went back?

[15]  A: Yes, sir, there was.

[16]  Q: And was one of those jobs as the programmer?

[17]  A: Yes, sir.

[18]  Q: And did that —

[19]  A: That would be light duty.

[20]  Q: And did that fit within — Were you physically

[21] able to do that job?

[22]  A: Yes, sir.

[23]  Q: And as nighttime supervisor, are you physically

[24] able to do that job?

[25]  A: Yes, sir.

**Page 95**

[1]  Q: Is there anything about your shoulder injuries

[2] that prohibits you from doing anything you're

[3] required to do as a nighttime supervisor?

[4]  A: No, sir.

[5]  Q: What about as a programmer?

[6]  A: No, sir.

[7]  Q: Do you still have any physical problems —

[8]  A: Yes, sir.

[9]  Q: — that you relate back to your accident in June

[10] of '99?

[11]  A: Yes, sir.

[12]  Q: Tell me what those are.

[13]  A: I still have constant pain in my arm.

[14]  Q: Now, you say constant pain. Is that 24 hours a

[15] day or does it come and go? If you could

[16] describe it for me.

[17]  A: It's basically 24 hours a day.

[18]  Q: Where is the pain? I mean, where is it

[19] situated?

[20]  A: The constant pain is going into my bicep

[21] (indicating).

[22]  Q: You're referring to your right bicep?

[23]  A: Yes, this part here.

[24]  Q: And?

[25]  A: And then the pain — That's constant there. But

**Page 96**

[1] the pain just varies in the top or in back of

[2] the shoulder.

[3]  Q: And you're referring to the top of your shoulder

[4] or back towards your shoulder blade?

[5]  A: Right.

[6]  Q: What else, if anything?

[7]  A: No, that's basically about it. Or the pain

[8] gets — increases as the more repetitious I use

[9] it, you know. That determines the amount of

[10] pain.

[11]  Q: Are there any types of activities that are —

[12] Strike that. Are there any type of activities

[13] that are less likely to cause the discomfort in

[14] your arm? Well, strike that. Let's do it this

[15] way. Is there anything that you can't do today

[16] that you could do before the accident in June of

[17] '99?

[18]  A: In regards to doing what?

[19]  Q: Well, in regards to let's take your work life,

[20] first of all. Anything at work that you can't

[21] do today that you could do before June 15th of

[22] '99?

[23]  A: What I can't do now?

[24]  Q: Yes.

[25]  A: Yes, I can't do the physical things that I could

Case Boyd-wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Case 1:01-cv-01419-SHR  Document 22  Filed 07/15/2002  Page 29 of 107

Terry Boyd Wilki
June 10,

Page 97

[1] have done in the yard, climbing, hanging onto a
[2] rail car for extended times.
[3]  Q: I'm not sure I know what you mean by hanging
[4] onto a rail car.
[5]  A: Well, a container car. You got to hang on with
[6] your hands, your arms, to keep your balance when
[7] you're putting bullets in or IBC.
[8]  Q: What's a bullet or an IBC?
[9]  A: It's a — okay, IBC is a — it's a device to
[10] connect containers. It's a locking device to
[11] connect containers.
[12]  Q: You're talking about double-stacked containers?
[13]  A: Yes, so you're balancing yourself with your arm
[14] while you're using the other arm to put these
[15] IBCs in.
[16]  Q: Anything else?
[17]  A: Probably opening up hitches again.
[18]  Q: What is it about that?
[19]  A: It would be the jarring.
[20]  Q: Anything else?
[21]  A: Heavy lifting.
[22]  Q: Define for me what you mean by heavy lifting.
[23]  A: Anything probably that would be over my shoulder
[24] with any kind of weight.
[25]  Q: And, I'm sorry, when you say over your shoulder?

Page 98

[1]  A: I mean, I'm sorry, excuse me, over my head.
[2]  Q: Anything else? And we're talking about work
[3] right now.
[4]  A: I think I covered it all.
[5]  Q: Now, what about in your personal life, is there
[6] anything that you did before the accident that
[7] the problems with your right arm you described
[8] either prevents you totally from doing or you
[9] can't do as much of?
[10]  A: Activities?
[11]  Q: Yes, anything in your personal — Well, in other
[12] words, driving, eating, dressing, any kind of
[13] leisure activities you had, anything like that?
[14]  A: Yes, hunting, fishing, archery, sports
[15] activities, a lot of them.
[16]  Q: Before the accident, what type of sporting
[17] activities did you do?
[18]  A: I was an avid archer, an avid hunter.
[19]  Q: Did you belong to any type of archery clubs?
[20]  A: At one time, I did.
[21]  Q: And when was that?
[22]  A: That was '90.
[23]  Q: And what about, say in the year before your
[24] accident, what type of archery activities did
[25] you do?

Page

[1]  A: I just went out and hunted white-tail deer with
[2] the bow.
[3]  Q: Did you just hunt with bow or did you also use
[4] rifle?
[5]  A: And also rifle.
[6]  Q: And you said you did fishing, too?
[7]  A: Fly fishing, yes.
[8]  Q: Now, do you still do any of those activities
[9] since the accident?
[10]  A: No.
[11]  Q: You don't do them at all?
[12]  A: No, I go hunting, but I just pal around. I
[13] don't carry a gun.
[14]  Q: And are you right or left-handed?
[15]  A: I am right-handed.
[16]  Q: Are you able to drive an automobile?
[17]  A: Yes.
[18]  Q: What types of automobiles do you drive? Or
[19] vehicles, I should say vehicles. Do you have a
[20] pickup truck?
[21]  A: I drive my wife's car and my car.
[22]  Q: Are they automatic or standard transmission?
[23]  A: My wife is automatic and my car is a standard.
[24]  Q: And what kind of car do you have?
[25]  A: I have a 1986 Tempo.

Page 1

[1]  Q: Ford Tempo?
[2]  A: Ford Tempo.
[3]  Q: Do you own any other type of motorized vehicles?
[4] And I include boats, motor homes, jet skis.
[5]  MR. MYERS: Skateboards, snowmobiles?
[6]  A: I have rollerblades.
[7]  BY MR. STAUDENMAIER:
[8]  Q: What do you call those, ski-mobiles, electrified
[9] ski —
[10]  MR. MYERS: Wheelchairs?
[11]  A: I'm getting close to it.
[12]  BY MR. STAUDENMAIER:
[13]  Q: Motorcycles, anything of that nature?
[14]  A: No, sir.
[15]  Q: Did you own any of those before your accident?
[16]  A: No, sir.
[17]  Q: Do you own a home or do you rent?
[18]  A: I own a home.
[19]  Q: And does it have a yard that has to be taken
[20] care of?
[21]  A: Yes, sir, it does.
[22]  Q: Do you do the yard work?
[23]  A: I do some of it.
[24]  Q: Tell me —
[25]  A: Well, I'll say most of it.

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 101

[1]    MR. STAUDENMAIER: Off the record.

[2]    (Discussion held off the record.)

[3]    BY MR. STAUDENMAIER:

[4]    Q: Tell me the types of things that you do around

[5] the house, yard work type things?

[6]    A: I cut the grass.

[7]    Q: Do you have a rider mower or a push mower?

[8]    A: Yes, a rider mower and a push.

[9]    Q: Do you have to use both?

[10]    A: Sometimes.

[11]    Q: And your push mower, is it self-propelled or do

[12] you have to propel it yourself?

[13]    A: It's self-propelled — I mean, propelled.

[14]    Q: What about things like during the winter when we

[15] had snow someday years ago, do you have to do

[16] the snow removal or do you have somebody do that

[17] for you?

[18]    A: I used to do it, and I do what I can. And plus

[19] I have a tractor that I put a plow on.

[20]    Q: And is that the rider mower you're referring to?

[21]    A: Yes. Yes, it is.

[22]    I might have got confused on that, I'm

[23] sorry. But what did I say, propelled on that

[24] push mower? It's a push mower.

[25]    Q: It's not self-propelled?

Page 102

[1]    A: It's not self-propelled.

[2]    Q: That's the way I took it.

[3]    A: Oh, okay.

[4]    Q: Any other type of leisure activities or hobbies

[5] that you had before the accident that you either

[6] can't do at all now or had to cut back on?

[7]    A: Yeah, with my eight-year-old son, I can't

[8] play — can't really throw the ball or, you

[9] know, wrestle with him. It's kind of limited.

[10] Football, basketball.

[11]    Q: You had mentioned before about the pain that you

[12] get in your arm. Do you take any type of

[13] medication for the pain?

[14]    A: No, sir. My visit with Rychak said to just

[15] over — I won't say overdose, but just take

[16] enough aspirin to subside the pain.

[17]    Q: So you basically just take over-the-counter

[18] aspirin or Tylenol or something like that?

[19]    A: Yes.

[20]    Q: Do you have any type of prescription medication

[21] that you have to take for any condition related

[22] to the June 15 accident?

[23]    A: No, sir.

[24]    Q: Do you take any medication for your knee?

[25]    A: No, sir.

Page 103

[1]    Q: Somewhere in the materials I read, Mr.

[2] Wilkinson, you're asserting a claim in this

[3] lawsuit that you've suffered a loss of wages

[4] because of the injuries you suffered.

[5]    MR. MYERS: Loss of earning capacity.

[6]    BY MR. STAUDENMAIER:

[7]    Q: Loss of earning capacity. In terms of there

[8] were earnings that you could have in your former

[9] job with GPS that you can't have now or can't do

[10] now. Are you aware of that claim?

[11]    A: Yes, sir.

[12]    Q: Can you explain to me what you mean by that?

[13]    A: Well, I lost my earning capacity as far as the

[14] amount of hours that I could put in. When I

[15] went from the yard to the office, I became

[16] strictly 40 hours. My wages prior to that,

[17] before the injury, were all based on overtime,

[18] and I worked a considerable amount of overtime,

[19] at least 20 to 30 hours a week.

[20]    Q: Do you work any overtime now?

[21]    A: Yes.

[22]    Q: What's the average amount of overtime you work

[23] now? I guess I should say like within the last

[24] year maybe as an average.

[25]    A: I only started receiving overtime since this new

Page 104

[1] position.

[2]    Q: Did you ever work overtime as a programmer?

[3]    A: No, sir.

[4]    Q: And?

[5]    A: Gate person.

[6]    Q: And a gate person?

[7]    A: No, sir.

[8]    Q: Can you tell me in the last month how much

[9] overtime you worked?

[10]    A: 20 to 30 hours approximately.

[11]    Q: During the month?

[12]    A: During the month, yes.

[13]    Q: And this may seem like a silly question, but in

[14] intermodal, is there a busier time of the year

[15] than others or is it pretty much even across the

[16] year? I don't know if it's seasonal like some

[17] employment or not.

[18]    A: It's unpredictable. I mean, I've seen it slow

[19] and I've seen it when it was supposed to be slow

[20] be busy.

[21]    Q: And it doesn't correspond to any time of the

[22] year?

[23]    A: You do get your busier moments in a year. What

[24] I mean is prior to the Christmas rush, it does

[25] become more busier, just like any department

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

**Page 105**

[1] store becomes busier.

[2]  Q: In some of the materials that I got from

[3] Concentra, Mr. Wilkinson, there was a job

[4] analysis in here for a position called hitch

[5] inspector. Did you ever hold a position for GPS

[6] as a hitch inspector?

[7]  A: No, that — No.

[8]  Q: Does that —

[9]  A: It's not a position.

[10]  Q: What is it that you're claiming, Mr. Wilkinson,

[11] that the railroad should have done or did that

[12] it shouldn't have done that may have caused your

[13] accident?

[14]  A: This equipment was the railroad's equipment.

[15] And at one time when I first started prior to —

[16] I won't say prior, but when I first started in

[17] 1987, they had car inspectors that would

[18] actually walk these cars, grease them and oil

[19] them, and maintain the hitch. That the railroad

[20] no longer provided. They do not, it ceased.

[21]  Q: When did that stop?

[22]  A: I really couldn't remember to tell you that.

[23] But the maintenance on the hitches now after

[24] that is next to none.

[25]  Q: And it is your contention it's the

**Page 106**

[1] responsibility of the railroad to maintain the

[2] hitches?

[3]  A: Definitely, sir.

[4]  Q: And why do you say that?

[5]  A: Because it's their car and they have car

[6] inspectors. And if that hitch is dysfunctional,

[7] that car should be shot.

[8]  Q: I'm sorry, you said you can't be sure about when

[9] this stopped with the car inspectors and

[10] maintaining hitches, but would I be correct it

[11] was several years prior to your accident?

[12]  A: Yes.

[13]  Q: It just didn't start like a month or two before

[14] your accident?

[15]  A: Correct.

[16]  Q: It was several years?

[17]  A: It could have been in '89, I'm not sure. I have

[18] no recollection of when it ceased.

[19]  Q: But it was several years prior to your accident?

[20]  A: That it stopped, yes.

[21]  Q: Anything else that you contend the railroad

[22] either should have done or did and shouldn't

[23] have done that caused your accident other than

[24] what you've told me about the hitches and the

[25] inspection and the car inspectors?

**Page**

[1]  A: Other than the maintenance, maintaining that

[2] car. That is the railroad's responsibility.

[3]  MR. STAUDENMAIER: I think those are all

[4] the questions I have at the moment. Mr. Rettig

[5] may have some questions.

[6]  EXAMINATION

[7]  BY MR. RETTIG:

[8]  Q: I have a few, so bear with me. I'll try not to

[9] repeat anything. My name is Jeff Rettig. I

[10] represent GPS.

[11]  Are you a member of the union now?

[12]  A: No, sir.

[13]  Q: Have you ever been a member of the union?

[14]  A: Yes, sir, I have.

[15]  Q: What union were you a member of?

[16]  A: Teamsters.

[17]  Q: And when were you last a member of that union?

[18]  A: When Pacific Rail ceased to exist at Harrisburg.

[19] That was my last, in '96, '94. I'm not sure. I

[20] think it was in '96.

[21]  Q: And that was right before you went to work for

[22] GPS?

[23]  A: Yes, Pacific Rail had ceased at that point and

[24] that was the end of my union. GPS took over and

[25] then they went from Pacific Rail to GPS.

**Page**

[1]  Q: With GPS, you were not a member of the union?

[2]  A: No, sir.

[3]  Q: Why was that?

[4]  A: They were a nonunion organization.

[5]  Q: Before this accident occurred on June 15 of

[6] 1999, for how many years had you been involved

[7] in opening hitches on rail cars?

[8]  A: From '87 to '99, 14 years.

[9]  Q: Well, whatever that —

[10]  A: Whatever that, yes.

[11]  Q: As I understand it, you used a pry rod to open

[12] hitches. Is that what you did back in the

[13] beginning as well, is used a pry rod?

[14]  A: In PTL days?

[15]  Q: Yes.

[16]  A: Yes, sir, but they were different.

[17]  Q: It was a longer bar, I guess you called it?

[18]  A: Correct.

[19]  Q: As far as the condition of the hitches, did that

[20] change during this period of time that you were

[21] opening hitches?

[22]  A: I don't understand "condition." Do you mean the

[23] condition of the hitches, the condition of —

[24] the working conditions?

[25]  Q: The hitch that you told us about that you were

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 109

[1] working on when you injured yourself had flared
[2] edges — it should have been squared or
[3] rectangular, but it was square — have you ever
[4] encountered hitches like that in the years that
[5] you'd been opening hitches before this accident?
[6]     A: Yes, but not as frequent when they had car
[7] inspectors looking at the cars.
[8]     Q: So when the hitches were maintained, you'd
[9] encounter flared hitches, but not as frequently?
[10]     A: Not as frequently, yes.
[11]     Q: When you encountered flared hitches before this
[12] accident, how did you deal with it?
[13]     A: It was different, because at that point when you
[14] used the five-foot bar, you didn't have — the
[15] machine took the pressure off them hitches, so
[16] there was no need for force or momentum to open
[17] those hitches.
[18]     Q: And when did that stop when the packer stopped
[19] going along with you to open the hitches or help
[20] you open the hitches?
[21]     A: That began in Pacific Rail's time and just
[22] continued from Pacific Railroad through GPS.
[23]     Q: During the time period you worked for GPS, they
[24] didn't send the packer along with the groundman.
[25] Correct?

Page 110

[1]     A: That's correct.
[2]     Q: During the time period you began with GPS up
[3] until the time of your accident, did you
[4] encounter hitches with flared ends?
[5]     A: Yes, sir.
[6]     Q: Now, that's during the time period when you
[7] didn't have the packer. How did you deal with
[8] the hitches on those occasions?
[9]     A: It's a double system. In other words, you can
[10] be on one side. If it was that bad, you could
[11] go to the other side of the car.
[12]     Q: So you determined, before you decided to open
[13] the hitch, you determined if the female hitch
[14] end —
[15]     A: If you can see it.
[16]     Q: If you could see it. Whether the female end was
[17] flared out on one side and, if it was, you'd
[18] just go around to the other side of the hitch
[19] and hope that that —
[20]     A: Wasn't flared out, too.
[21]     Q: Correct?
[22]     A: Correct.
[23]     Q: That's only if you could see it, though.
[24] Correct?
[25]     A: Correct.

Page 111

[1]     Q: If you couldn't see it, how —
[2]     A: You took a chance.
[3]     Q: Could you have just determined by putting your
[4] hand on there to determine whether the female
[5] end of the hitch was flared out or cracked?
[6]     A: If you put your hand up there, yes.
[7]     Q: And is that what you did when you couldn't see
[8] if it was flared out or not? Did you put your
[9] hand up there?
[10]     A: No.
[11]     Q: Did you recognize that if you were trying to
[12] open a hitch that had a flared out female end
[13] that that increased the possibility that the pry
[14] bar could come out of the hitch?
[15]     A: Yes, sir.
[16]     Q: There's nothing that holds the pry bar into the
[17] hitch, is there? In other words, you push the
[18] pry bar in and you just pull it out if you want
[19] to. Correct?
[20]     A: Right. I mean, it's a receptacle.
[21]     Q: Understood. But there's nothing that catches it
[22] or locks it in there?
[23]     A: Correct.
[24]     Q: Well, when you come to work at 4 o'clock in the
[25] morning and it's dark out, what did you do to

Page 112

[1] determine whether the female end of the hitch
[2] was flared out or not?
[3]     A: I didn't do nothing. I just assumed it was
[4] normal, put the bar — What you do is you assume
[5] the location, because it's just like closing
[6] your eyes and touching your nose. It's just
[7] like habit. And then when there's something
[8] wrong, that's....
[9]     Q: But you made that assumption, even knowing that
[10] some of those female end hitches were flared
[11] out. Correct?
[12]     A: Yes.
[13]     Q: You told us before that when you put the pry rod
[14] or pry bar in there, your left hand would be
[15] close to the female hitch, correct, the female
[16] part of the hitch?
[17]     A: I wouldn't know exactly what position your hand
[18] would be. I mean, it could be anywhere on that
[19] bar.
[20]     Q: You say you can't see that female end of the
[21] hitch. How do you get the end of the bar in
[22] that if you can't see it?
[23]     A: It's, like I said, closing your eyes and
[24] touching your nose. It's so — You're so used
[25] to doing it. After so many, it's just

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilki
June 10, 2

Page 113

[1] (indicating).

[2]    Q: To unlock the hitch, does the bar go back
[3] towards the trailer tires or towards the front
[4] of the trailer?

[5]    A: You can make that bar go in any direction.

[6]    Q: You mean to unlock it?

[7]    A: Yes.

[8]    Q: You can either pull back on it or —

[9]    A: Or push it forward, yes.

[10]    Q: And what were you doing at the time of your
[11] accident?

[12]    A: I was pulling it back.

[13]    Q: Were you pulling it back towards the tires or
[14] back towards the front of the trailer?

[15]    A: Towards the front. Always when I was on a car,
[16] I always faced the wheels.

[17]    Q: If you had known that the hitch was flared,
[18] could you have taken some precautions to have
[19] prevented the bar from coming out of the hitches
[20] you were trying to unlock?

[21]    A: I could have seen if the other side wasn't
[22] flared.

[23]    Q: Well, could you have actually used that side of
[24] the hitch that was flared out and used
[25] precautions to make sure that the bar didn't

Page 114

[1] come out?

[2]    A: Well, it would have probably stayed unlocked —
[3] or, I'm sorry, stayed lock.

[4]    Q: But can you answer my question? Could you have
[5] used any precautions; that is, as far as keeping
[6] pressure in on the bar as you were trying to
[7] unlock the hitch if you had known that that
[8] receptacle, female receptacle, was flared out?

[9]    A: I don't think. You couldn't put your bar in.

[10]    Q: So we know that the morning in question, it's
[11] dark out, and you can't see if that female
[12] receptacle is flared or not. Correct?

[13]    A: Right.

[14]    Q: In the past, though, as I understand it, you had
[15] been issued flashlights?

[16]    A: That's correct.

[17]    Q: And was one of the purpose for the flashlights
[18] to be able to see what you were doing?

[19]    A: That's correct.

[20]    Q: Did you use those flashlights when you had them
[21] to determine if the female end of the hitch was
[22] flared or broken?

[23]    A: No, we didn't have the flashlights then, but we
[24] were given flashlights.

[25]    Q: You were?

Page

[1]    A: Right. But that was when Eric Sheffield was the
[2] terminal manager, which is one, two years prior
[3] to this accident.

[4]    Q: Was he the one that gave you the flashlights?

[5]    A: Yes, sir.

[6]    Q: Did he take them back then?

[7]    A: No, sir.

[8]    Q: Did GPS take back the flashlights?

[9]    A: No, sir, they didn't.

[10]    Q: What happened to your flashlight?

[11]    A: I don't remember, sir. I don't know where it's
[12] at.

[13]    Q: Did you turn it in to GPS?

[14]    A: Well, no, sir. Some of them were stolen. You
[15] know, I mean, I don't know what happened to
[16] mine.

[17]    Q: Did you ask for a replacement?

[18]    A: After they got tired of replacing so many
[19] flashlights, they discontinued it.

[20]    Q: Did you ask for a replacement for your
[21] flashlight?

[22]    A: No, sir.

[23]    Q: Who was your supervisor at the time of this
[24] accident, Larry Heckert?

[25]    A: Yes, sir.

Page

[1]    Q: Did you ever talk to him about the need for a
[2] flashlight in order to do your job?

[3]    A: No, sir.

[4]    Q: Did you ever think about using your own
[5] flashlight so you could see what you were doing
[6] at 4 o'clock in the morning?

[7]    A: No, sir, I don't think anybody out there uses
[8] their own flashlight or uses a flashlight to
[9] this day.

[10]    Q: But you could use a flashlight, and if you used
[11] a flashlight, you could see if that was flared
[12] out or not. Correct?

[13]    A: Yes.

[14]    Q: The pry rods, you were telling us how they went
[15] from around five feet to somewhere between two
[16] feet, 33 inches. Who provides the push bars or
[17] pry rods?

[18]    A: GPS.

[19]    Q: And do you know why they went from five feet to
[20] 33 inches?

[21]    A: It was actually to save money.

[22]    Q: And how did that save money, just less material?

[23]    A: Excuse me?

[24]    Q: I mean, just a shorter rod would cost less?

[25]    A: No, it was man hours. In other words, they

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 117

[1] didn't tie up a man with that machine the whole
[2] day. As long as that machine — so they could
[3] take that man that was with that machine and
[4] have him do other functions.
[5]     Q: What machine, the packer?
[6]     A: Yes.
[7]     Q: Were you allowed to use the five-foot push rod
[8] at the time of this accident or did you have to
[9] use —
[10]     A: They were designed different, the five-foot pry
[11] rod.
[12]     Q: Had you ever asked for a longer pry rod before
[13] this accident?
[14]     MR. MYERS: You mean to do the job in June
[15] of '99?
[16]     MR. RETTIG: Right.
[17]     A: No.
[18]                BY MR. RETTIG:
[19]     Q: Was there any reason you couldn't have used a
[20] four-foot long pry rod if you needed the
[21] leverage to open the hitches?
[22]     A: The problem with the four foot or five foot at
[23] that time when we did them, it would make it
[24] impossible to carry with you, keep it with you.
[25] It was more convenient for the two foot to carry

Page 118

[1] and be with you.
[2]     Q: But I realize maybe it would be more convenient
[3] to have a shorter pry rod, but could you have
[4] used a four-foot one if you wanted?
[5]     A: You could have.
[6]     Q: Did you ever ask for a longer pry rod so you had
[7] more leverage for some of these?
[8]     A: No, sir.
[9]     Q: Now, you identified the people that were in your
[10] crew the day of this accident. I just want to
[11] make sure you know what each of them was
[12] supposed to be doing. Tim Gross?
[13]     A: Yes, sir.
[14]     Q: Was he a groundman?
[15]     A: He was a yard person. We all opened the tracks.
[16]     Q: Well, but one of the group operated the packer?
[17]     A: Correct.
[18]     Q: And do you know if that was Mr. Dressler or Mr.
[19] Zaleck?
[20]     A: I'm not sure of that really.
[21]     Q: But there would have been just five people in
[22] your crew?
[23]     A: I'm not sure how many were there that day.
[24]     Q: The names that you gave us we talked about
[25] before were Zaleck, Dressler, Gross, Rich Hunter

Page 119

[1] and then yourself. Is that your recollection?
[2]     A: Yes, that's the best of my knowledge.
[3]     Q: So if we have one of those people operating the
[4] packer, were the other four people opening the
[5] hitches?
[6]     A: Three to four, yes.
[7]     Q: Now, were there ever any occasions back in
[8] August — I'm sorry, back in May and June of
[9] 1999 when you would call for help from an
[10] employee of the railroad?
[11]     A: If we had a problem with a hitch that we
[12] couldn't open up. There's different kinds of
[13] hitches. And what I mean by that is there's
[14] some hitches that what we call are a screw
[15] hitch. They turn this way, they screw open.
[16] And what happens is a lot of times these
[17] receptacles that you turn to open up that screw
[18] will be missing. So sometimes the car inspector
[19] will have to get up with pipe wrenches and open
[20] them that way.
[21]     Q: And how would you get a railroad car inspector
[22] to come to a car that was in that situation?
[23]     A: We'd yell to the programmer and the programmer
[24] would send them out.
[25]     Q: You'd just yell to them?

Page 120

[1]     A: Through a radio.
[2]     Q: Would you go through your foreman to do that?
[3]     A: You could.
[4]     Q: Did you do that the morning of this accident?
[5] Did you ask the railroad car inspector to come
[6] out?
[7]     A: No, sir. I don't even — I don't know. I
[8] didn't.
[9]     Q: You didn't, okay. The programmer, you were
[10] telling us about what that person does first
[11] thing in the morning. When you were the job
[12] foreman and you would go to the programmer, you
[13] would get papers, would you not?
[14]     A: Yes.
[15]     Q: And those papers contained the instructions for
[16] what, what trailers to take off and what
[17] trailers to take on. Correct?
[18]     A: Yes.
[19]     Q: Did you have a conversation with the programmer?
[20] On those mornings when you went to the
[21] programmer, did you actually say something?
[22]     A: Yes, you could. He would explain what he wanted
[23] done.
[24]     Q: Would he tell you what track the train was on —
[25]     A: Yes.

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilki

June 10, 2

Page 121

[1] Q: — or was that on the papers as well?

[2] A: That was on the paper. I'll take that back. If

[3] it was an inbound train that had to be loaded,

[4] he would verbally tell you.

[5] Q: Tell you what?

[6] A: To unload that track. That track had to be

[7] unloaded.

[8] Q: There's an inbound train that had to be

[9] unloaded?

[10] A: He would verbally tell you that that track had

[11] to be. If we were loading a track, we would get

[12] a printed sheet. You'd go into his office.

[13] He'd program the trailers on what cars and he

[14] would give you a sheet with these trailers for

[15] these different cars.

[16] Q: The morning of June 15, 1999, do you know if the

[17] programmer just gave the GPS employee paperwork

[18] to show what trailers had to be —

[19] A: I don't remember. All I know is — I would

[20] assume I think that that morning the first thing

[21] our job to do or given to us by the programmer

[22] was to unload this 14 track.

[23] Q: But yet when you unload the trailers, the

[24] trailers have to be taken somewhere. Correct?

[25] A: We park them, yes.

Page 122

[1] Q: Do you do that with instructions or do you just

[2] know to park them?

[3] A: We just know to park them.

[4] Q: I thought some of the trailers had to go to

[5] other areas where they would be loaded?

[6] A: Oh, okay. That's in the Harrisburg yard, yes.

[7] They were to be parked in designated areas.

[8] Q: How do you know what area was designated for a

[9] given trailer?

[10] A: I can't remember.

[11] Q: Didn't the programmer give you a piece of paper

[12] that showed you where the trailers were to be

[13] parked so they could be reloaded if they were

[14] going to continue on another train?

[15] A: I think at one point they were — they used the

[16] last digit of the trailer number to park it in

[17] certain areas. I'm not familiar how that was

[18] done. I really can't remember.

[19] Q: Were you in a hurry the morning of the accident?

[20] A: Not any more than what I usually am to get the

[21] job done.

[22] Q: Do you know what time of the morning the

[23] accident happened?

[24] A: It had to be after 4:00.

[25] Q: Because you start at 4:00. Correct?

Page

[1] A: Correct.

[2] Q: The complaint alleges on or about 4:15 in the

[3] morning. Were you at work maybe 15 minutes that

[4] morning when this happened or do you think it's

[5] longer or shorter?

[6] A: Explain that to me.

[7] Q: In the complaint that was filed on your behalf,

[8] it's alleged that your accident took place at

[9] about 4:15 in the morning, quarter after 4:00.

[10] I understood you started work at 4 o'clock that

[11] morning?

[12] A: Yes.

[13] Q: Is it your recollection that you got injured

[14] about 15 minutes after you started or was it —

[15] A: Yes, it was in that area.

[16] Q: Now, you told us about what happened in

[17] connection with your accident, that you went to

[18] pull back on the pry bar, it came out from the

[19] female end, and you had to try to catch

[20] yourself. Is that correct?

[21] A: Yes.

[22] Q: Did I understand you to say you had all your

[23] weight pulling back on this bar?

[24] A: Yes.

[25] Q: And then without any warning to you, the bar

Page

[1] came out of the female receptacle. Is that

[2] correct?

[3] A: Yes.

[4] Q: And then before falling over from your knees,

[5] you had time to take your hand off the bar and

[6] to reach up and grab hold of the trailer?

[7] A: Yes.

[8] Q: And you had time to put your right hand back

[9] behind you in order to prevent yourself from

[10] falling?

[11] A: Well, alls I know is I grabbed it and went like

[12] this (indicating).

[13] MR. MYERS: For the record, indicating his

[14] left hand.

[15] BY MR. RETTIG:

[16] Q: I'm sorry, your left arm went back to prevent

[17] you from falling and your right hand went up to

[18] reach for the car. Correct?

[19] A: Well, it grabbed the trailer.

[20] Q: The trailer. Could you tell if there was play

[21] in the pry rod as you were trying to open the

[22] hitch?

[23] A: Not really. I didn't pay attention to it.

[24] Q: And do you know who opened that hitch on that

[25] particular trailer?

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 125

[1] **A:** No, I don't.

[2] **Q:** Are you sure you didn't?

[3] **A:** I don't know if I did. I don't even know if it
[4] stayed locked. I don't know if they had to come
[5] back and unlock that later or not.

[6] **Q:** Did you talk to any of your co-workers about
[7] whether anybody else encountered that hitch?

[8] **A:** I think I made — When we all got back into our
[9] jockeys, I think I said that I'm not sure if
[10] that hitch opened. And the only way that they
[11] would know that is when the machine would grab
[12] it and it wouldn't come out of the hitch.

[13] **Q:** But do you know if one of your co-workers had to
[14] go —

[15] **A:** I don't remember that, if they did or if they
[16] didn't.

[17] **Q:** You said you went back to that car later in the
[18] day and you saw that the female end was flared.
[19] Is that your testimony?

[20] **A:** I looked at it — not later in the day, but as
[21] soon as it was daylight.

[22] **Q:** How did you know which car to go to look at to
[23] see if the hitch was flared or not?

[24] **A:** Because I know — because I guess it's
[25] remembering where you hurt yourself, you know

Page 126

[1] what I mean.

[2] **Q:** Well, did you remember exactly which car to go
[3] to to look at the hitch when it got light out?

[4] **A:** Well, I mean, it could be, you know, like in the
[5] basic area, so what you do is you just go down
[6] and look.

[7] **Q:** Do you have a recollection, sitting here today,
[8] of going back into that area after your accident
[9] to look for the car that you think you hurt
[10] yourself on?

[11] **A:** Yes.

[12] **Q:** You have a recollection of doing that?

[13] **A:** Yes.

[14] **Q:** When did you do that?

[15] **A:** I think as soon as it broke daylight.

[16] **Q:** Did anybody go with you?

[17] **A:** No.

[18] **Q:** Had you already reported this to Larry, the
[19] incident to Larry?

[20] **A:** No, sir.

[21] **Q:** So it was before he came to work?

[22] **A:** Yes, sir.

[23] **Q:** And what was the purpose of your going back to
[24] look at the....

[25] **A:** I was just curious to see why that thing

Page 127

[1] didn't — the bar slipped out, and I don't know
[2] if it unlocked.

[3] **Q:** Even at that point in time, you didn't know if
[4] that female receptacle was flared or not?

[5] **A:** I did to the point where you could put your hand
[6] up and feel it, you know, after it happened.
[7] You know, but I wanted to see how bad it was
[8] flared.

[9] **Q:** And just tell me again how you were able to
[10] determine the exact hitch that you were injured
[11] on when you went back after daybreak to look at
[12] it?

[13] **A:** Just being familiar with what — at that point
[14] of the car.

[15] **Q:** Was the trailer still on the car?

[16] **A:** I'm not sure. I don't think it was. I think it
[17] was removed.

[18] **Q:** What did you see when you went back?

[19] **A:** I saw that they flipped the — The unlocking bar
[20] was flared out.

[21] **Q:** Both sides?

[22] **A:** I only looked at the one side, the one side that
[23] I was on.

[24] **Q:** And did you report that condition to anyone,
[25] that flared out condition of the hitch?

Page 128

[1] **A:** I told the car inspector, I think.

[2] **Q:** Who was that?

[3] **A:** I wouldn't know which car inspector it was.

[4] **Q:** Where was the car inspector when you told him?

[5] **A:** I don't know where I was in the yard. I just
[6] told him that it was a bad hitch.

[7] **Q:** Did you tell him which car it was that had the
[8] bad hitch?

[9] **A:** I don't remember.

[10] **Q:** For a car inspector to do anything in terms of
[11] taking a car out of service, he would have to
[12] know the car number, wouldn't he?

[13] **A:** Yes.

[14] **Q:** Did you tell him —

[15] **A:** Or if he came down while you were there at the
[16] car.

[17] **Q:** Did he?

[18] **A:** No.

[19] **Q:** When you went to the car inspector later in the
[20] day to tell him about this bad hitch, did you
[21] tell him the car number?

[22] **A:** I don't believe I did.

[23] **Q:** Did you write down the car number when you went
[24] back in the daylight hours?

[25] **A:** No, sir, I didn't.

Gayboyd Wilkinson and Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkin
June 10, 2

Page 129

[1]  Q: Why not?

[2]  A: I didn't think of it.

[3]  Q: Did you have any sort of responsibility to

[4] report dangerous or defective equipment on the

[5] cars that you were working on?

[6]  (Interruption and recess taken.)

[7]  (Previous question read by the court

[8] reporter.)

[9]  A: No.

[10]  BY MR. RETTIG:

[11]  Q: Are there any reasons, other than perhaps having

[12] a flared female hitch, any other reasons that a

[13] bar could pull out from a hitch?

[14]  A: Not that I know of.

[15]  Q: Could you lose your balance or something and

[16] pull it out?

[17]  A: I don't think so. I guess it would be possible

[18] it could happen.

[19]  Q: How about if you don't insert it fully into the

[20] female part of the hitch, could it come out in

[21] the course of being opened in that circumstance

[22] as well?

[23]  A: I would assume it could.

[24]  Q: You were telling me before that you — Do you

[25] believe you reported this to a car inspector

Page 130

[1] that morning?

[2]  A: I think I did. I'm not sure.

[3]  Q: Was that before or after you went back to look

[4] at the hitch?

[5]  A: I don't remember.

[6]  Q: When you reported the incident to Mr. Heckert,

[7] did you tell him about this flared female hitch?

[8]  A: No, I don't believe I did.

[9]  Q: When you filled in your report, this Exhibit 4,

[10] did you say anything in there about the flared

[11] female hitch?

[12]  A: No, I didn't. I don't think I did.

[13]  Q: No, you didn't. At least you can look at it,

[14] but I didn't see anything in there.

[15]  A: No, I think I just said the bar slipped out of

[16] it.

[17]  Q: Had you already gone back and looked at the car

[18] that you believe was the one involved in your

[19] incident before you filled in that document?

[20]  A: Yes.

[21]  Q: So you knew when you filled in that document

[22] that the car that you got injured on, at least

[23] you felt, had a flared female end?

[24]  A: Yes.

[25]  Q: Why didn't you say anything in there about it?

Page

[1]  A: I'm not sure. I have no idea.

[2]  Q: Just so I can understand who you were supervised

[3] with or by the morning of this accident, who was

[4] your immediate boss the morning of June 15,

[5] 1999?

[6]  A: My immediate boss?

[7]  Q: Which I think is going to be the job foreman.

[8] If it wasn't you, it would have been the job

[9] foreman. Let me ask it that way.

[10]  A: I would say it would probably be the railroad,

[11] because they're the ones that gave us the

[12] instructions if the supervisor wasn't there.

[13]  Q: If you weren't the job foreman the morning of

[14] this accident, would your immediate supervisor

[15] have been the job foreman for GPS?

[16]  A: No, he wasn't there.

[17]  Q: Well, there's nobody there at the time, but I'm

[18] just saying, during that shift, wouldn't you be

[19] under the job foreman if you were not the job

[20] foreman?

[21]  A: Correct.

[22]  Q: If you were the job foreman and you had some

[23] supervisory role over the other —

[24]  A: If I was.

[25]  Q: Okay, but you don't remember if you were or not?

Page 1

[1]  A: No.

[2]  Q: Immediately above the job foreman would be Larry

[3] Heckert. Correct?

[4]  A: Correct.

[5]  Q: What's his title?

[6]  A: I believe he's assistant terminal — I think

[7] assistant terminal manager.

[8]  Q: And who is his boss within GPS?

[9]  A: At that time?

[10]  Q: Yes, at the time of the accident.

[11]  A: I don't know. I can't remember if it was Dan

[12] Bradley or Dale Baucum.

[13]  MR. RETTIG: That's all I have for right

[14] now.

[15]  MR. STAUDENMAIER: I don't have any.

[16]  MR. MYERS: I have some questions.

[17]  EXAMINATION

[18]  BY MR. MYERS:

[19]  Q: Sir, showing you what they marked as Exhibit 4,

[20] this is the Employer's Report of Occupational

[21] Injury or Disease. In the box it says, did

[22] injury — I can't read it — oh, did injury or

[23] illness occur on employer's premises? You

[24] marked yes. You got hurt on the railroad car?

[25]  A: Yes.

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 133

[1]  Q: Why did you put down employer's premises?

[2]  A: Because....

[3]  Q: Because you were working for that company at the

[4] time?

[5]  A: Can you please repeat that?

[6]  Q: You were working on a railroad car at the time.

[7] Is that correct?

[8]  A: Correct.

[9]  Q: The railroad car was either owned or controlled

[10] by Conrail or Norfolk Southern?

[11]  A: Yes.

[12]  MR. STAUDENMAIER: Wait a minute, hold on.

[13] I'm objecting to the form of your question,

[14] because that statement is not true. It hasn't

[15] been established that the railroad owned the

[16] car.

[17]  MR. MYERS: I said owned or controlled the

[18] car.

[19]          BY MR. MYERS:

[20]  Q: So, now, in terms of the hatch that you say you

[21] got injured on — I mean the hitch — that was

[22] part — that was attached to the railroad car?

[23]  A: Yes, sir.

[24]  Q: Now, the railroad car was sitting on what?

[25]  A: On the track.

Page 134

[1]  Q: And whose tracks were they?

[2]  A: The railroad's.

[3]  Q: Whose yard was this?

[4]  A: The railroad's.

[5]  Q: What railroad yard was this?

[6]  A: It was Conrail's at the time.

[7]  Q: Now, let me ask you this. You said that the

[8] instructional videos or safety videos you had

[9] observed were railroad videos?

[10]  A: Yes.

[11]  Q: Do you know which railroad? Was it Conrail, was

[12] it an older railroad? Do you know which

[13] railroad it was?

[14]  A: When it was PTL, it was Conrail.

[15]  Q: Now, you had been working at this yard in the

[16] Harrisburg yard for approximately how many

[17] years?

[18]  A: Fifteen.

[19]  Q: Now, counsel for GPS had asked you earlier that

[20] something to the effect — I can't quote his

[21] eloquence — but that when there were car

[22] inspectors that were lubricating and looking at

[23] these hitches, you didn't have as many problems

[24] with the hitches back in those days?

[25]  A: That's correct.

Page 135

[1]  Q: And as time went on, you've been having more

[2] problems with hitches?

[3]  A: Yes, more people getting hurt.

[4]  Q: Before you, was there anybody else that got

[5] injured on these hitches?

[6]  A: Yes.

[7]  Q: Who?

[8]  A: Jack Dressler was injured opening up hitches.

[9]  Q: Do you remember how long before you got hurt?

[10]  A: I would say '94, '95, in that area.

[11]  Q: Who else? Anybody else that you know?

[12]  A: Skip Mutzabaugh — I'm sorry, Eugene Mutzabaugh.

[13]  Q: And did he get hurt trying to use a hitch

[14] apparatus?

[15]  A: He tried to put the hitch down.

[16]  Q: And when was that?

[17]  A: I would say '94, '95.

[18]  Q: Now, did both of those individuals get hurt on

[19] the railroad cars themselves?

[20]  A: Yes, sir.

[21]  Q: And using the railroad hitches?

[22]  A: Yes, sir.

[23]  Q: Anybody else that you know got hurt on those

[24] rail cars?

[25]  MR. STAUDENMAIER: I'm objecting to the

Page 136

[1] form of the railroad hitches.

[2]  MR. MYERS: You can answer.

[3]          BY MR. MYERS:

[4]  Q: Anybody else get hurt there?

[5]  A: Yes, sir, Lenny Traverna on a rail car.

[6]  Q: Are we all talking about Harrisburg yard now?

[7]  A: Yes, sir.

[8]  Q: And do you know how he got hurt?

[9]  A: Coming down off the car, climbing down off the

[10] car. Rich Hunter got hurt on a car.

[11]  Q: Was this on a railroad car at the Harrisburg

[12] yard?

[13]  A: Yes.

[14]  Q: When was this?

[15]  A: '90 — I'm not sure, '98, '99.

[16]  Q: What part of the body did he injure?

[17]  A: Well, it might have been 2000. I'm not sure of

[18] the date.

[19]  Q: What part of his body did he hurt?

[20]  A: He hurt his shoulder.

[21]  Q: Doing what?

[22]  A: I think he was opening up cars, and I'm not sure

[23] if the track was properly flagged or controlled,

[24] and the engine came in and hit the cars. He

[25] came off the car.

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkins
June 10, 20

Page 137

[1] **Q:** Does the railroad control the movement of these
[2] rail cars?
[3] **A:** Yes.
[4] **Q:** Do they use their locomotives or engines to move
[5] these cars with the trucks on them?
[6] **A:** Yes.
[7] **Q:** Did the railroad crews move these equipment
[8] around or cars around?
[9] **A:** Yes, sir.
[10] **Q:** Now, when you report to work you said it's 4
[11] o'clock in the morning?
[12] **A:** Yes, sir.
[13] **Q:** I'm talking about back in June of 1999?
[14] **A:** Yes, sir.
[15] **Q:** The date of your accident, I think counsel said
[16] was June 15th?
[17] **A:** Yes, I believe.
[18] **Q:** Now, did you report to work every day at 4
[19] o'clock in the morning?
[20] **A:** In my work week, yes, sir.
[21] **Q:** Had you been doing that for a while before you
[22] got hurt?
[23] **A:** Starting at 4 o'clock in the morning?
[24] **Q:** Yes.
[25] **A:** Yes, sir.

Page 138

[1] **Q:** When was the earliest there was any supervision
[2] from GPS that came on the property?
[3] **MR. RETTIG:** I would object to the form of
[4] the question.
[5] **BY MR. MYERS:**
[6] **Q:** Answer the question.
[7] **A:** 7 to 8 o'clock in the morning.
[8] **Q:** So that's approximately three to four hours
[9] after you got on the property?
[10] **A:** Yes, sir.
[11] **Q:** So who gave you your instructions on where to
[12] work and what to work on when you went on the
[13] property at 4 o'clock in the morning?
[14] **A:** Programmer who programmed the trains.
[15] **Q:** Who does the programmer work for?
[16] **A:** He was a Conrail person, railroad.
[17] **Q:** Did you have to follow his orders?
[18] **A:** Yes, sir.
[19] **Q:** Did you have to follow his directions?
[20] **A:** Yes, sir.
[21] **Q:** If you had any questions about where to go or
[22] what cars to work on, wouldn't you have to
[23] discuss that with that same man?
[24] **A:** Yes, sir.
[25] **Q:** Now, once the people from your supervisors or

Page

[1] the supervisor personnel from GPS got on the
[2] property between 7 or 8 o'clock in the morning,
[3] did they have anything to do with your working
[4] at that point in terms of what to tell you or
[5] where to go?
[6] **A:** Only if something changed, the programmer
[7] changed something in our — what we were doing
[8] after the supervisor was there, he'd relay it to
[9] our supervisor, which in turn he would tell us.
[10] **Q:** You called it a programmer? Is that what you
[11] called it?
[12] **A:** Yes.
[13] **Q:** The railroad employee, this programmer, when he
[14] would give you instructions at 4 o'clock in the
[15] morning, would you generally follow those
[16] instructions for the entire day?
[17] **A:** Yes.
[18] **Q:** Who set the schedule for the movement of the
[19] trains, the movement of the — you know, when
[20] you go in and do the hitches and remove these
[21] cars? Not the cars, but the trucks. The
[22] programmer?
[23] **A:** Yes, the train was pushed in. He would tell you
[24] where and when and what had to be done. Either
[25] it had to be unloaded and reloaded or he would

Page 14

[1] say that this train is on a specific track, we
[2] need that unloaded, and then while you're
[3] unloading that, we need another track to be
[4] loaded.
[5] **Q:** Now, when did you take breaks or did you have
[6] something called a lunch or a dinner when you
[7] worked during these shifts?
[8] **A:** No, sir. Sometimes we worked without — I mean,
[9] there's times we just worked until we got the
[10] job done.
[11] **Q:** Why is that?
[12] **A:** You had to do that to get the job done or get
[13] the train out on time.
[14] **Q:** Whose schedule were you following then, the
[15] railroad schedule or the GPS schedule?
[16] **A:** The railroad schedule.
[17] **Q:** Did you have to obey or follow railroad safety
[18] rules?
[19] **A:** Yes, sir.
[20] **Q:** If you didn't, could the railroad discipline you
[21] or have you terminated or have some job action
[22] against you?
[23] **A:** Yes.
[24] **Q:** Other than the — And I can't remember what
[25] counsel called the bar, pry bar or this two-foot

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson  v.
Norfolk Southern Railway Company, et al.

Page 141

[1] bar or whatever it's called. What is it called?

[2] A: We just call them a bar.

[3] Q: A bar?

[4] A: A bar.

[5] Q: Is it like an iron bar, a metal bar?

[6] A: Yes, it's an iron bar. I don't know —

[7] Q: It's a piece of metal?

[8] A: It's a piece of bar.

[9] Q: Other than the bar that was supplied to you by
[10] GPS, the other equipment you have to work with,
[11] the rail car, the hitch and all that sort of
[12] thing, whose equipment is that?

[13] A: That belongs to the railroad.

[14] Q: Now, counsel for GPS asked you could you use
[15] four-foot bars, five-foot bars. When in the
[16] history of doing this work did you use five-foot
[17] bars?

[18] A: When we were employed by Pennsylvania Truck
[19] Lines.

[20] Q: And where did you manipulate the hitch with
[21] these bars from, on the car or on the ground?

[22] A: On the ground.

[23] Q: And prior to GPS taking over, there was another
[24] company you worked for when they changed the
[25] size of these bars?

Page 142

[1] A: Yes, sir.

[2] Q: Is that when you went up on the car to perform
[3] this job?

[4] A: Correct.

[5] Q: I think you told counsel that you didn't have to
[6] work — There was no longer an employee on the
[7] ground at that point then?

[8] A: Correct.

[9] Q: By using the shorter bar, it eliminated one
[10] employee from being at your work site?

[11] A: Technically, yes.

[12] Q: Now, when you used the five-foot bar, would you
[13] have to get underneath the truck to get into the
[14] hitch?

[15] A: No.

[16] Q: I mean physically, your body?

[17] A: When we had the five-foot bar, you could stand
[18] alongside the machine off the car.

[19] Q: When you used this two-foot bar, did you have to
[20] go under the truck to do this?

[21] A: Yes.

[22] MR. RETTIG: You mean trailer?

[23] BY MR. MYERS:

[24] Q: Or trailer. How far under the trailer did you
[25] have to go under to do this?

Page 143

[1] A: Again, that depends on the distance from the
[2] hitch from the end of the car. Some are set
[3] back further so they can receive what they call
[4] a 42-inch kingpin or some are set closer to the
[5] end of the car so they can receive a 36-inch
[6] kingpin.

[7] Q: Over — Well, let me ask you this. When you go
[8] under the car, you said at 4 o'clock in the
[9] morning there's no light down there?

[10] A: Correct.

[11] Q: Were there ever lights provided by the railroad
[12] on those cars underneath there?

[13] A: No.

[14] Q: You said you were supplied flashlights at some
[15] point by GPS?

[16] A: Yes.

[17] Q: What happened to all the flashlights?

[18] A: Some were stolen, they get broken, and they just
[19] end up gone.

[20] Q: Many years ago when you first went in to
[21] Harrisburg yard, what company did you work for?

[22] A: I worked for Pennsylvania Truck Lines.

[23] Q: Is that where you got hired? Did you get hired
[24] into that position when you started doing these
[25] things with the hitches, with the trailers and

Page 144

[1] all that?

[2] A: Yes, that was part of my job.

[3] Q: Do you know whether or not the railroad had to
[4] agree whether you got hired or not at that time?

[5] MR. STAUDENMAIER: I'm sorry, you're
[6] talking about when he hired on with Pennsylvania
[7] Truck Lines?

[8] MR. MYERS: Yes.

[9] A: Yes, they did have a say. When I was hired, it
[10] was as being in the yard or wherever needed or
[11] as the truck driver, which your license, your
[12] CDL license was inserted into their computer.
[13] And if that was a good license, you could run
[14] their mill. If it wasn't, you probably weren't
[15] hired.

[16] BY MR. MYERS:

[17] Q: Did you work any other shifts in the Harrisburg
[18] yard other than the 4 o'clock in the morning
[19] shift until, I'm sorry, 2:00 in the afternoon I
[20] believe you said?

[21] A: Yes, I've worked 6:00 to 2:00. I've worked them
[22] all.

[23] Q: How long were you working this 4 o'clock in the
[24] morning shift to 2:00?

[25] A: Two and a half to three years.

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Gregory L. Wilkinson &, Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilki...
June 10, 2...

Page 145

[1] Q: During that two and a half to three years, did
[2] you always receive your job assignments from the
[3] programmer that worked for the railroad?

[4] A: Yes.

[5] Q: Did you have any option not to follow that
[6] railroad employee's instructions when you
[7] started performing your job?

[8] MR. STAUDENMAIER: I'll object to the form
[9] of the question. His testimony will stand that
[10] the instructions given were which trains had to
[11] be loaded and unloaded. If you're asking him
[12] within those parameters, fine. Otherwise, it's
[13] not been his testimony.

[14] MR. MYERS: Could you reread my question,
[15] please?

[16] (Previous question read by the court
[17] reporter.)

[18] BY MR. MYERS:

[19] Q: You can answer that question.

[20] A: No, I had no other choice, but to perform. At 4
[21] o'clock in the morning, there was no other
[22] person to Or even if there was a supervisor
[23] there, you basically had to do — because they
[24] controlled what had to be done.

[25] Q: During your workday from 4:00 in the morning to

Page 146

[1] 2:00 in the afternoon, did you perform any other
[2] work activities other than what you've described
[3] to us with the hitches?

[4] MR. STAUDENMAIER: You're asking about the
[5] day of the accident?

[6] BY MR. MYERS:

[7] Q: Yes, in the two or three years before that. In
[8] your daily work activity, you put these bars in,
[9] you manipulate the hitches, and the trailers are
[10] removed, the trailers are removed from these
[11] rail cars. Right?

[12] A: Right.

[13] Q: Do you perform any other duties on that
[14] particular day other than do that?

[15] A: No.

[16] Q: So you were performing the same duties day after
[17] day on that shift?

[18] A: Yes.

[19] Q: And they're all working on or around the
[20] railroad equipment on the railroad yard?

[21] A: Yes.

[22] Q: Did this programmer specify the precise location
[23] where you were to work that day?

[24] A: Yes. Because when we get there to work, we have
[25] no idea where they place their trains. They

Page ...

[1] have I think a total of six tracks over there,
[2] and it could have been in any number of the
[3] tracks. So we have to get instructions on what
[4] track to go to.

[5] Q: While you were working that shift, did you work
[6] the same job assignment on those premises for
[7] the, what, two to three years you said?

[8] A: Yes.

[9] Q: Did you work with the same railroad programmer
[10] every day for those two or three years or did
[11] those individuals change?

[12] A: They changed, because their shifts changed. It
[13] was a different programmer sometimes. When
[14] they'd go on vacation, it would be a different
[15] programmer.

[16] Q: Did they have somebody there 24 hours a day?

[17] A: They have programmers there 24 hours a day.

[18] Q: Did your company work this particular job 24
[19] hours a day?

[20] A: No.

[21] Q: What hours did they work it?

[22] A: My supervisors?

[23] Q: No, the employees such as you. How many hours
[24] in a day would employees from your company
[25] actually go on these rail cars and remove these

Page 1...

[1] trailers?

[2] A: Every time that there was a trailer unloaded,
[3] that was taken off of the inbound train.

[4] Q: My question is, you did it during your shift.
[5] Correct?

[6] A: Right.

[7] Q: Was that done on any other shift as well?

[8] A: Yes, the other shifts.

[9] Q: Was that done around the clock?

[10] A: Yes.

[11] Q: So you and your fellow employees are performing
[12] this same job around the clock. Is that what
[13] you're telling me?

[14] A: Yes.

[15] Q: And the railroad would have their people
[16] coordinating these activities around the clock
[17] as well?

[18] MR. STAUDENMAIER: Objection to the form of
[19] the question.

[20] A: Yes.

[21] (Discussion held off the record.)

[22] BY MR. MYERS:

[23] Q: Mr. Wilkinson, were you working within your
[24] assigned job duties on the date that you got
[25] hurt?

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 149

[1] A: Yes.

[2] Q: And the job duties you were performing, as you

[3] said — as you told us earlier, these were the

[4] same type of job duties you performed on a

[5] regular basis on that job premises?

[6] A: Yes.

[7] Q: As far as you know, did you have permission to

[8] perform that job on that rail car working that

[9] hitch that day?

[10] A: Yes, sir.

[11] Q: Now, when you went to that particular car and

[12] before you had your accident and got hurt, was

[13] there any kind of red flags, blue flags,

[14] documentations, any kind of warnings at all

[15] concerning that hitch that was provided to you

[16] by the railroad?

[17] A: No, sir.

[18] Q: Did the railroad programmer provide you with any

[19] warning as to a potential problem with a hitch

[20] on that car?

[21] A: No, sir.

[22] Q: Now, you have a trailer that's — explain to

[23] me — the trailer is somehow connected to this

[24] hitch?

[25] A: They're locked in this hitch.

Page 150

[1] Q: Is that so they don't move on the rail cars?

[2] A: Correct.

[3] Q: So does that mean somebody had to put that

[4] device — somebody had to connect that to be on

[5] the rail car before you got there?

[6] A: Right. So, in other words, say that train came

[7] out of Chicago, somebody with a machine slid

[8] that trailer into that device and it locks up.

[9] Q: Now, the device you're referring to is the

[10] hitch?

[11] A: Yes.

[12] Q: So what you were doing was trying to operate the

[13] device to unload the truck now?

[14] A: Correct.

[15] Q: Now, other than the injuries of the individuals

[16] you told us on the premises in that same area

[17] working that job, were there any other

[18] complaints from your fellow employees with

[19] regard to people who had minor injuries trying

[20] to work on those hitches?

[21] A: Yes.

[22] Q: How many years did those complaints go on?

[23] A: For a long time. I'd say since I've been there,

[24] because there's just been numerous injuries.

[25] And more so after the car inspectors quit on a

Page 151

[1] daily maintenance program.

[2] Q: Now, did GPS, did they provide any maintenance

[3] or repair or any kind of services to those

[4] hitches?

[5] A: No.

[6] Q: Did any supervisor or any employee of GPS

[7] provide you with any information before you went

[8] to work that day that the railroad had told them

[9] there were problems with those hitches?

[10] A: No, no.

[11] MR. STAUDENMAIER: Well, when you say

[12] "those hitches," what are you referring to?

[13] MR. MYERS: Any of the hitches, including

[14] the one he got hurt on.

[15] MR. STAUDENMAIER: Is your answer still the

[16] same?

[17] A: Yes.

[18] BY MR. MYERS:

[19] Q: You had mentioned something before about moving

[20] these trailers. How do you move the trailers

[21] once they come off this rail car?

[22] A: With a jockey truck.

[23] Q: What's a jockey truck?

[24] A: It's a truck with a hydraulic hoist on it that

[25] lifts the trailer in the air, which keeps you

Page 152

[1] from going out and manually turning the dollies

[2] up, and then you park it in its area.

[3] Q: Does it have a gas pedal and a steering wheel,

[4] things like that?

[5] A: Yes.

[6] Q: Is that like the cab of a truck?

[7] A: Yes.

[8] Q: And you all do that as well?

[9] A: Yes.

[10] Q: Now, counsel for GPS asked you if you had put

[11] your hand up in the hitch area when it was still

[12] dark before you got hurt on the bar. Where are

[13] you when you're in that location? That's what I

[14] don't understand.

[15] A: You're at the — usually at the hitches are at

[16] the nose of the trailer. You're underneath the

[17] trailer. Most of the time, you're facing the

[18] wheels that you can get the leverage pulling

[19] back, and you would be underneath the trailer.

[20] Q: Are you supposed to spend a lot of time under

[21] this trailer?

[22] A: No.

[23] Q: Why is that?

[24] A: Because you have a certain amount of time to get

[25] this done and approximately even drop this train

Terry Boyd Wilkinson & Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkins
June 10, 2

Page 153

[1] and reload it and get it out.

[2]   Q: Has anybody been hurt from the trailers from
[3] above then?

[4]   A: Could you explain that more?

[5]   Q: I mean, have they ever dropped or anything like
[6] that?

[7]   A: They have came out of the packers, but. Yes,
[8] there was one individual where it slipped out,
[9] but he wasn't underneath the rail car.

[10]   Q: Where was he?

[11]   A: He was in his jockey with a chassis on and the
[12] machine failed I guess apparently, and the
[13] container dropped on his chassis and threw him
[14] off the jockey — off the jockey.

[15]   Q: Who controls what bars you use on these hitches?
[16] Well, let me say who controls what size bar you
[17] use on these hitches?

[18]   A: They were introduced to us in Pacific Rail.
[19] They had them in a specific size, and that's
[20] what we've used from that point on from the time
[21] of GPS — or, I'm sorry, from Pacific Rail
[22] through until now.

[23]   Q: When GPS came in, did they give you the option
[24] to use larger or longer bars?

[25]   A: No.

Page 154

[1]   Q: Did they provide you with any other size bars?

[2]   A: No.

[3]   Q: Counsel had asked you once you put that bar in,
[4] can you jiggle it or move it to see if there's
[5] some sort of problem. Can you tell that just by
[6] putting a bar in?

[7]   A: It's sometimes sloppy, sometimes — It's just so
[8] quick, you put it in and snap it. It's like
[9] trying to get it done as fast as you can.

[10]   Q: Well, how long does it take to do it?

[11]   A: Snap one of them open?

[12]   Q: Yes.

[13]   A: Less than a second. I mean, it's just — You're
[14] in a fast-paced situation. Just go about
[15] slapping — doing it as fast as you can.

[16]   Q: Counsel had asked you about these flashlights.
[17] Did GPS provide you with any flashlights at that
[18] time in June of 1999?

[19]   A: Not at that time.

[20]   Q: Did they have any rule requiring you to use
[21] them?

[22]   A: No.

[23]   Q: You had mentioned to one of the attorneys that
[24] you were wearing some sort of reflective gear?

[25]   A: Yes.

Page

[1]   Q: And who required you to wear the reflective
[2] gear?

[3]   A: The railroad, I would assume. It's part of
[4] their requirement.

[5]   Q: Why?

[6]   A: Safety.

[7]   MR. MYERS: Thank you. I have no other
[8] questions.

[9]                        EXAMINATION
[10]           BY MR. STAUDENMAIER:

[11]   Q: Unfortunately, Mr. Wilkinson, I have some.
[12] Let's start with the last shall be first.

[13]      The reflective gear that you wear, I'm
[14] correct, am I not, Mr. Wilkinson, that GPS
[15] required you to wear that so you could be seen
[16] by the jockey drivers driving around to avoid
[17] accidents? Correct?

[18]   A: I think it's — me personally, I think it's the
[19] railroad's yard requirement, because the gate
[20] people also were required to wear reflective
[21] gear.

[22]   Q: Well, let me ask this, Mr. Wilkinson. You're
[23] aware that some GPS employees were hit by
[24] drivers going in and out in years past?

[25]   A: You mean truck drivers?

Page 1

[1]   Q: Yes.

[2]   A: Hit their truck?

[3]   Q: No, no that truck drivers would hit GPS
[4] employees that were in the yard, and it was
[5] after those occurrences that GPS required you to
[6] wear reflective gear so you could be seen?

[7]   A: Are you talking about the man who was killed in
[8] our yard?

[9]   Q: Yes.

[10]   A: He wasn't a GPS employee. He wasn't even an
[11] employee of Pacific Rail or Pennsylvania Truck
[12] Lines, he was a truck driver.

[13]   Q: Isn't it true that after that you were required
[14] to wear the reflective clothing that you
[15] described earlier by GPS?

[16]   A: That didn't happen when it was GPS.

[17]   Q: When did it happen, when it was PacRail?

[18]   A: Yes, sir.

[19]   Q: You were required by PacRail to wear it.
[20] Correct?

[21]   A: I would think it was the railroad.

[22]   Q: Well, Mr. Wilkinson, I'm not asking you what you
[23] think. What I'm asking you is, were you ever
[24] specifically instructed by a railroad individual
[25] to wear the reflective clothing?

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 157

[1] A: I don't know. I'm not sure.

[2] Q: The reflective clothing was provided to you by

[3] GPS, was it not?

[4] A: Correct.

[5] Q: And you were given it by GPS and told to wear it

[6] by GPS. Correct?

[7] A: Correct.

[8] Q: Now, after you went to the programmer, I'm

[9] correct, am I not, the programmer told you what

[10] train had to be unloaded. Correct?

[11] A: Correct.

[12] Q: I'm also correct, am I not, the programmer did

[13] not tell you what individuals — what GPS

[14] employees you or whoever the working foreman was

[15] had to use to accomplish that. Correct? He

[16] didn't say, I want you to use Joe, Smitty and

[17] Rick, did he?

[18] A: No.

[19] Q: You decided among yourselves — "you" meaning

[20] the GPS employees — who was going to do what

[21] job. Correct? Who was going to work the

[22] packer, who was going to be the —

[23] A: The tracks.

[24] Q: And you also decided what equipment you were

[25] going to use to do that, correct? If you were

Page 158

[1] going to use the pry bar, you used the pry bar?

[2] If you were going to use — the person operating

[3] the machine would operate the machine. Correct?

[4] A: Correct.

[5] Q: The programmer never told you to use the pry bar

[6] to open up the hitches. Correct?

[7] A: That's the only way to open them.

[8] Q: That wasn't my question, Mr. Wilkinson. The

[9] programmer never told you to use a pry bar to

[10] open the hitches, did he?

[11] MR. MYERS: Objection. Obviously from his

[12] answer, he didn't tell him to do it or not to do

[13] it. He just said that's the only way he could

[14] open it.

[15] BY MR. STAUDENMAIER:

[16] Q: Go ahead and answer the question.

[17] A: That's the only way you can open that

[18] particular.

[19] Q: But my question, though, is —

[20] A: He told me — He would tell me or others that

[21] that track had to be opened and dropped.

[22] Q: But he didn't tell you you had to use a pry bar

[23] to open up the hitches. Correct?

[24] A: That's correct, but it's the only way to open it

[25] up.

Page 159

[1] Q: I understand. And he also didn't instruct you

[2] where on the train you had to start, did he? In

[3] other words, whether you had to start in the

[4] middle or the end, you decided to start at one

[5] end and work your way one way and the other GPS

[6] employee decided to start at the other end and

[7] work towards you. Correct?

[8] A: Correct.

[9] Q: And you were asked a question about whether or

[10] not there was any GPS supervision on the site

[11] when you were there. I'm correct, am I not,

[12] that the working foreman was a supervisor of

[13] sorts on the shift until Mr. Heckert or someone

[14] would arrive. Correct?

[15] A: Correct.

[16] Q: And that working foreman, whether it was you or

[17] someone else, was a GPS employee. Correct?

[18] A: Correct.

[19] Q: And Mr. Myers asked you a question about whether

[20] you were required to follow railroad safety

[21] rules, and you answered yes. What railroad

[22] safety rules were you required to follow?

[23] A: Speeding in the yard.

[24] Q: What was the source of these rules?

[25] A: Well....

Page 160

[1] Q: In other words, were they written down, did

[2] somebody tell you this?

[3] A: It's posted.

[4] Q: What's posted, the speed limit?

[5] A: Speed limit.

[6] Q: Was that the safety rule you were referring to

[7] when he asked you that question?

[8] A: Yes, and the reflective gear.

[9] Q: But that was based on your assumption that the

[10] railroad made you wear the reflective gear.

[11] Correct?

[12] A: I think that that's part of their safety

[13] program.

[14] Q: But you never saw any specific rule from the

[15] railroad requiring you to wear the reflective

[16] gear. Correct?

[17] A: No.

[18] Q: Any other safety rules that you're referring to?

[19] A: Blue flags.

[20] Q: I'm sorry?

[21] A: Blue flags, flagging the end of the tracks.

[22] Q: And what's a blue flag?

[23] A: A blue flag is to prevent engines coming in onto

[24] the track while you're working on the track.

[25] Q: And do you place those blue flags on there?

Min-U-Script®     Filius & McLucas Reporting Service, Inc.

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkins
June 10, 20

Page 161

[1] **A:** I have placed them on there.

[2] **Q:** And did anything regarding a blue flag have
[3] anything to do with your accident?

[4] **A:** No, sir.

[5] **Q:** In response to one of Mr. Myers' questions, he
[6] asked you about whether the railroad if you
[7] didn't follow their rules could discipline you
[8] or fire you. I understand your answer to that
[9] question that you believe the railroad could
[10] fire you?

[11] **A:** Yes, they'd bar you from the yard.

[12] **Q:** Okay, but could they actually terminate your
[13] employment?

[14] **A:** That did terminate your employment.

[15] **Q:** Well, my question, Mr. —

[16] **MR. MYERS:** Objection, it's already asked
[17] and answered.

[18] **MR. STAUDENMAIER:** No, Mr. —

[19] **MR. MYERS:** Don't tell me your question.
[20] He already answered your question.

[21]         **BY MR. STAUDENMAIER:**

[22] **Q:** Could the railroad actually — could they
[23] actually fire you from your job?

[24] **A:** They can bar you from the yard.

[25] **Q:** But they could not fire you from your

Page 162

[1] employment. Correct?

[2] **A:** They couldn't fire you, but you could not — no
[3] longer be employed if you were barred from the
[4] yard.

[5] **Q:** And when you've referred to barred from the
[6] yard, that's the Harrisburg yard?

[7] **A:** That means any NS Railroad or Conrail yard.

[8] **Q:** And the entity that actually could fire you was
[9] GPS. Correct?

[10] **A:** Fire, yes; bar, the railroad. But it ended your
[11] employment no matter what.

[12] **Q:** And in terms of disciplining you, the railroad
[13] could not discipline you as an employee, could
[14] they?

[15] **A:** Yes, by barring you from the yard again.

[16] **Q:** Any other way? Could they suspend you from
[17] service for a couple days?

[18] **A:** Yes.

[19] **Q:** In other words, they actually would come to you
[20] and say, Mr. Wilkinson, you're no longer here
[21] for a couple days?

[22] **A:** Yes.

[23] **Q:** Who would do that?

[24] **A:** I think Ed Holt did it one time.

[25] **Q:** And who did he do that to?

Page

[1] **A:** I think, if I'm not mistaken, to Don Leamen.
[2] And I can be wrong, but he was suspended because
[3] he hit a building with a jockey.

[4] **MR. MYERS:** Excuse me, with what?

[5] **A:** With a jockey.

[6]         **BY MR. STAUDENMAIER:**

[7] **Q:** And when was that?

[8] **A:** I really don't — I can't recall, but I'm not
[9] even sure if it was him. But I do know that
[10] he — the person that hit that building was
[11] suspended for two weeks in that yard.

[12] **Q:** And they were suspended by GPS?

[13] **A:** No, he was — he wanted — Ed Holt wanted him
[14] terminated, and they worked out a situation that
[15] he would be suspended for 14 days.

[16] **Q:** And who worked that out, GPS?

[17] **A:** GPS and Ed Holt, but Ed Holt wanted his job.

[18] **Q:** I understand. And he came back to work after
[19] those two weeks?

[20] **A:** Yes.

[21] **Q:** Have you ever had a situation where you've gone
[22] to insert one of these pry bars into the female
[23] end and you've missed and hit something else?

[24] **A:** No.

[25] **Q:** You've hit one every time?

Page 16

[1] **A:** Yes.

[2] **MR. STAUDENMAIER:** I have no other
[3] questions.

[4] **MR. RETTIG:** Just two more if I may, sir.

[5]         **EXAMINATION**

[6]         **BY MR. RETTIG:**

[7] **Q:** Sir, was the unloading of this train delayed by
[8] your injury the morning of this accident?

[9] **A:** No, I don't think it was.

[10] **Q:** How is it you had time to go back to the train
[11] later after daylight broke to check out the
[12] hitch if you were so busy?

[13] **A:** Well, you're not constantly busy.

[14] **Q:** You don't have to do the hitch in a second, do
[15] you?

[16] **A:** It just happens that quick.

[17] **Q:** You don't have to do it that quick, do you?

[18] **A:** It's better for us if we get the job done as
[19] quick as possible. And sometimes, like I said,
[20] we might have to drop that track and reload that
[21] track.

[22] **Q:** Did you have to do that the morning of this
[23] accident?

[24] **A:** I'm not sure. I really don't remember.

[25] **Q:** If the train was still there at daybreak when

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Page 165

[1] you went back to check out the hitch, does that
[2] give you any indication?
[3]   A: Daybreak is only an hour away, 4:15 to 5
[4] o'clock, 5:30.
[5]   Q: But you were done —
[6]   A: Unlocking.
[7]   Q: — unlocking the train?
[8]   A: Right.
[9]   Q: And the train was still there. Right?
[10]   A: Right.
[11]   Q: For you to go back and look at it. Correct?
[12]   A: Right.
[13]   Q: And you still had time to go to the car
[14] inspector, you think maybe, and talk to him
[15] about the bad hitch. Correct?
[16]   A: Right.
[17]   Q: And you would have had time that morning, if you
[18] had noticed that the female end was flared out,
[19] to go to the other side and see if that was
[20] okay. Right?
[21]   A: Right.
[22]   Q: You knew you had time to do that. Correct?
[23]   A: Right.
[24]   Q: You had time to put your hand up if you couldn't
[25] see the female end, to put your hand up to see

Page 166

[1] if it was flared? You had time to do that?
[2]   A: Correct.
[3]   MR. RETTIG: That's all.
[4]   A: May I say something?
[5]   MR. MYERS: Sure, go ahead.
[6]   A: One thing, too, also. When we had the groundman
[7] with the machine, you had constant lights. I
[8] don't know if you ever saw the lighting
[9] situation on a machine, but that just
[10] illuminates the whole area and you can see what
[11] is really going on there.
[12]   BY MR. RETTIG:
[13]   Q: You hadn't had the packer right with the
[14] groundman for a number of years before this
[15] incident. Right?
[16]   A: Right.
[17]   Q: That's why you got flashlights really, wasn't
[18] it?
[19]   A: Well, they did provide them, because you do have
[20] a problem seeing.
[21]   Q: Understood. And when they stopped putting a
[22] packer with each groundman, then they gave you
[23] flashlights to provide illumination. Correct?
[24]   A: Right, but it became harder to open up the
[25] hitches.

Page 167

[1]   Q: Which made more sense to use the flashlight to
[2] see if you were going to have a problem?
[3]   MR. RETTIG: Withdraw the question. I have
[4] no further questions.
[5]     EXAMINATION
[6]   BY MR. MYERS:
[7]   Q: Did you still have flashlights then?
[8]   A: No.
[9]   Q: Did they stop providing you with flashlights?
[10]   A: Yes.
[11]   Q: Did the railroad provide you with any lights on
[12] the trains? Did they provide you with any
[13] flashlights?
[14]     (Discussion held off the record and
[15] previous question read by the court reporter.)
[16]   A: No, they didn't.
[17]     EXAMINATION
[18]   BY MR. RETTIG:
[19]   Q: Is it your testimony that GPS did not provide
[20] you with flashlights?
[21]   A: She said the railroad.
[22]   Q: Did GPS provide you with flashlights?
[23]   A: At one point.
[24]     EXAMINATION
[25]   BY MR. MYERS:

Page 168

[1]   Q: And after they disappeared, they never gave them
[2] to you again?
[3]   A: No.
[4]     (Whereupon, the deposition was concluded at
[5] 4:52 p.m.)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkins
June 10, 20

Page 169

COMMONWEALTH OF PENNSYLVANIA :
COUNTY OF CUMBERLAND          :

I, Susan L. Petrilla, Reporter and Notary
Public in and for the Commonwealth of
Pennsylvania and County of Cumberland, do hereby
certify that the foregoing deposition was taken
before me at the time and place hereinbefore set
forth, and that it is the testimony of

TERRY BOYD WILKINSON

I further certify that said witness was by
me duly sworn to testify the whole and complete
truth in said cause; that the testimony then
given was reported by me stenographically, and
subsequently transcribed under my direction and
supervision; and that the foregoing is a full,
true and correct transcript of my original
shorthand notes.

I further certify that I am not counsel for
or related to any of the parties to the
foregoing cause, or employed by them or their
attorneys, and am not interested in the subject
matter or outcome thereof.

Dated at New Cumberland, Pennsylvania this
20th day of June, 2002.

Susan L. Petrilla
Registered Professional Reporter
Notary Public

The foregoing certification of this
transcript does not apply to any reproduction of
the same by any means unless under the direct
control and/or supervision of the certifying
reporter.

**Lawyer's Notes**

Terry Boyd Wilkinson & Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkins
June 10, 20

# 0

01-CV-1146 4:20

# 1

10th 11:18
11th 75:24
12/31/01 77:10
13th 74:24; 87:7
14 41:16, 17; 74:12
15 8:15; 121:16; 131:4
15th 39:18; 96:21; 137:16
16th 78:25
17th 86:6
18 9:18
18th 76:3
19 8:13
1948 7:11
1966 13:5
1986 99:25
1987 13:20, 21; 14:15, 23; 105:17
1992 20:13
1996 28:25; 78:5
1998 74:24
1999 8:20; 86:15; 87:8; 89:24; 108:6; 119:9; 121:16; 131:5; 137:13; 154:18
19th 7:11
1st 77:4

# 2

2/24/99 76:19
2000 78:18, 19; 80:6, 15; 82:24; 88:12, 22; 89:14, 16; 136:17
2001 57:22; 77:4, 7, 16; 89:11, 20; 90:6, 13; 92:4
2002 75:25; 78:7, 8; 89:8
21 9:20
22 8:9
23rd 86:15
2:00 31:21; 39:18, 19, 20; 66:6; 144:19, 21, 24; 146:1

# 3

31st 77:7
36-inch 143:5
3:00 93:7, 14, 17, 25

# 4

4/18/96 76:9
40 24:22
40-hour 93:20

42-inch 143:4
45-degree 51:1
4:00 31:21; 39:18, 19, 20; 66:5; 122:24, 25; 123:9; 145:25
4:15 123:2, 9; 165:3
4:52 168:5

# 5

572 4:16
5:00 93:7, 14, 24
5:30 165:4

# 6

6:00 144:21

# 7

7:00 67:19
7th 78:8

# 8

87 14:3; 108:8
89 106:17
8:00 67:20

# 9

90 98:22; 136:15
94 107:19; 135:10, 17
95 76:15; 135:10, 17
96 29:17; 30:5; 75:25; 76:3; 78:11; 107:19, 20
97 82:2
98 82:2; 136:15
99 9:13; 10:1, 16; 11:7, 11; 12:3, 18; 31:13, 20; 33:1; 35:7; 39:18; 78:5; 80:1, 13, 14; 81:2; 82:12, 23; 90:5; 95:10; 96:17, 22; 108:8; 117:15; 136:15

# A

a.m 31:21; 93:14, 17, 25
able 16:15; 23:17; 50:2; 60:23; 62:21; 74:8; 94:21, 24; 99:16; 114:18; 127:9
above 47:18, 20, 23, 23; 48:12, 17; 49:6, 7, 12, 19; 50:18, 20; 132:2; 153:3
accident 8:19; 10:16; 11:7, 17; 12:22; 29:4; 30:6; 31:12, 14; 39:4, 17; 44:6, 13, 18; 56:2; 58:7; 62:23; 65:7; 66:23; 67:11, 16; 71:15, 18, 23; 72:7, 17, 20; 74:1; 78:20; 79:4, 6, 21; 80:24; 82:3, 16, 21; 83:7,

8, 10, 18, 21, 24; 84:1, 18, 23; 85:25; 86:5, 7, 16; 88:6, 8; 90:24, 25; 95:9; 96:16; 98:6, 16, 24; 99:9; 100:15; 102:5, 22; 105:13; 106:11, 14, 19, 23; 108:5; 109:5, 12; 110:3; 113:11; 115:3, 24; 117:8, 13; 118:10; 120:4; 122:19, 23; 123:8, 17; 126:8; 131:3, 14; 132:10; 137:15; 146:5; 149:12; 161:3; 164:8, 23; 155:17
accomplish 157:15
across 104:15
acted 34:1
action 4:18; 140:21
activities 96:11, 12; 98:10, 13, 15, 17, 24; 99:8; 102:4; 146:2; 148:16
activity 146:8
actually 4:24; 27:10; 28:11; 32:18; 37:1, 3; 42:22; 43:15; 46:17, 23; 47:2; 49:21, 24; 68:12; 105:18; 113:23; 116:21; 120:21; 147:25; 161:12, 22, 23; 162:8, 19
additional 22:2, 9
address 4:14, 15; 7:13; 8:22
afternoon 66:6; 144:19; 146:1
again 6:15; 10:15; 29:24; 39:16; 45:5; 60:10; 62:8; 76:13; 97:17; 127:9; 143:1; 162:15; 168:2
against 4:21; 62:17; 140:22
age 9:18, 20
ago 77:13; 92:13; 101:15; 143:20
agree 144:4
agreement 12:14
ahead 62:7; 65:1; 158:16; 166:5
ahold 60:18
aides 42:15
air 151:25
alleged 123:8
alleges 123:2
allowed 117:7
alls 124:11
almost 11:17
alone 7:14; 43:10, 11
along 27:13; 42:8; 65:10; 73:19; 74:1; 81:20; 109:19, 24
alongside 27:3; 142:18
always 27:3; 33:25; 34:8; 113:15, 16; 145:2
among 39:13; 157:19
amount 19:4; 96:9; 103:14, 18, 22; 152:24
analysis 105:4

angle 50:20; 51:1
answered 159:21; 161:17, 20
Anthony 74:23, 25
anymore 26:23
apartment 10:4, 5, 12
apologize 30:23
apparatus 135:14
apparently 153:12
appears 75:2
application 28:11, 16
approximate 74:11
approximately 11:20; 18:8; 24:19; 44:9; 73:25; 80:4; 104:10; 134:16; 138:8; 152:25
approximation 79:13
April 75:24; 76:3; 80:5, 15; 82:24; 89:16
archer 98:18
archery 98:14, 19, 24
area 32:6; 49:8; 53:5; 74:4; 80:9; 89:22; 122:8; 123:15; 126:5, 8; 135:10; 150:16; 152:2, 11; 166:10; 122:5, 7, 17
arise 92:24; 21:9
arm 49:13, 15; 50:17, 21; 53:17; 54:1, 1, 3, 5, 17; 67:3, 24; 68:1; 95:13; 96:14; 97:13, 14; 98:7; 102:12; 124:16
arms 97:6
around 9:12; 23:3; 27:17; 74:4; 82:9; 99:12; 101:4; 110:18; 116:15; 137:8, 8; 146:19; 148:9, 12, 16; 155:16
arrangement 12:15; 19:8; 10:3
arrive 34:24; 159:14
arrow 61:13; 59:13
aspirin 102:16, 18
asserting 103:2
assigned 15:16; 36:1, 4; 38:8, 25; 39:23; 148:24
assignment 35:5; 40:9; 147:6; 33:8, 21; 34:15; 38:1; 90:25; 145:2
assigns 38:1
assist 92:25
assistant 132:6, 7
associated 30:4
assume 67:12; 112:4; 121:20; 129:23; 155:3; 44:22; 112:3
assumption 112:9; 160:9
attached 133:22
attend 12:25; 17:15; 31:6
attention 124:23
attitude 75:7
attorneys 71:13; 83:4; 154:23

August 78:15, 17; 80:
14; 81:2; 82:23; 90:11;
119:8
aunts 14:20
automatic 99:22, 23
automobile 99:16, 18
auxiliary 18:3, 5; 23:8
available 16:11; 21:10
65:15, 22; 94:14
average 103:22, 24
avid 98:18, 18
Avoid 5:15, 22; 155:16
aware 18:18; 103:10;
155:23
away 25:17; 39:8; 54:1
165:3

# B

B-a-u-c-u-m 84:14
back 8:19; 10:15, 20;
11:6, 10; 12:3; 16:21;
28:19; 31:12, 19; 32:25;
33:13; 34:5; 35:7; 40:17
41:8; 45:1, 5; 46:1; 47:1
48:4; 50:22, 23; 51:7;
52:12; 54:17; 55:18, 22,
22; 67:5, 10; 76:3, 6;
78:10; 88:17; 91:15;
94:11, 14; 95:9; 96:1, 4;
102:6; 108:12; 113:2, 8,
12, 13, 14; 115:6, 8; 119
8; 121:2; 123:18, 23;
124:8, 16; 125:5, 8, 17;
126:8, 23; 127:11, 18;
128:24; 130:3, 17; 134:2
137:13; 143:3; 152:19;
163:18; 164:10; 165:1, 1
backwards 49:14; 53:2
bad 40:15; 59:24; 110:
127:7; 128:6, 8, 20; 165:
balance 45:19; 97:6;
129:15
balancing 97:13
ball 102:8
ballast 81:23
bar 15:19, 22, 23; 16:1,
17:2, 6, 8; 24:6; 25:3, 3, 7
15, 19, 21, 24; 26:3, 5, 13
27:6, 10, 19; 30:12; 36:14
37:2, 3; 42:10; 44:3, 23,
24; 45:18, 21, 22; 46:1, 1
18, 23, 24; 47:3, 5, 11;
49:10; 53:3, 13, 18; 54:5,
23; 58:18; 60:15, 20, 22;
61:1, 3, 7, 13, 19; 62:17;
64:11, 13, 20; 65:3, 12;
66:10, 12; 69:15, 15;
70:19, 20, 23; 71:5;
108:17; 109:14; 111:14,
16, 18; 112:4, 14, 19, 21;
113:2, 5, 19, 25; 114:6, 9;
123:18, 23, 25; 124:5;
127:1, 19; 129:13; 130:15
140:25, 25; 141:1, 2, 3, 4,
5, 5, 6, 8, 9; 142:9, 12, 17,
19; 152:12; 153:16; 154:3

June 10, 2002

Terry W. Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

6; 158:1, 1, 5, 9, 22;
161:11, 24; 162:10

**barred** 162:3, 5

**barring** 162:15

**bars** 15:7; 24:1, 5; 38:22;
54:23; 71:2; 116:16;
141:15, 15, 17, 21, 25;
146:8; 153:15, 24; 154:1;
163:22

**based** 103:17; 160:9

**basic** 126:5

**basically** 14:18; 15:5;
17:13; 19:12; 23:3, 9, 14;
27:19; 29:11, 21; 40:21;
46:5, 13, 15; 61:18; 66:18;
75:25; 85:18; 92:16, 21,
23; 95:17; 96:7; 102:17;
145:23

**basis** 22:13, 17; 93:19;
149:5

**basketball** 102:10

**Baucum** 84:13, 17;
132:12

**bear** 107:8

**became** 19:13; 21:20;
22:11; 91:18, 19, 21; 92:5;
103:15; 166:24

**become** 92:8; 104:25;
105:1

**began** 21:25; 24:15; 29:7,
16, 21; 41:13; 43:18;
109:21; 110:2

**begin** 6:14; 28:20; 78:14;
20:9

**beginning** 108:13

**behalf** 123:7

**behind** 54:21; 51:24;
53:18; 124:9

**belong** 98:19; 141:13

**below** 49:5; 50:18

**bend** 59:21

**bent** 55:8, 9; 59:20; 60:8;
61:1, 2, 19, 20; 62:17, 19

**besides** 8:23; 25:18;
71:13; 80:14

**best** 38:4; 119:2

**better** 86:25; 164:18

**beyond** 19:25; 51:16;
76:12; 94:5

**bicep** 95:20, 22

**bid** 35:25

**billing** 93:3

**birth** 7:10

**birthday** 12:20

**bit** 54:20

**Black** 87:15, 21

**blade** 96:4

**block** 70:6

**Bloomsburg** 10:9

**blue** 149:13; 160:19, 21,
22, 23, 25; 161:2

**boats** 100:4

**Bob** 56:8

**body** 45:24; 49:4; 51:16;

53:19; 136:16, 19; 142:16

**book** 30:18, 18

**boss** 131:4, 6; 132:8

**both** 21:12; 22:11, 12;
47:15; 48:23, 23; 101:9;
127:21; 135:18

**bottom** 57:9; 75:3; 77:9

**bow** 99:2, 3

**box** 132:21

**BOYD** 4:9, 15, 17

**Bradley** 84:9, 17; 132:12

**breaks** 140:5

**bring** 56:16; 67:10; 83:22

**broke** 82:11, 13; 126:15;
164:11

**broken** 18:2, 5; 114:22;
143:18

**brothers** 14:19

**brought** 4:19; 91:15

**building** 163:3, 10

**bullet** 97:8, 7

**bunch** 16:18; 32:17

**busier** 104:14, 23, 25;
105:1

**business** 13:12; 18:22

**busy** 104:20; 164:12, 13

# C

**cab** 152:6

**call** 18:3; 28:3; 50:10, 11;
52:7, 8; 55:13; 81:21;
100:8; 119:9, 14; 141:2;
143:3; 4:9; 15:17; 20:8;
21:10; 28:1; 33:6, 20; 36:9;
91:12, 13; 105:4; 108:17;
139:10, 11; 140:6, 25;
141:1, 1

**came** 10:20; 13:16;
14:22; 18:22; 19:5; 26:11;
27:13; 33:8; 40:18; 47:11,
12; 49:11; 53:18; 67:19;
91:16; 123:18; 124:1;
126:21; 128:15; 136:24,
25; 138:2; 150:6; 153:7,
23; 163:18

**can** 5:18, 23; 6:8, 16; 7:4;
16:18; 18:8; 21:3, 15; 31:3,
9; 44:9; 46:21; 47:1; 49:3;
51:22, 24; 59:25; 61:10;
62:16; 64:21; 65:2; 66:4,
16; 74:5, 11; 77:15; 79:8,
10; 92:24; 101:18; 103:12;
104:8; 110:9, 15; 113:5, 8;
114:4; 130:13; 131:2;
133:5; 136:2; 143:3, 5;
145:19; 152:18; 154:4, 5,
9, 15; 158:17; 161:24;
163:2; 166:10

**capable** 36:21

**capacity** 103:5, 7, 13

**capital** 76:13

**car** 15:18; 16:11, 11, 15;
27:10, 14, 16, 19; 44:2, 2,
4, 10, 12, 18; 45:2, 3, 4, 7,

10, 14; 47:16, 19; 48:6, 14,
19; 49:1, 23; 51:13, 21, 22;
52:1, 2, 6; 53:25; 54:7;
55:19; 56:2; 60:17; 63:5, 6,
12; 66:15, 16, 20, 22, 24;
67:2, 5; 74:2, 9; 92:20;
97:2, 4, 5; 99:21, 21, 23,
24; 105:17; 106:5, 5, 7, 9,
25; 107:2; 109:6; 110:11;
113:15; 119:18, 21, 22;
120:5; 124:18; 125:17, 22;
126:2, 9; 127:14, 15;
128:1, 3, 4, 7, 10, 11, 12,
16, 19, 21, 23; 129:25;
130:17, 22; 132:24; 133:6,
9, 16, 18, 22, 24; 134:21;
136:5, 9, 10, 10, 11, 25;
141:11, 21; 142:2, 18;
143:2, 5, 8; 149:8, 11, 20;
150:5, 25; 151:21; 153:9;
165:13

**Care** 86:11; 90:7; 100:20

**carry** 99:13; 117:24, 25

**cars** 15:6; 23:7; 26:4;
63:8, 10; 66:19; 105:18;
108:7; 109:7; 121:13, 15;
129:5; 135:19, 24; 136:22,
24; 137:2, 5, 8; 138:22;
139:21, 21; 143:12;
146:11; 147:25; 150:1

**cartilage** 81:9, 14

**catch** 44:24; 51:12;
123:19; 111:21

**category** 85:4

**caught** 50:10; 53:23

**cause** 69:14; 96:13;
105:12; 106:23

**CDL** 144:12

**ceased** 105:20; 106:18;
107:18, 23

**center** 61:20; 87:16

**Central** 88:16; 89:1

**certain** 19:4; 31:15;
36:16, 17; 51:20; 79:9;
91:19; 122:17; 152:24

**certainty** 62:21

**certification** 4:4

**chance** 111:2

**change** 12:5; 19:9; 25:20;
26:1; 27:4, 9; 30:9; 32:8;
34:2; 90:23; 91:10;
108:20; 147:11; 10:14;
19:9, 24; 25:1, 4, 21; 40:4;
91:3; 139:6, 7; 141:24;
147:12, 12; 26:9, 13; 27:20

**charge** 33:21; 93:22

**chassis** 153:11, 13

**check** 65:13; 89:21;
164:11; 165:1; 69:20, 24;
70:8; 65:11

**Chemical** 21:2, 18, 19, 9

**Chicago** 150:7

**child** 9:7; 12:12

**children** 7:18; 8:18, 23;
9:1, 10, 24; 85:7; 7:19

**choice** 145:20

**chords** 6:17

**Christmas** 104:24

**Christmastime** 79:12

**Christopher** 8:4, 14;
10:24; 12:7; 85:6

**circle** 61:5, 9

**circumstance** 129:21

**claim** 79:5; 103:2, 10;
105:10

**clamped** 15:19

**clamps** 16:25

**clarify** 11:6, 14; 19:20;
72:19

**Class** 75:24; 76:4, 6, 8,
19, 20, 24; 77:5, 12, 15;
78:7; 17:15; 31:7

**clear** 6:8; 23:15, 17;
78:10

**clerk** 93:3, 2

**climb** 26:4; 45:4, 6, 8;
49:23; 45:17; 37:21; 97:1;
136:9

**clock** 148:9, 12, 16

**close** 64:17; 100:11;
112:15

**closer** 42:4, 5, 6; 45:14,
14; 52:21, 22, 23; 53:7;
143:4

**closing** 112:5, 23

**clothes** 32:8; 40:4

**clothing** 32:7; 70:12;
156:14, 25; 157:2

**clubs** 98:19

**clue** 82:2

**co-workers** 125:6, 13

**collapse** 16:14

**collapsible** 16:12, 12

**college** 10:5, 7, 8; 13:11,
11

**coming** 113:19; 136:9;
160:23

**communicate** 33:13;
26:13

**comp** 79:16

**Company** 4:21; 18:22;
19:5; 20:8; 21:7, 18; 22:25;
28:1; 133:3; 141:24;
143:21; 147:18, 24

**compared** 43:21

**complaint** 53:6; 123:2, 7;
150:18, 22

**complete** 61:7; 85:21;
89:4; 76:4, 8, 15; 77:4, 10

**completely** 54:2; 60:15;
61:1; 64:12

**complies** 61:11, 16

**computer** 32:19; 144:12

**Concentra** 86:10, 19, 24,
25; 88:11, 17; 105:3

**concentrate** 30:5; 31:11;
82:15

**concerning** 83:21;
149:15

**concluded** 168:4

**condition** 66:2; 86:24;

102:21; 108:19, 22, 23, 23;
127:24, 25; 83:7; 84:23;
87:21; 108:24

**conform** 94:3

**confused** 101:22

**confusing** 34:16; 37:9

**confusion** 6:9

**conjunction** 17:2

**connect** 97:10, 11;
150:4; 149:23

**connection** 123:17

**Conrail** 5:4; 18:17; 31:5;
72:8, 13; 133:10; 134:11,
14; 138:16; 162:7; 134:6

**considerable** 103:18

**consists** 42:16

**Consolidated** 4:22

**constant** 95:13, 14, 20,
25; 166:7

**constantly** 25:9; 164:13

**contained** 120:15

**container** 48:9; 73:7;
97:5; 153:13; 51:25;
97:10, 11, 12

**contend** 106:21

**contention** 105:25

**continue** 19:6; 28:6;
78:21; 122:14; 19:4; 67:7;
109:22

**continuously** 9:25

**contribute** 12:11, 18, 21

**contributing** 11:10; 12:2

**control** 137:1; 32:22;
133:9, 17; 136:23; 145:24;
153:15, 16

**convenience** 88:18

**convenient** 117:25;
118:2

**conversation** 120:19

**coordinating** 148:16

**copy** 68:24

**corner** 56:25; 60:3;
61:24; 62:6, 12, 15; 75:3

**Corporation** 4:22

**correspond** 104:21

**cost** 116:24

**counsel** 4:3; 63:20;
134:19; 137:15; 140:25;
141:14; 142:5; 152:10;
154:3, 16

**couple** 5:8; 77:13; 82:3;
85:22; 162:17, 21

**course** 76:25; 129:21

**Court** 4:19; 12:13, 16;
129:7; 145:16; 167:15

**cover** 17:25; 23:1, 19;
24:1; 76:25; 77:15; 98:4

**crack** 59:25; 60:2; 55:8;
59:25; 111:5

**Craig** 5:2

**crank** 27:17; 44:3; 27:11;
42:11

**crawl** 44:2; 60:17; 63:6;
27:10; 67:5

crew 118:10, 22; 137:7
cuff 44:25; 87:2, 3
curious 126:25
current 4:14
currently 7:3; 58:1; 90:15
cut 101:6; 102:6

# D

daily 146:8; 151:1
Dale 84:13; 132:12
damages 85:6, 10
Dan 84:9; 132:11
dangerous 129:4
dark 44:21; 46:22; 61:9; 65:14; 111:25; 114:11; 152:12
date 7:10; 72:10; 76:8, 19; 82:15, 21; 86:18; 87:13; 88:10; 90:24; 136:18; 137:15; 148:24; 74:23; 11:16; 79:10
daughters 9:11; 12:17
David 74:23
day 18:14; 20:1; 31:14; 34:13, 24; 35:25; 36:2; 38:14; 39:3, 17; 42:6; 46:9; 55:18; 67:7; 68:7; 71:15, 23; 78:23, 25; 84:1, 4, 6, 8, 22; 85:2; 86:14; 87:7, 10; 95:15, 17; 116:9; 117:2; 118:10, 23; 125:18, 20; 128:20; 137:18; 139:16; 146:5, 14, 16, 17, 23; 147:10, 16, 17, 19, 24; 149:9; 151:8
daybreak 127:11; 164:25; 165:3
daylight 66:4; 125:21; 126:15; 128:24; 164:11
days 31:22, 25; 34:12; 85:24; 86:15; 93:14, 15, 16; 108:14; 134:24; 162:17, 21; 163:15
deal 109:12; 110:7; 23:12; 66:14, 17; 83:11; 86:7
December 77:7, 16, 16
decided 38:14; 110:12; 157:19, 24; 159:4, 6
decides 38:23
decision 37:19, 23
deer 99:1
defective 129:4
Define 97:22
definitely 75:9; 79:22; 106:3
deformed 55:1
delayed 164:7
delegates 92:17
delivered 14:11
demonstrate 24:4
department 76:2; 104:25
depends 143:1

deposition 4:25; 56:19; 63:17; 68:20; 73:2; 74:18; 75:17; 168:4
describe 68:17; 95:16; 27:23; 52:16; 53:16; 98:7; 146:2; 156:15
description 68:18
designated 122:7, 8
designation 44:12; 91:12; 41:19, 19
designed 117:10
destinations 14:12
destroyed 64:12
determine 66:1, 7; 111:4; 112:1; 114:21; 127:10; 33:16, 24; 34:6, 11; 38:15, 16, 17; 39:13; 110:12, 13; 111:3; 96:9
determining 34:25
device 16:24; 18:6; 25:16; 58:19, 23, 25; 59:17, 19, 22, 24; 60:7, 16, 19; 61:21; 97:9, 10; 150:4, 8, 9, 13; 58:22
difference 25:19; 58:15; 92:14
different 14:12; 36:8; 51:20; 52:1; 58:23; 59:5, 10; 62:1, 2, 13; 63:11; 66:20; 108:16; 109:13; 117:10; 119:12; 121:15; 147:13, 14
differently 46:6
difficult 5:25; 6:24; 7:6
digit 122:16
dinner 140:6
direction 113:5; 138:19
directly 50:17; 71:18
disappeared 37:2; 168:1
discharged 90:7
discipline 140:20; 161:7; 162:13
disciplining 162:12
discomfort 96:13
discontinued 115:19
discovery 56:10
discuss 138:23; 77:19
Discussion 6:21; 9:22; 53:10; 57:13; 79:18; 92:6; 101:2; 148:21; 167:14
Disease 132:21
distance 51:21; 143:1
distributing 33:22
distribution 65:19
District 4:19
divested 19:14
docketed 4:19
doctor 87:23; 88:4; 85:19; 87:20
document 69:1; 73:9; 75:7, 9, 12, 15, 22; 130:19, 21
documentations 149:14
dollies 152:1

dolly 27:11, 17; 42:11; 44:3
Don 163:1
done 12:22; 26:22; 30:10; 32:13; 33:23; 35:2; 38:18, 19; 40:24; 44:10; 97:1; 105:11, 12; 106:22, 23; 120:23; 122:18, 21; 139:24; 140:10, 12; 145:24; 148:7, 9; 152:25; 154:9; 164:18; 165:5
door 28:14
double 110:9
double-stacked 48:9; 97:12
doubt 71:21; 76:19
down 5:13, 18; 16:8; 18:1; 23:8, 13; 25:3; 27:12, 14, 18; 45:4, 6; 46:2; 48:25; 49:3, 17, 24; 53:12; 54:1, 18; 60:8; 61:2, 19; 68:15; 76:7, 13; 83:12, 14; 126:5; 128:15, 23; 133:1; 135:15; 136:9, 9; 143:9; 160:1
Dr 86:22; 87:4, 5, 15, 18, 20, 21, 24, 24; 88:1, 5; 90:3, 12; 94:3, 10
dressing 98:12
Dressler 35:20; 39:6, 12; 84:3; 118:18, 25; 135:8
drive 42:24; 43:6; 99:16, 18, 21
driver 14:24; 21:6; 144:11; 156:12; 36:11; 155:16, 24, 25; 156:3
driving 14:25; 15:1; 98:12; 155:16
drop 27:16; 152:25; 164:20; 153:5, 13; 158:21; 37:7
drove 14:11
duly 4:10
during 19:17; 20:24; 21:12, 16, 22; 22:10; 82:25; 93:22; 101:14; 104:11, 12; 108:20; 109:23; 110:2, 6; 131:18; 140:7; 145:1, 25; 148:4
duties 14:23; 15:4; 19:8; 22:3; 24:25; 30:4; 38:2, 6, 10; 67:7; 91:8, 24, 25; 146:13, 16; 148:24; 149:2, 4
duty 91:4, 6; 94:12, 19
dysfunctional 106:6

# E

e-n 21:4
E-r-i-n 8:1
earlier 5:2; 7:13; 72:16; 88:2; 92:1; 134:19; 149:3; 156:15
earliest 138:1
earning 103:5, 7, 13, 8

easier 57:6
eating 98:12
edge 51:16; 109:2
education 13:10, 10
Edwin 8:6, 16; 9:7; 11:3
effect 36:15; 134:20
Eight 8:17; 20:22, 24; 21:13, 16; 24:17; 86:15
eight-year-old 102:7
either 7:4; 31:5; 50:10; 65:5, 6; 84:17; 98:8; 102:5; 106:22; 113:8; 133:9; 139:24
electrified 100:8
eliminated 142:9
ellipse 59:13
eloquence 134:21
else 8:3, 22; 33:12; 35:2, 10, 12, 19, 21; 55:23; 56:3; 58:9; 83:20; 84:20; 96:6; 97:16, 20; 98:2; 106:21; 125:7; 135:4, 11, 11, 23; 136:4; 159:17; 163:23
elsewhere 11:23
emergency 86:1, 4
employed 71:24; 141:18; 162:3
employee 33:20; 75:23; 78:3, 7; 119:10; 121:17; 139:13; 142:6, 10; 151:6; 156:10, 11; 159:6, 17; 162:13; 145:6; 17:19; 18:12; 19:2, 22; 22:4; 72:21; 147:23, 24; 148:11; 150:18; 155:23; 156:4; 157:14, 20
employer 79:16; 69:19; 132:20, 23; 133:1
employment 29:22; 104:17; 161:13, 14; 162:1, 11
encounter 109:9; 110:4; 109:4, 11; 125:7
end 40:14; 42:1, 4; 43:12, 13, 15, 17; 45:13; 46:24, 25; 47:3, 3; 51:19, 21, 23; 52:2, 9; 53:19; 61:7, 8; 64:13; 80:9; 107:24; 110:14, 16; 111:5, 12; 112:1, 10, 20, 21; 114:21; 123:19; 125:18; 130:23; 143:2, 5, 19; 159:4, 5, 6; 160:21; 163:23; 165:18, 25
ended 162:10
ends 55:10; 110:4
engine 136:24; 137:4; 160:23
enough 48:21; 61:10; 90:2; 102:16
entails 91:5
entire 139:16
entirely 51:15
entitled 75:23
entity 72:5; 162:8
envisioning 34:23

equipment 15:12; 16:?; 23:4, 5; 69:24; 70:2, 4, ?; 10; 72:12, 24; 105:14, ?; 129:4; 137:7; 141:10, 1?; 146:20; 157:24
Eric 115:1
Erin 7:25; 8:12; 9:24; 10:5; 12:2; 85:6
established 133:15
Eugene 135:12
even 65:4; 68:18; 104:?; 112:9; 120:7; 125:3; 127:3; 145:22; 152:25; 156:10; 163:9; 65:10, 2? 93:7
evenly 63:15
event 75:14
everyone 35:4
exact 29:18; 51:18; 79:14; 127:10
exactly 11:17; 64:18; 112:17; 126:2
exam 76:20; 77:6, 21, ? 78:1
EXAMINATION 4:11; 107:6; 132:17; 155:9; 164:5; 167:5, 17, 24
except 4:5
excluding 29:5; 82:18
excuse 28:19; 37:3; 67:?; 98:1; 116:23; 163:4
Exhibit 56:19, 23; 60:1?; 24; 61:6, 17, 23; 62:12, 1?; 63:17, 23; 64:7, 9, 15; 65:1, 5; 68:20, 24; 71:10?; 73:2, 6; 74:18, 22; 75:17; 21; 130:9; 132:19
exist 107:18
expect 5:9; 29:18; 91:7; 34:14; 17:19; 18:12
explain 103:12; 120:22; 123:6; 149:22; 153:4
extend 50:17; 49:13; 50:20; 97:2
extent 55:25
extreme 54:1
eyes 55:17; 112:6, 23

# F

faced 113:16
facing 52:25; 53:13; 152:17
fact 19:23; 71:1
failed 153:12
fair 41:11; 52:10
fall 51:5, 6, 11; 53:20; 54:10, 11; 82:1; 49:14; 124:4, 10, 17
familiar 73:10, 16; 122:17; 127:13
family 14:19
far 18:3; 23:3; 38:3; 49:7;

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

51:19; 103:13; 108:19;
114:5; 142:24; 149:7
**fast** 154:9, 15
**fast-paced** 154:14
**father** 12:10; 14:19
**favor** 61:12
**February** 7:11; 77:4;
78:7, 8; 89:22; 90:6, 6, 13
**feel** 54:21; 127:6; 54:16;
55:14
**feet** 49:8; 53:4, 5, 7;
116:15, 16, 19
**fell** 81:17, 19
**fellow** 148:11; 150:18
**felt** 55:10, 14; 130:23
**female** 8:10, 13; 44:22;
46:25; 47:3; 110:13, 16;
111:4, 12; 112:1, 10, 15,
15, 20; 114:8, 11, 21;
123:19; 124:1; 125:18;
127:4; 129:12, 20; 130:7,
11, 23; 163:22; 165:18, 25
**few** 4:25; 107:8
**Fifteen** 134:18
**fifth** 50:10; 62:19
**filed** 123:7
**filing** 4:4
**fill** 28:11; 68:12; 71:8;
28:16; 68:6; 84:19; 130:9,
19, 21
**film** 18:9, 10; 19:25;
23:14; 24:4; 17:18, 21, 23;
18:9; 19:21; 22:3, 14, 20;
23:10; 24:8, 12; 29:8; 30:2,
24; 31:4
**find** 32:11; 34:4; 40:6, 10
**fine** 145:12
**finish** 10:10; 78:23; 6:13,
18, 19; 11:4; 27:15
**fire** 161:8, 10, 23, 25;
162:2, 8, 10
**First** 5:11; 21:25; 24:8;
29:25; 32:5, 6; 38:16;
42:20; 44:6; 56:12; 58:13;
59:11; 61:24; 79:22;
83:15; 86:14; 87:7; 88:18,
25; 89:24; 96:20; 105:15,
16; 120:10; 121:20;
143:20; 155:12
**fishing** 98:14; 99:6, 7
**fit** 16:15; 94:20
**five** 7:17; 15:24; 34:22,
23; 37:12, 21; 57:10;
60:24; 93:14, 16; 116:15,
19; 117:22; 118:21
**five-foot** 15:19; 25:3, 7,
15; 37:3; 109:14; 117:7,
10; 141:15, 16; 142:12, 17
**five-inch** 15:23
**flag** 160:22, 23; 161:2;
136:23; 160:21; 149:13,
13; 160:19, 21, 25
**flared** 54:22, 24, 25; 55:3,
8, 11; 60:1; 61:18; 109:1,
9, 11; 110:4, 17, 20; 111:5,
8, 12; 112:2, 10; 113:17,

22, 24; 114:8, 12, 22;
116:11; 125:18, 23; 127:4,
8, 20, 25; 129:12; 130:7,
10, 23; 165:18; 166:14
**flaring** 60:1, 7
**flashlight** 115:10, 21;
116:2, 5, 8, 8, 10, 11;
167:1; 65:15, 17, 19, 22;
114:15, 17, 20, 23, 24;
115:4, 8, 19; 143:14, 17;
154:16, 17; 166:17, 23;
167:7, 9, 13, 20, 22
**flat** 63:12; 64:21
**flipped** 127:19
**floor** 27:12; 48:18; 49:1;
50:11, 13; 51:7
**Fly** 99:7
**folds** 16:25
**follow** 30:19; 138:17, 19;
139:15; 140:17; 145:5;
159:20, 22; 161:7; 78:25;
140:14; 4:10
**foot** 15:24; 50:8; 82:11,
13; 117:22, 22, 25
**Football** 102:10
**force** 25:17; 45:24; 46:5;
47:15; 109:16
**Ford** 100:1, 2
**foreman** 33:18, 19; 34:1,
12; 35:3, 7, 8, 9; 36:2, 3;
37:24; 38:1; 40:6; 120:2,
12; 131:7, 9, 13, 15, 19,
20, 22; 132:2; 157:14;
159:12, 16
**forget** 6:13
**form** 4:6; 133:13; 136:1;
138:3; 145:8; 148:18
**formal** 17:12
**formalized** 13:10
**former** 103:8
**forth** 46:1
**forward** 113:9; 53:21
**four** 7:17; 8:18, 23; 34:22,
23; 37:12; 49:8; 56:24;
57:2, 3, 3; 60:13, 15;
117:22; 119:4, 6; 138:8
**four-foot** 117:20; 118:4;
141:15
**fraction** 21:15
**frame** 28:8, 18
**Frank** 10:4
**Frankie** 7:21; 8:8; 9:24;
10:12; 11:7, 20
**frequent** 109:6
**frequently** 109:9, 10
**front** 52:9, 18, 19, 20, 24,
25; 113:3, 14, 15
**full** 4:13; 27:21; 47:10;
87:2
**full-time** 21:21; 22:11;
24:15, 20, 23; 28:20; 29:2
**fullest** 45:22
**fully** 129:19
**functions** 18:4; 117:4
**furloughed** 29:3

**further** 51:23; 143:3;
167:4

### G

**gas** 152:3
**gate** 93:2; 104:5, 6;
155:19
**gave** 7:13; 8:23; 44:23;
51:6; 77:25; 83:5; 115:4;
118:24; 121:17; 131:11;
138:11; 166:22; 168:1
**gear** 154:24; 155:2, 13,
21; 156:6; 160:8, 10, 16
**general** 46:15
**generally** 139:15
**gentleman** 83:17
**gestures** 5:16
**gets** 96:8
**gifts** 12:20
**given** 22:24; 30:17;
36:20; 63:20; 70:23;
73:17; 114:24; 121:21;
122:9; 145:10; 157:5
**gives** 76:1
**glad** 56:18
**goes** 5:24; 10:9; 75:24
**Good** 7:23, 25; 8:4; 9:2;
59:17, 18, 20; 85:7; 144:13
**GPS** 28:2, 3, 6, 9, 10, 20,
24; 29:2, 7, 22; 30:3, 9, 17,
22, 24; 34:21; 36:4; 45:15,
16; 58:4; 65:15, 23; 68:25;
70:21; 71:1, 24; 72:1, 4, 5;
74:23; 75:1, 22; 84:12;
90:22; 93:24; 103:9;
105:5; 107:10, 22, 24, 25;
108:1; 109:22, 23; 110:22;
115:8, 13; 116:18; 121:17;
131:15; 132:8; 134:19;
138:2; 139:1; 140:15;
141:10, 14, 23; 143:15;
151:2, 6; 152:10; 153:21,
23; 154:17; 155:14, 23;
156:3, 5, 10, 15, 16; 157:3,
5, 6, 13, 20; 159:5, 10, 17;
162:9; 163:12, 16, 17;
167:19, 22
**GPS's** 52:22, 23, 25;
53:13
**grab** 25:12; 48:13; 49:12;
50:9; 60:18; 124:6;
125:11; 47:18, 20; 48:12;
49:11; 50:14, 15; 53:17;
124:11, 19
**grade** 11:1, 3; 76:15
**graduate** 13:2, 6
**grass** 101:6
**grease** 105:18
**Gross** 84:7; 118:12, 25
**ground** 25:14; 51:8, 11;
63:7; 141:21, 22; 142:7
**groundman** 15:4, 16;
36:25; 37:1; 39:11;
109:24; 118:14; 166:6, 14,
21

**groundmen** 36:9
**Group** 57:1, 10; 58:14,
15, 15, 16, 17, 24; 59:2, 5,
8, 11, 11; 60:25; 61:22, 23;
62:13, 25; 63:3, 4, 9, 9, 14,
14, 16, 23; 64:9, 14, 21,
24; 65:2; 118:16
**grown** 9:15
**guess** 21:25; 67:12;
72:15; 74:15; 77:9; 86:12;
89:2; 103:23; 108:17;
125:24; 129:17; 153:12;
46:14
**guesswork** 46:22
**guidelines** 5:1
**gun** 99:13
**guys** 37:21

### H

**habit** 26:10; 112:7; 25:4;
30:8
**half** 11:23; 49:8; 144:25;
145:1
**halfway** 76:12
**hand** 5:16; 45:19; 50:16,
21, 24; 53:18; 54:20;
111:4, 6, 9; 112:14, 17;
124:5, 8, 14, 17; 127:5;
152:11; 165:24, 25; 14:12;
54:19; 97:6
**handle** 52:4
**hang** 97:5, 1, 3
**happen** 37:25; 44:6;
81:16, 25; 129:18; 156:16,
17; 10:16; 11:7; 28:7;
43:24; 44:13, 17, 18, 20;
47:9; 53:19, 22; 56:2;
62:23; 65:18; 66:23;
68:16, 19; 71:15; 72:7, 17;
74:2, 8; 86:5; 115:10, 15;
122:23; 123:4, 16; 127:6;
143:17; 54:11; 66:8;
119:16; 164:16
**hard** 70:5, 15
**harder** 166:24
**harpsichord** 6:16
**Harrisburg** 20:6; 107:18;
122:6; 134:16; 136:6, 11;
143:21; 144:17; 162:6
**hat** 70:5, 15
**hatch** 133:20
**hauled** 21:9
**head** 5:16; 84:15; 98:1
**hear** 6:25; 7:7
**heart** 4:25
**Heavy** 97:21, 22
**Heckert** 67:22, 23; 68:4,
10; 69:4; 71:22; 79:2;
83:15; 115:24; 130:6;
132:3; 159:13
**held** 6:21; 9:22; 53:10;
57:13; 79:18; 92:6; 101:2;
148:21; 167:14
**help** 92:23; 109:19;

119:9; 12:21
**hereby** 4:2, 5
**Hershey** 87:16
**high** 10:24, 24; 12:25;
13:6, 7
**highest** 93:23
**hired** 143:23, 23; 144:4,
6, 9, 15
**History** 75:24; 78:7;
141:16
**hit** 16:13, 17, 23; 45:20;
54:3, 5; 136:24; 155:23;
156:2, 3; 163:3, 10, 23, 25
**hitch** 15:20; 16:21, 23,
25; 18:1, 7; 23:21, 23, 25;
25:14; 27:11; 37:19;
40:15; 42:16; 43:21; 45:3;
47:24, 25; 51:20; 52:2, 7,
7, 16, 17, 18, 19, 21;
54:21; 58:7; 59:2, 9, 12;
62:1, 2, 3, 3, 10, 16; 63:4;
65:7, 25; 66:15, 16, 18, 20,
21; 67:8, 14; 69:15; 76:4,
7, 13, 21, 25; 77:9, 18;
105:4, 6, 19; 106:6;
108:25; 110:13, 13, 18;
111:5, 12, 14, 17; 112:1,
15, 16, 21; 113:2, 17, 24;
114:7, 21; 119:11, 15;
124:22, 24; 125:7, 10, 12,
23; 126:3; 127:10, 25;
128:6, 8, 20; 129:12, 13,
20; 130:4, 7, 11; 133:21;
135:13, 15; 141:11, 20;
142:14; 143:2; 149:9, 15,
19, 24, 25; 150:10; 152:11;
164:12, 14; 165:1, 15;
15:8, 21; 16:4, 8, 12, 13;
23:12, 20, 22, 23; 24:2, 5;
25:25; 26:4; 40:13; 42:10,
11, 13; 43:18; 58:17;
66:19; 70:20; 73:20;
97:17; 105:23; 106:2, 10,
24; 108:7, 12, 19, 21, 23;
109:4, 5, 8, 9, 11, 15, 17,
19, 20; 110:4, 8; 112:10;
113:19; 117:21; 119:5, 13,
14; 134:23, 24; 135:2, 5, 8,
21; 136:1; 139:20; 143:25;
146:3, 9; 150:20; 151:4, 9,
12, 13; 152:15; 153:15, 17;
158:6, 10, 23; 166:25;
59:22; 60:16
**hobbies** 102:4
**hoist** 151:24
**hold** 25:12; 64:23; 105:5;
124:6; 133:12; 111:16
**hole** 45:20; 55:12; 60:20
**Holt** 162:24; 163:13, 17,
17
**Holy** 85:25; 86:4
**home** 10:15; 11:12, 21;
100:17, 18, 4
**hope** 110:19
**horizontally** 46:2
**hospitals** 85:19
**hour** 165:3; 24:20; 28:21;
93:10, 21; 95:14, 17;

103:14, 16, 19; 104:10;
116:25; 128:24; 138:8;
147:16, 17, 19, 21, 23
**hourly** 93:11, 12
**house** 101:5
**huh-uh** 50:8
**hump** 50:6
**hunch** 50:5
**hunt** 99:3, 1; 98:14; 99:12
**Hunter** 84:5; 98:18;
118:25; 136:10
**hurry** 122:19
**hurt** 40:16; 67:24; 81:8;
125:25; 126:9; 132:24;
135:3, 9, 11, 13, 18, 23;
136:4, 8, 10, 19, 20;
137:22; 148:25; 149:12;
151:14; 152:12; 153:2;
67:3
**hydraulic** 151:24

## I

**IBC** 97:7, 8, 9
**IBCs** 97:15
**idea** 10:23; 131:1; 146:25
**identification** 56:20;
63:18; 68:21; 73:3; 74:19;
75:18
**identified** 118:9
**illness** 69:19; 132:23
**illuminates** 166:10
**illumination** 166:23
**imagine** 5:24
**immediate** 14:18; 131:4,
6, 14
**immediately** 37:7; 132:2
**impossible** 117:24
**in-gated** 91:15
**inbound** 121:3, 8; 148:3
**lnc** 28:2
**inches** 53:8; 116:16, 20
**incident** 126:19; 130:6,
19; 166:15
**incisive** 23:18
**include** 100:4
**including** 151:13
**incorrect** 78:4
**increase** 93:9, 10;
111:13; 96:8
**indicated** 77:8; 87:1;
94:6
**indicating** 95:21; 113:1;
124:12, 13
**indication** 51:6; 165:2
**individual** 22:8; 38:19;
45:6; 51:20; 52:1; 92:16;
153:8; 156:24; 19:3;
36:17, 18; 38:21; 46:6;
85:4; 135:18; 147:11;
150:15; 157:13
**industry** 13:22
**information** 36:5; 37:15;

79:14; 85:3, 5; 151:7
**informs** 92:20
**injure** 136:16; 67:25;
109:1; 123:13; 127:10;
130:22; 133:21; 135:5, 8
**injuries** 79:5; 85:9; 86:4;
89:12; 90:16; 95:1; 103:4;
150:15, 19, 24
**injury** 55:24; 69:9, 14, 18;
74:7; 87:22; 89:5; 91:9;
94:4; 105:17; 132:21, 22,
22; 164:8
**insert** 24:3, 6; 44:3;
45:20; 46:11; 60:20;
65:12; 129:19; 163:22;
46:18, 23; 49:9; 144:12;
45:18
**inspection** 76:5, 7, 14,
21; 77:1, 10; 106:25
**inspector** 105:5, 6;
119:18, 21; 120:5; 128:1,
3, 4, 10, 19; 129:25;
165:14; 105:17; 106:6, 9,
25; 109:7; 134:22; 150:25
**instead** 64:19
**instruct** 159:1; 26:21;
156:24
**instruction** 24:24; 31:1
**instructional** 17:23;
29:8; 134:8
**instructions** 26:8, 9;
30:19; 31:8; 33:12, 17;
34:10; 41:12; 120:15;
122:1; 131:12; 138:11;
139:14, 16; 145:6, 10;
147:3
**intact** 65:3, 4
**interest** 19:9
**intermodal** 13:24, 24;
14:5; 18:23; 20:5; 28:1;
31:1; 73:7; 104:14
**Interruption** 129:6
**into** 4:24; 5:7, 17; 11:4;
35:25; 36:14; 40:3, 15;
43:16; 44:22; 45:18;
46:18, 24; 47:3; 51:22;
62:19; 91:16; 95:20;
111:16; 121:12; 125:8;
126:8; 129:19; 142:13;
143:24; 144:12; 150:8;
163:22
**introduced** 5:2; 153:18
**involve** 17:24; 15:11;
16:4; 58:7; 108:6; 130:18;
5:20
**involvement** 14:14
**iron** 141:5, 6
**issued** 114:15

## J

**Jack** 35:20; 39:6, 11;
84:3; 135:8
**January** 71:25
**jarring** 97:19
**jaws** 18:7; 25:17; 42:17;

45:25
**Jeff** 107:9
**Jersey** 26:25
**jet** 100:4
**jiggle** 154:4
**job** 14:23; 17:13; 19:19;
22:2; 24:25; 26:2, 15; 30:4;
35:25; 36:1; 56:1; 63:13;
91:8; 92:3; 94:2, 13, 21,
24; 103:9; 105:3; 116:2;
117:14; 120:11; 121:21;
122:21; 131:7, 8, 13, 15,
19, 19, 22; 132:2; 140:10,
12, 21; 142:3; 144:2;
145:2, 7; 147:6, 18;
148:12, 24; 149:2, 4, 5, 8;
150:17; 157:21; 161:23;
163:17; 164:18
**jobs** 36:8, 21; 94:16
**jockey** 36:10, 24; 39:8;
43:6, 7, 21, 25; 44:1, 1;
151:22, 23; 153:11, 14, 14;
155:16; 163:3, 5; 36:16,
17; 38:7; 42:24; 125:9
**Joe** 157:16
**judgment** 66:11
**July** 80:9, 9; 87:7; 90:5
**June** 8:19; 9:12, 25;
10:16; 11:6, 11, 18; 12:3,
17; 31:12, 20; 32:25; 35:7;
39:18; 78:25; 80:13;
82:12; 86:6, 15; 95:9;
96:16, 21; 102:22; 108:5;
117:14; 119:8; 121:16;
131:4; 137:13, 16; 154:18
**junior** 10:11, 24; 13:11

## K

**keep** 5:1, 9; 18:6, 7;
47:19; 49:13; 97:6;
117:24; 114:5; 151:25
**killed** 36:14
**kind** 15:11; 45:20; 54:19;
61:19; 68:4, 10; 73:17;
74:3; 97:24; 98:12; 99:24;
102:9; 149:13, 14; 151:3;
119:12
**kingpin** 143:4, 6
**knee** 80:19, 25; 81:1, 4, 5,
7; 82:5, 11; 90:20; 102:24;
49:17; 53:12; 48:23, 24,
25; 49:9; 50:2; 51:9; 53:20,
23; 124:4
**kneel** 49:23; 48:22, 23,
25; 49:3
**knew** 24:7; 38:18; 84:1;
130:21; 165:22
**knock** 16:8; 23:7, 12;
16:22, 24
**knowing** 112:9
**knowledge** 30:1; 46:15;
119:2
**known** 24:10; 86:21;
113:17; 114:7
**knows** 83:20

## L

**L-e-a-m-a-n** 21:4
**laid** 28:7; 29:3
**Landisburg** 4:16, 16
**landmark** 74:3; 73:25
**larger** 153:24
**Larry** 67:22; 71:21; 79:2;
83:15; 115:24; 126:18, 19;
132:2
**last** 7:22; 8:5; 9:1; 21:3;
77:5; 78:16; 87:23; 88:10;
90:7, 9; 103:23; 104:8;
107:17, 19; 122:16;
155:12
**latch** 16:22
**later** 27:13; 55:18; 81:11;
125:5, 17, 20; 128:19;
164:11
**lawsuit** 103:3
**lawyer** 5:3; 85:3; 5:6
**Leamen** 21:2, 19; 163:1
**least** 80:4; 103:19;
130:13, 22
**leaves** 42:17
**left** 49:18, 20; 50:21, 21,
24; 53:17; 57:7; 81:5, 7;
90:19; 112:14; 124:14, 16
**left-hand** 56:25; 60:3;
61:24; 62:12; 75:3; 99:14
**leg** 67:3
**legs** 27:11, 18; 42:11;
44:4; 47:15
**leisure** 98:13; 102:4
**length** 25:19
**Lenny** 136:5
**less** 96:13; 116:22, 24;
154:13
**letterhead** 74:23
**letters** 76:13
**level** 49:5
**leverage** 49:23; 117:21;
118:7; 152:18
**license** 144:11, 12, 13
**life** 96:19; 98:5
**lifting** 97:21, 22
**lifts** 151:25
**light** 91:4, 6; 94:12, 19;
126:3; 143:9; 166:8;
143:11; 166:7; 167:11
**light-duty** 94:13
**likely** 96:13
**limit** 160:4, 5; 102:9
**line** 76:7; 77:8; 83:12;
13:17; 14:10, 23; 15:9, 14,
15; 17:12; 18:16, 21, 25;
19:10, 19, 24; 20:3, 5;
25:8; 29:13; 69:13;
141:19; 143:22; 144:7;
156:12
**list** 75:23; 83:8; 85:18, 21;
92:19; 77:24; 85:6
**litigation** 83:11, 22

**little** 5:25; 32:6; 34:14;
54:20; 59:21; 60:21;
61:13; 76:12, 14; 81:18;
91:17
**live** 7:14, 16; 8:22; 9:12;
85:7; 9:25
**living** 8:18; 10:17; 11:8;
20, 23
**load** 15:5; 51:24; 15:6;
32:14, 23; 33:9; 36:6;
37:16; 41:5; 92:19; 121:
122:5; 140:4; 145:11;
17:8, 10; 37:8; 92:18, 18;
121:11
**located** 13:8; 40:22; 4
14; 43:22; 52:8; 73:23;
74:9
**location** 42:21; 74:11;
88:20; 112:5; 146:22;
152:13
**lock** 18:4, 5; 66:2; 114:
125:4; 149:25; 18:1;
66:13; 69:15; 97:10;
111:22; 150:8
**lock-up** 23:8
**locomotives** 137:4
**long** 18:11, 13; 20:21;
53:4; 80:3, 8; 117:2, 20;
135:9; 144:23; 150:23;
154:10
**longer** 16:10; 14; 20:5;
25:5, 22, 24; 27:1, 6, 25;
92:13; 93:8; 105:20;
108:17; 117:12; 118:6;
123:5; 142:6; 153:24;
162:3, 20
**look** 18:2; 22:5, 9; 55:19
23; 58:12; 73:10, 16; 78:
125:22; 126:3, 6, 9, 24;
127:11; 130:3, 13; 165:1
23:21; 55:17; 125:20;
127:22; 130:17; 55:4;
64:9; 66:9; 109:7; 134:22
57:5; 62:1
**lose** 129:15
**loss** 103:3, 5, 7
**lost** 103:13
**lot** 98:15; 119:16; 152:2
**lower** 15:7; 60:3; 23:20
**lubricating** 134:22
**lunch** 140:6

## M

**M.R.I** 87:1
**machine** 6:15; 15:17, 20
23:6, 15, 16, 18; 25:5, 9,
10, 16, 22, 24; 27:3, 6, 13,
16; 30:14; 37:5; 38:3, 5,
11, 20, 24; 39:1, 12; 42:18
60:18, 22; 67:10; 109:15;
117:1, 2, 3, 5; 125:11;
142:18; 150:7; 153:12;
158:3, 3; 166:7, 9
**main** 23:16
**maintain** 105:19; 106:1;

109:8; 75:6; 106:10; 107:1

**maintenance** 84:16; 105:23; 107:1; 151:1, 2

**makes** 6:24; 71:2

**making** 23:8; 37:22; 83:23

**male** 8:10, 11

**man** 38:23; 116:25; 117:1, 3; 138:23; 156:7

**Managed** 86:11

**manager** 115:2; 132:7

**manipulate** 141:20; 146:9

**manner** 12:11

**Manual** 73:8

**manually** 152:1

**manufactures** 71:2

**many** 18:8; 24:20; 34:20; 44:9; 46:14; 108:6; 112:25; 115:18; 118:23; 134:16, 23; 143:20; 147:23; 150:22

**mark** 56:14; 63:22; 64:16; 76:14; 56:20, 22, 25; 57:4, 9; 58:14, 14; 63:18, 23; 68:21, 23; 73:3, 6; 74:14, 19, 21; 75:18, 20; 132:19, 24

**marriage** 9:3, 4

**match** 41:20

**mate** 58:18

**material** 70:13; 116:22; 73:18; 103:1; 105:2

**matter** 162:11

**may** 5:6; 40:18; 72:3; 73:10; 84:21, 22; 104:13; 105:12; 107:5; 119:8; 164:4; 166:4

**maybe** 11:16; 37:10; 92:13; 93:8; 103:24; 118:2; 123:3; 165:14

**mean** 6:4; 12:19; 13:11; 16:9; 17:21; 18:3; 22:19, 23; 24:21; 25:6; 28:20; 33:19; 37:2, 25; 42:13; 43:24; 46:12, 21, 22; 47:22; 48:16; 52:25; 54:9, 18, 25; 58:21; 59:18; 64:7; 66:7; 95:18; 97:3, 22; 98:1; 101:13; 103:12; 104:18, 24; 108:22; 111:20; 112:18; 113:6; 115:15; 116:24; 117:14; 119:13; 126:1, 4; 133:21; 140:8; 142:16, 22; 150:3; 153:5; 154:13; 155:25; 157:19; 91:5, 6; 162:7

**meant** 26:3

**meat** 4:25

**mechanism** 16:21; 45:18; 59:6; 65:12; 66:14

**medical** 85:17; 86:11; 87:16

**medication** 7:4; 102:13, 20, 24

**member** 107:11, 13, 15,

17; 108:1

**memory** 77:2

**men** 33:22; 37:12; 39:7, 13

**mentioned** 12:17; 20:1; 25:2; 30:24; 31:5; 36:9; 46:25; 83:17; 84:21; 102:11; 151:19; 154:23

**merchandise** 14:11

**message** 34:5

**metal** 141:5, 7

**method** 34:25

**Middle** 4:19; 43:14; 60:4; 159:4

**might** 5:25; 34:13; 38:9; 66:20; 68:7; 83:6, 10; 85:10; 89:20; 101:22; 136:17; 164:20

**mill** 41:22, 24; 144:14

**mind** 5:1, 9; 32:16; 80:18

**mine** 115:16

**minor** 150:19

**minute** 45:1; 48:5; 54:16; 63:22; 69:21; 133:12; 123:3, 14

**misformed** 61:21

**missed** 79:3, 22; 82:8, 16, 24; 163:23

**misshaped** 55:1; 61:1, 20

**misshapen** 55:2

**missing** 60:15; 79:21; 119:18

**mistaken** 163:1

**moment** 107:4; 104:23

**momentum** 47:11; 51:12; 109:16

**Monday** 31:25

**money** 116:21, 22

**month** 29:20; 92:13; 104:8, 11, 12; 106:13; 20:22, 22, 24; 21:13, 16; 24:18; 29:20; 77:13; 88:13; 92:13

**more** 5:25; 16:3; 18:12; 21:19; 22:3, 3; 29:14; 34:14; 45:11; 46:5; 48:5, 6; 51:7; 63:13, 14, 16; 66:11, 18; 81:18; 91:17; 93:10; 96:8; 104:25; 117:25; 118:2, 7; 122:20; 135:1, 3; 150:25; 153:4; 164:4; 167:1

**morning** 32:5; 34:24; 39:25; 43:4; 65:14; 93:7; 111:25; 114:10; 116:6; 120:4, 11; 121:16, 20; 122:19, 22; 123:3, 4, 9, 11; 130:1; 131:3, 4, 13; 137:11, 19, 23; 138:7, 13; 139:2, 15; 143:9; 144:18, 24; 145:21, 25; 164:8, 22; 165:17; 120:20

**most** 12:1; 38:9; 45:23; 100:25; 152:17

**mother** 14:19

**motion** 62:3; 49:15

**motor** 100:4

**Motorcycles** 100:13

**motorized** 100:3

**move** 46:1, 2; 137:4, 7; 150:1; 151:20; 154:4

**movement** 23:16; 137:1; 139:18, 19

**moving** 151:19

**mower** 101:7, 7, 8, 11, 20, 24, 24

**much** 11:20; 21:16, 17; 59:21; 98:9; 104:8, 15

**muscle** 68:8; 86:21; 69:9

**mushroomed** 55:11

**Mutzabaugh** 135:12, 12

**MYERS** 39:20; 41:23; 48:1; 54:12; 56:10, 16; 74:15; 76:17; 79:15; 80:19; 81:8, 12; 87:9; 88:6; 100:5, 10; 103:5; 117:14; 124:13; 132:16, 18; 133:17, 19; 136:2, 3; 138:5; 142:23; 144:8, 16; 145:14, 18; 146:6; 148:22; 151:13, 18; 155:7; 158:11; 159:19; 161:5, 16, 19; 163:4; 166:5; 167:6, 25

**myself** 5:2; 22:7; 40:16; 44:24; 51:12

**N**

**name** 4:14, 15; 5:2; 9:1; 26:23; 33:3, 4; 44:15; 76:1; 86:12; 87:5; 107:9; 7:19, 22; 83:8; 118:24

**natural** 12:10

**nature** 13:13; 22:4; 44:15; 100:13

**near** 72:10

**need** 11:14; 22:7; 37:16; 41:4; 109:16; 116:1; 140:2, 3; 25:22; 32:23; 117:20; 144:10

**new** 22:2; 26:25; 103:25

**next** 6:20; 44:4; 68:6; 69:23; 70:6; 76:15; 105:24

**night** 70:19

**nighttime** 91:20; 92:9, 11, 15, 22; 93:5; 94:23; 95:3

**nine** 20:22, 24; 21:13, 16; 24:18

**nobody** 131:17

**nodding** 5:16

**none** 80:16; 105:24

**nonprescription** 7:5

**nonunion** 108:4

**Norfolk** 4:21; 5:3; 31:5; 72:9; 133:10

**Norm** 39:5; 83:25

**normal** 62:10; 112:4

**normally** 93:13

**Nos** 56:19

**nose** 112:6, 24; 152:16

**notice** 74:22; 165:18

**notified** 67:25

**notify** 68:2; 83:24

**November** 74:24

**numb** 54:2; 67:4

**number** 57:7, 8; 59:12, 23; 60:6, 13, 15, 24; 61:17; 64:15, 24; 65:2; 122:16; 128:12, 21, 23; 147:2; 166:14

**numerous** 23:22, 23; 150:24

**O**

**o'clock** 111:24; 116:6; 123:10; 137:11, 19, 23; 138:7, 13; 139:2, 14; 143:8; 144:18, 23; 145:21; 165:4

**obey** 140:17

**object** 138:3; 145:8; 133:13; 135:25

**Objection** 148:18; 158:11; 161:16; 4:5

**objective** 23:17

**observed** 134:9

**Obviously** 158:11

**occasion** 38:9; 17:5; 110:8; 119:7

**Occupational** 132:20

**occur** 69:19; 92:12; 132:23; 65:8; 67:2; 72:20; 84:23; 108:5

**occurrences** 156:5

**October** 88:12, 22; 90:9, 11

**off** 6:21; 9:22; 15:21; 25:13, 25; 27:14, 16; 28:7; 29:3, 5; 31:25; 34:13; 47:15, 19; 51:13; 53:10, 24; 54:7, 10, 11; 57:13; 60:23; 61:12; 67:5; 79:18; 80:3, 8; 92:6; 101:1, 2; 109:15; 120:16; 124:5; 136:9, 9, 25; 142:18; 148:3, 21; 151:21; 153:14, 14; 167:14

**office** 32:19, 21; 34:4; 35:4; 41:21; 42:5, 5, 7, 25; 43:1, 8; 45:14, 15, 16; 52:22, 22, 23; 53:1, 13, 14, 15; 103:15; 121:12

**oil** 105:18

**old** 8:8

**older** 9:24; 134:12

**on-the-job** 17:14; 20:1

**Once** 24:23; 31:17; 32:10; 36:5; 37:15; 45:21; 90:9; 138:25; 151:21; 154:3

**one** 6:16; 8:5; 15:25; 16:3; 18:4, 9, 10; 22:5; 29:14;

32:22; 33:11; 38:7, 19, 23; 40:14, 15; 42:1; 43:6, 7, 11, 12, 12, 13; 44:6; 45:4, 8, 11, 19, 20; 48:6; 57:1, 4, 5, 5, 5, 7; 59:12; 63:13, 24; 64:10, 24; 65:2, 17; 72:10, 16; 77:3, 4, 7, 21; 80:1, 14, 15; 83:5; 90:12; 94:16; 98:20; 105:15; 110:10, 17; 114:17; 115:2, 4; 118:4, 16; 119:3; 122:15; 125:13; 127:22, 22; 130:18; 142:9; 151:14; 153:8; 154:11, 23; 159:4, 5; 161:5; 162:24; 163:22, 25; 166:6; 167:23

**one-third** 11:24

**ones** 22:21; 23:2; 131:11

**only** 6:16; 9:7; 17:10; 18:10; 24:3; 25:1; 34:18; 67:13; 78:1; 83:2; 84:25; 86:21; 103:25; 110:23; 125:10; 127:22; 139:6; 158:7, 13, 17, 24; 165:3

**onto** 44:17; 45:8; 48:13; 50:9; 97:1, 4; 160:23

**open** 25:16, 23; 26:4; 42:10, 12, 17; 44:3; 45:25; 52:16; 60:23; 62:3; 63:7; 66:2; 108:11; 109:16, 19, 20; 110:12; 111:12; 117:21; 119:12, 15, 17, 19; 124:21; 154:11; 158:6, 7, 10, 14, 17, 23, 24; 166:24; 15:20; 27:11; 36:15, 18; 37:4; 38:6; 78:15; 118:15; 124:24; 125:10; 129:21; 158:21; 18:1; 23:19; 38:8; 40:12; 42:10, 16; 46:16, 17; 66:11; 77:17; 97:17; 108:7, 21; 109:5; 119:4; 135:8; 136:22

**operate** 38:24; 150:12; 158:3; 19:2; 118:16

**operating** 24:1; 119:3; 158:2

**operation** 44:5; 89:24; 22:22; 28:3; 31:2

**operator** 23:18; 36:23, 24; 37:5; 38:3, 11; 39:2, 13; 36:10

**opinion** 7:6; 64:11

**opposed** 17:21; 17:6; 27:7; 30:9; 63:2, 9

**option** 145:5; 153:23

**order** 12:14, 16; 83:13; 116:2; 124:9; 138:17

**organization** 108:4

**others** 51:23; 104:15; 158:20

**Otherwise** 37:20; 145:12

**out** 10:6, 19, 22; 16:24; 17:16, 19; 18:7, 11, 21; 22:7; 25:23; 28:11, 16; 32:12; 34:4; 38:21; 40:6, 10, 12; 42:18; 44:24; 45:24; 47:11, 12, 13, 14, 18; 49:11, 13; 50:18, 20; 53:18; 54:22, 24, 25; 55:3,

**Min-U-Script®**
Filius & McLucas Reporting Service, Inc.

8, 11; 60:1, 7; 61:19;
65:11, 13; 68:4, 6, 12;
69:15; 71:8; 74:6; 76:17;
83:23; 84:19; 92:18; 99:1;
110:17, 20; 111:5, 8, 12,
14, 18, 25; 112:2, 11;
113:19, 24; 114:1, 8, 11;
116:7, 12; 119:24; 120:6;
123:18; 124:1; 125:12;
126:3; 127:1, 20, 25;
128:11; 129:13, 16, 20;
130:15; 140:13; 150:7;
152:1; 153:1, 7, 8; 154:24;
163:14, 16; 164:11; 165:1,
18

**outbound** 33:10

**over** 9:17, 20; 24:18, 22,
22; 28:3, 24; 31:1; 50:5, 6;
62:8; 69:23; 70:6; 71:14;
74:14; 93:21; 97:23, 25;
98:1; 102:15; 107:24;
124:4; 131:23; 141:23;
143:7; 147:1

**over-the-counter** 7:5;
102:17

**over-the-road** 14:25;
15:2

**overdose** 102:15

**overtime** 93:18, 21;
103:17, 18, 20, 22, 25;
104:2, 9

**own** 10:4, 4, 20, 22;
11:22; 100:3, 15, 17, 18;
116:4, 8

**owned** 18:17, 25; 19:2;
133:9, 15, 17

**owner** 75:1

**ownership** 19:9, 10, 24

---

**P**

**p.m** 31:21; 93:14, 25;
168:5

**Pa** 69:22

**Pacific** 20:9; 29:13;
107:18, 23, 25; 109:21, 22;
153:18, 21; 156:11

**packer** 15:17, 19; 23:6;
25:11, 12, 12; 26:12; 27:2;
30:15; 36:10, 23; 37:18,
21; 109:18, 24; 110:7;
117:5; 118:16; 119:4;
157:22; 166:13, 22; 153:7

**PacRail** 20:15, 17; 21:17,
21; 22:11; 23:2; 24:15, 18,
24; 25:2, 20, 21; 26:6, 14,
24; 27:22, 25; 29:13;
30:10; 42:5; 156:17, 19

**page** 69:8, 11

**paid** 72:1; 93:11, 12, 17,
18

**pain** 54:1, 17, 18; 85:12;
95:13, 14, 18, 20, 25; 96:1,
7, 10; 102:11, 13, 16

**pal** 99:12

**paper** 121:2; 122:11;
120:13, 15; 121:1

**paperwork** 121:17

**parameters** 145:12

**park** 44:1; 121:25; 122:2,
3, 16; 152:2; 122:7, 13

**part** 21:3; 23:23; 51:16;
64:21; 95:23; 112:16;
129:20; 133:22; 136:16,
19; 144:2; 155:3; 160:12

**part-time** 21:25; 22:10

**Partially** 36:12

**particular** 23:24; 31:19;
44:10; 58:18; 62:2; 63:4, 5;
73:13; 74:2; 83:13;
124:25; 146:14; 147:18;
149:11; 158:18

**particularly** 85:2

**parties** 4:3

**past** 31:18; 57:21, 21, 21;
80:20, 21; 93:17; 114:14;
155:24

**pay** 93:9; 124:23

**paycheck** 72:4, 5

**pays** 12:12

**pedal** 152:3

**pen** 61:6; 64:16

**Pennsylvania** 4:16;
13:9, 16; 14:9, 22; 15:8,
14, 15; 17:11; 18:15, 21,
25; 19:10, 18, 23; 20:3, 4;
25:8; 29:12; 88:16; 89:1;
141:18; 143:22; 144:6;
156:11

**people** 32:17; 33:14;
34:20; 36:8; 72:9; 83:6, 9;
84:25; 85:20; 92:17;
118:9, 21; 119:3, 4; 135:3;
138:25; 148:15; 150:19;
155:20

**per** 19:3; 36:16

**percentage** 21:15

**Perfect** 76:16

**perform** 31:7; 38:12;
142:2; 145:20; 146:1, 13;
149:8; 88:1, 4; 149:4;
36:21; 56:1; 145:7;
146:16; 148:11; 149:2

**perhaps** 129:11

**period** 10:22; 11:19;
20:18, 21; 29:1, 3; 82:22;
91:19; 108:20; 109:23;
110:2, 6; 79:8; 82:9

**permission** 149:7

**person** 6:16; 14:24;
15:25; 26:20, 24; 34:1, 9,
18; 36:20; 38:4, 7; 40:19;
43:11, 12, 13; 71:14;
93:24; 104:5, 6; 118:15;
120:10; 138:16; 145:22;
158:2; 163:10

**personal** 98:5, 11

**personally** 9:10; 155:18

**personnel** 139:1

**photocopies** 57:3; 63:21

**photocopy** 56:24

**photograph** 57:1, 6, 8;
59:12, 14, 23; 60:4, 11, 13;

55:20; 56:24; 57:3, 4, 9;
58:6, 10, 13, 24; 59:8;
63:21, 25; 64:3, 5

**photos** 56:7

**phrase** 6:5

**physical** 6:23; 85:19;
88:11, 19, 24, 25; 89:4, 11,
23; 90:1; 91:7; 95:7; 96:25

**physically** 32:18; 43:20;
49:21, 22; 55:16; 94:6, 20,
23; 142:16

**physicians** 90:15

**picked** 27:13

**pickup** 99:20

**picture** 48:1; 60:6, 24;
61:17, 24; 62:4, 6, 11, 14;
64:15, 17, 23; 65:2, 5, 7;
57:19, 20, 24; 61:22; 64:10

**piece** 122:11; 141:7, 8

**pin** 16:24; 42:16; 45:24;
60:21

**pipe** 119:19

**place** 6:4; 53:12; 88:20;
123:8; 146:25; 160:25;
40:7; 50:23; 52:15; 64:16;
161:1; 21:12

**placing** 15:5

**plaintiff** 4:18; 85:5

**plate** 50:11; 62:19, 20

**play** 6:17; 102:8; 124:20

**please** 4:13; 5:14, 21; 6:6,
13; 7:20; 82:20; 133:5;
145:15

**plow** 101:19

**plus** 28:21; 101:18

**point** 13:15; 18:21; 20:4;
21:20; 24:14; 27:25;
28:23; 37:17, 19; 38:23;
40:13; 45:22; 46:21;
47:10; 53:23; 60:16; 68:7;
84:15; 86:20, 21, 22; 87:2;
92:5, 8; 107:23; 109:13;
122:15; 127:3, 5, 13;
139:4; 142:7; 143:15;
153:20; 167:23

**Polaroid** 56:24; 57:3, 11,
16

**poles** 74:13

**poor** 77:2

**pop** 53:25

**popped** 47:14

**position** 23:11; 36:3;
49:24; 51:22; 91:10;
104:1; 105:4, 5, 9; 112:17;
143:24; 23:3; 51:18

**possibility** 111:13

**possible** 129:17; 164:19

**posted** 160:3, 4

**potential** 149:19

**precautions** 113:18, 25;
114:5

**precise** 11:15; 146:22

**precisely** 74:10

**premises** 69:19; 132:23;
133:1; 147:6; 149:5;

150:16

**preparing** 15:4; 68:10

**prescription** 7:4; 102:20

**present** 56:5; 58:9; 72:21

**pressure** 15:21; 25:13,
25; 60:23; 109:15; 114:6

**pretty** 104:15

**prevent** 53:24; 124:9, 16;
160:23; 113:19; 98:8

**previous** 9:2, 4; 14:9;
24:11; 129:7; 145:16;
167:15

**previously** 29:12

**printed** 73:17; 121:12

**prints** 92:18

**Prior** 13:21, 23; 14:2, 15;
31:14; 80:12; 82:11, 12;
103:16; 104:24; 105:15,
16; 106:11, 19; 115:2;
141:23

**probably** 33:4; 55:18;
63:5; 67:9, 10; 76:23;
97:17, 23; 114:2; 131:10;
144:14

**problem** 6:24; 93:8;
117:22; 119:11; 149:19;
154:5; 166:20; 167:2;
92:23, 24; 95:7; 98:7;
134:23; 135:2; 151:9

**procedures** 27:21;
73:18; 77:17, 19

**proceed** 44:4

**process** 16:16, 19

**produced** 56:20; 63:18;
68:21; 73:3; 74:19; 75:18;
78:8

**product** 21:8

**professional** 75:6

**program** 121:13; 151:1;
160:13; 138:14

**programmer** 32:11, 16,
22; 33:6; 35:1; 36:6; 38:17;
39:9; 40:10, 21; 42:21;
43:1; 91:18, 21, 24, 25;
92:3, 15, 16; 93:2; 94:2, 7,
16; 95:5; 104:2; 119:23,
23; 120:9, 12, 19, 21;
121:17, 21; 122:11;
138:14, 15; 139:6, 10, 13,
22; 145:3; 146:22; 147:9,
13, 15; 149:18; 157:8, 9,
12; 158:5, 9; 42:24, 25;
147:17

**prohibits** 95:2

**propel** 101:12, 13, 23

**proper** 66:1

**properly** 136:23

**property** 138:2, 9, 13;
139:2

**provide** 65:17; 149:18;
151:2, 7; 154:1, 17;
166:19, 23; 167:11, 12, 19,
22; 31:10; 68:25; 69:24;
70:3; 75:22; 85:3, 17;
105:20; 143:11; 149:15;
157:2; 116:16

**providing** 167:9

**pry** 15:7, 21, 23, 25; 11
17:2, 5, 8; 24:1, 5; 25:
7, 19, 21, 24; 26:5, 12;
108:11, 13; 111:13, 16
112:13, 14; 116:14, 17
117:10, 12, 20; 118:3,
123:18; 124:21; 140:2
158:1, 1, 5, 9, 22; 163:

**PTL** 15:22; 19:4, 13;
20:17; 23:9; 24:11;
108:14; 134:14

**publishing** 75:15

**pull** 39:8; 46:4, 8; 86:2
111:18; 113:8; 123:18;
129:13, 16; 47:5, 8; 49
69:9; 113:12, 13; 123:2
152:18

**purpose** 42:14; 51:3;
114:17; 126:23

**pursuant** 12:13

**push** 101:7, 8, 11, 24,
111:17; 113:9; 116:16;
117:7; 139:23

**put** 5:17; 41:8; 44:22;
46:20; 47:5; 53:17; 54:2
59:13; 61:13, 13; 66:20
69:16; 76:14; 91:4; 94:4
97:14; 101:19; 103:14;
111:6, 8; 112:4, 13; 114
124:8; 127:5; 133:1;
135:15; 146:8; 150:3;
152:10; 154:3, 8; 165:24
25

**putting** 18:1, 1; 44:21;
66:11; 97:7; 111:3; 154:
166:21

---

**Q**

**qualified** 38:4

**quarter** 123:9

**quick** 8:7; 44:23; 154:8;
164:16, 17, 19

**quit** 150:25

**quote** 134:20

---

**R**

**radio** 120:1

**Rail** 4:22; 15:18; 20:9;
21:11; 23:7; 26:4; 27:10,
14, 19; 29:13; 41:22, 24;
44:2, 2, 18; 45:2, 3, 4, 10;
48:14, 19; 49:1, 23; 52:6;
54:7; 56:2; 58:1; 66:16, 24
81:20; 97:2, 4; 107:18, 23
25; 108:7; 135:24; 136:5;
137:2; 141:11; 146:11;
147:25; 149:8; 150:1, 5;
151:21; 153:9, 18, 21;
156:11; 109:21

**railroad** 14:18; 17:18, 21
23; 19:1, 1, 3, 15; 22:6, 18
21, 22, 23, 24; 31:10;
32:11, 15; 33:6; 41:21;

Case 5:01-cv-01140-SHR    Document 22    Filed 07/15/2002    Page 56 of 107

Terry Boyd Wilkinson
June 10, 2002

Terry Boyd Wilkinson & Sharon Wilkinson v.
Norfolk Southern Railway Company, et al.

42:4, 6; 43:7; 45:14; 52:22;
53:14, 15; 56:5; 68:2;
70:24; 71:19; 72:20;
91:25; 105:11, 19; 106:1,
21; 109:22; 119:10, 21;
120:5; 131:10; 132:24;
133:6, 9, 15, 22, 24; 134:5,
9, 11, 12, 13; 135:19, 21;
136:1, 11; 137:1, 7;
138:16; 139:13; 140:15,
16, 17, 20; 141:13; 143:11;
144:3; 145:3, 6; 146:20,
20; 147:9; 148:15; 149:16,
18; 151:8; 155:3; 156:21,
24; 159:20, 21; 160:10, 15;
161:6, 9, 22; 162:7, 10, 12;
167:11, 21; 34:3; 38:17;
41:9; 42:25; 43:1;
105:14; 107:2; 134:2, 4;
155:19; 14:14
**Railway** 4:21
**raise** 15:7
**ranking** 93:23
**reach** 25:15; 124:6, 18;
44:10; 47:18
**read** 61:14; 103:1; 129:7;
132:22; 145:16; 167:15;
4:3
**realize** 118:2
**really** 10:23; 39:5; 45:12;
55:10; 68:8; 75:13, 16;
79:2; 82:2; 83:12; 86:17;
93:6; 102:8; 105:22;
118:20; 122:18; 124:23;
163:8; 164:24; 166:11, 17
**reason** 5:13; 6:3, 6;
51:24; 75:11; 81:6; 86:19;
117:19; 129:11, 12
**recall** 13:19; 19:13;
20:12; 21:23; 23:11;
27:21; 30:21; 31:9; 54:4, 6;
68:9; 71:11, 20; 73:12, 24;
74:4; 75:7, 14; 76:6, 9, 11;
77:5, 12; 79:20; 163:8;
87:10
**receive** 17:12; 19:17, 25;
24:23; 36:5; 143:3, 5;
145:2; 20:2
**receiver** 59:20; 66:10;
61:18
**receiving** 103:25
**receptacle** 111:20;
114:8, 8, 12; 124:1; 127:4;
119:17
**Recess** 85:14; 129:6
**recognize** 111:11
**recollection** 20:10;
24:17; 30:1; 43:3; 52:20;
73:13; 89:18; 106:18;
119:1; 123:13; 126:7, 12
**record** 6:21; 9:22; 53:10;
57:13; 79:18; 92:6; 101:1,
2; 124:13; 148:21; 167:14;
85:17; 89:3; 90:4, 5
**recovered** 54:20
**rectangle** 55:6; 59:20;
60:4, 11
**rectangular** 109:3

**red** 149:13
**refer** 22:18; 63:11; 20:14;
26:5; 60:2; 69:3; 87:18;
92:1; 162:5; 53:6
**referring** 60:2, 10; 61:3,
14; 62:5, 11, 25; 63:9;
64:14, 23; 70:3, 11; 95:22;
96:3; 101:20; 150:9;
151:12; 160:6, 18
**reflective** 70:4, 4, 13;
154:24; 155:1, 13, 20;
156:6, 14, 25; 157:2;
160:8, 10, 15
**refrigerator** 51:25
**regard** 12:7; 90:19; 94:4;
150:19; 75:6; 76:25; 82:5;
83:7, 21; 87:22; 89:5;
90:16; 161:2; 96:18, 19
**regular** 22:13; 149:5
**regularity** 22:15
**Rehabilitation** 88:16
**relate** 95:9; 102:21
**relation** 35:17; 52:5
**relative** 85:5; 14:17
**relay** 34:5; 139:8
**release** 89:21
**reload** 153:1; 164:20;
122:13; 139:25
**remaining** 39:7
**remember** 6:12, 19;
26:17, 18, 20, 23; 28:24;
31:3; 32:25; 35:10, 24;
39:3; 40:5, 20; 44:11, 12;
45:12, 13; 48:7; 50:13;
51:18; 66:22; 67:9, 11, 13,
14; 68:8, 18; 71:20; 73:11,
15, 22; 74:5; 75:9, 11;
76:20, 23, 24; 77:20, 20;
79:2, 11; 85:1; 105:22;
115:11; 121:19; 122:10,
18; 125:15; 126:2; 128:9;
130:5; 131:25; 132:11;
135:9; 140:24; 164:24;
125:25
**removal** 101:16
**remove** 139:20; 147:25;
41:7; 127:17; 146:10, 10
**rent** 100:17
**repair** 151:3
**Repeat** 82:20; 107:9;
133:5; 30:23
**repetitious** 96:8
**replaced** 65:20; 66:19
**replacement** 115:17, 20
**replacing** 115:18
**report** 31:16; 32:2; 67:16,
18; 68:4, 6, 10, 25; 69:3, 6;
71:9, 18; 83:23; 84:19;
127:24; 129:4; 130:9;
132:20; 137:10, 18; 39:25;
71:21; 79:1, 1; 83:18;
126:18; 129:25; 130:6
**reporter** 129:8; 145:17;
167:15
**represent** 64:19; 107:10;
5:3; 59:17

**require** 22:1; 29:7; 30:24;
31:6; 94:5; 22:5; 95:3;
155:1, 15, 20; 156:5, 13,
19; 159:20, 22
**requirement** 155:4, 19
**requiring** 154:20; 160:15
**reread** 145:14
**reserved** 4:6
**respect** 27:5
**respective** 4:3
**response** 83:3; 161:5
**responsibilities** 15:3;
19:19
**responsibility** 106:1;
107:2; 129:3
**rest** 38:20
**restate** 6:8
**restrictions** 94:3
**result** 79:6; 93:9; 77:23
**RETTIG** 79:17; 107:4, 7,
9; 117:16, 18; 124:15;
129:10; 132:13; 138:3;
142:22; 164:4, 6; 166:3,
12; 167:3, 18
**return** 91:14
**review** 22:14
**Rich** 84:5; 118:25; 136:10
**Rick** 84:5; 157:17
**ride** 42:23; 43:6
**rider** 101:7, 8, 20
**rifle** 99:4, 5
**right** 10:6; 20:17; 27:3;
28:14; 29:19, 21; 32:4;
35:5; 37:1; 40:17; 41:22;
46:15; 47:14; 49:15, 18,
20; 50:16; 52:14; 53:17;
54:18; 57:8; 58:3; 59:25;
60:12; 61:12; 64:17; 69:9;
72:9, 18; 74:13; 86:16, 17;
87:12; 88:14; 90:17;
95:22; 96:5; 98:3, 7; 99:14;
107:21; 111:20; 114:13;
115:1; 117:16; 124:8, 17;
132:13; 146:11, 12; 148:6;
150:6; 165:8, 9, 10, 12, 16,
20, 21, 23; 166:13, 15, 16,
24
**right-hand** 62:6, 14;
99:15
**Road** 4:16
**rod** 108:11, 13; 112:13;
116:24; 117:7, 11, 12, 20;
118:3, 6; 124:21
**rods** 116:14, 17
**role** 131:23
**rollerblades** 100:6
**room** 5:6; 48:21; 86:1, 4
**rotator** 44:25; 87:2, 3
**Roughly** 53:5
**rule** 154:20; 160:6, 14;
30:19; 31:8; 140:18;
159:21, 22, 24; 160:18;
161:7
**run** 14:13
**rundown** 8:7

**rush** 104:24
**Rutherford** 57:25; 76:2;
78:3, 5, 11, 14; 91:16, 18,
22
**Rychak** 86:23; 87:4, 5,
18, 21; 88:1, 5; 90:3, 13;
94:4, 10; 102:14

**S**

**safeguards** 69:23; 70:2,
7, 10
**safety** 16:22; 18:6; 30:18,
18; 31:8, 8; 69:24; 70:2, 7,
10; 134:8; 140:17; 155:6;
159:20, 22; 160:6, 12, 18
**salaried** 93:11
**salary** 93:19
**same** 12:8; 19:12; 23:9;
29:11; 33:25; 34:8, 20;
38:2, 5; 44:5; 58:22, 24;
59:2, 9; 62:16; 64:6, 18;
138:23; 146:16; 147:6, 9;
148:12; 149:4; 150:16;
151:16
**sat** 54:16, 19
**Saturday** 31:24
**save** 116:21, 22
**saw** 19:21; 23:2; 71:16;
73:12, 13, 15, 15; 87:7, 15;
125:18; 127:19; 160:14;
166:8
**saying** 36:19; 54:12;
59:6; 72:21; 78:10, 12;
94:8; 131:18
**schedule** 139:18;
140:14, 15, 15, 16
**school** 10:24; 12:25;
13:6, 7, 12
**score** 76:16
**screen** 32:20
**screw** 119:14, 15, 17
**sealing** 4:4
**seasonal** 104:16
**second** 11:4; 69:8; 88:13;
91:14; 154:13; 164:14
**section** 69:23
**Securement** 73:8; 76:5,
8, 14, 22; 77:1, 10
**seeing** 75:7; 85:11;
90:15, 19; 166:20
**seem** 52:9; 72:3; 104:13
**self-propelled** 101:11,
13, 25; 102:1
**seminars** 31:7
**send** 109:24; 119:24
**seniority** 37:23
**sense** 167:1
**sent** 86:24, 25
**separated** 64:12, 20
**separately** 17:3, 4
**separation** 4:2
**series** 5:5
**service** 128:11; 162:17;

20:9; 28:2; 86:11, 12;
151:3
**set** 27:14; 57:2; 139:18;
143:2, 4
**sets** 92:21
**seven** 93:15
**several** 106:11, 16, 19
**shaking** 5:15
**shall** 155:12
**shape** 55:5, 7
**shared** 38:2, 5, 10
**Sharon** 4:20; 7:17; 8:24;
9:5, 6, 7; 12:14; 9:2
**sheet** 121:12, 14
**Sheffield** 115:1
**shift** 31:15, 19, 21; 34:2,
17, 21; 36:8, 20; 37:12;
38:14; 39:14, 19, 23;
78:23; 85:1, 2; 93:4, 6;
131:18; 144:19, 24;
146:17; 147:5; 148:4, 7;
159:13; 140:7; 144:17;
147:12; 148:8
**shoes** 70:5, 17
**shop** 71:3
**shorter** 26:3; 27:6, 9, 19;
116:24; 118:3; 123:5;
142:9
**shot** 106:7
**shoulder** 44:25; 53:25;
69:9; 85:11; 87:1, 22; 89:5,
12; 90:17; 95:1; 96:2, 3, 4;
97:23, 25; 136:20
**shoving** 66:10
**show** 22:8; 24:4, 8; 37:13;
56:13; 58:24; 61:25;
68:23; 73:5; 74:7, 21;
75:20; 88:10; 90:4, 6;
121:18; 22:22; 23:10, 21,
22; 24:6; 32:4; 122:12;
18:12; 48:1; 56:22;
132:19; 59:12; 75:23
**shown** 17:18, 20; 19:22;
22:25; 29:12; 59:8; 71:9
**sick** 29:5
**side** 41:22; 50:18; 60:11;
110:10, 11, 17, 18; 113:21,
23; 127:22, 22; 165:19;
127:21
**sideways** 53:21
**sight** 49:5
**sign** 75:11, 2, 10; 4:4;
75:8; 23:18
**signature** 75:4
**silly** 72:3; 104:13
**similar** 91:25
**sisters** 14:19
**site** 142:10; 159:10
**sitting** 47:25; 60:19;
126:7; 133:24
**situated** 52:6; 95:19
**situation** 46:13; 119:22;
154:14; 163:14, 21; 166:9
**six** 29:20; 50:8; 57:10;
58:24; 61:17; 88:12;

93:15; 147:1

**size** 141:25; 153:16, 19; 154:1

**Skateboards** 100:5

**ski** 100:9

**ski-mobiles** 100:8

**Skip** 135:12

**skis** 100:4

**slapping** 154:15

**sledgehammer** 16:7, 13, 18; 17:1, 7, 10; 16:6

**slid** 150:7

**slide** 42:17

**slip** 18:7; 81:25; 44:24; 69:15; 81:17, 19; 127:1; 130:15; 153:8

**sloppy** 54:23; 55:3; 154:7

**slot** 44:23

**slow** 104:18, 19

**small** 60:10

**Smitty** 157:16

**snap** 44:3, 23; 45:24; 154:8, 11

**snow** 101:15, 16

**snowboards** 100:5

**sold** 19:1

**somebody** 33:12; 34:13; 37:17; 101:16; 147:16; 150:3, 4, 7; 160:2

**someday** 101:15

**somehow** 11:14; 149:23

**someone** 35:10; 43:10; 59:13; 64:15; 75:2; 159:13, 17; 32:19

**sometime** 10:19; 29:16; 65:18; 92:4; 6:12; 16:11; 35:3; 66:18; 101:10; 119:18; 140:8; 147:13; 154:7, 7; 164:19

**somewhere** 20:3; 43:16; 57:23; 73:13; 89:22; 103:1; 116:15; 121:24

**son** 102:7

**soon** 125:21; 126:15

**sophomore** 11:2

**sorry** 21:4; 47:20; 58:20; 93:4, 13; 97:25; 98:1; 101:23; 106:8; 114:3; 119:8; 124:16; 135:12; 144:5, 19; 153:21; 160:20

**sort** 5:1, 8; 19:21; 20:1, 14; 31:13; 129:3; 141:11; 154:5, 24; 159:13

**sound** 36:11; 52:13; 86:16; 88:14, 22; 86:17; 87:12

**source** 159:24

**Southern** 4:21; 5:4; 31:6; 72:9; 133:10

**space** 16:10

**spacing** 52:1

**sparked** 75:15

**speak** 27:4; 28:14; 71:13

**specific** 79:9; 87:10; 140:1; 153:19; 160:14

**specifically** 156:24

**specify** 146:22

**speed** 160:4, 5; 159:23

**spell** 21:3

**spend** 18:11; 152:20

**spine** 63:7

**Spirit** 85:25; 86:4

**split** 72:10

**spoke** 69:4; 88:2

**sporting** 98:16

**sports** 98:14

**spot** 74:7

**spring-loaded** 16:23

**square** 55:6; 59:20; 60:3, 11; 64:20; 109:3, 2

**stand** 25:14; 27:17; 63:6; 142:17; 145:9; 48:20

**standard** 99:22, 23

**start** 37:5, 6, 7; 39:16; 42:1, 4, 22; 43:12, 15, 16; 62:8; 92:3; 93:6; 106:13; 122:25; 155:12; 159:2, 3, 4, 6; 20:2; 29:2, 19, 25; 32:3; 40:12, 13, 14; 42:6; 90:4; 103:25; 105:15, 16; 123:10, 14; 143:24; 145:7; 137:23

**state** 4:13; 69:22

**statement** 52:10; 133:14

**status** 9:3; 76:8

**STAUDENMAIER** 4:12; 5:3; 6:22; 9:23; 39:22; 41:25; 48:3; 53:11; 54:14; 56:7, 11, 14, 18, 21; 57:14; 63:19; 68:22; 73:4; 74:20; 75:19; 76:18; 79:19; 80:23; 81:10, 13; 85:15; 87:11, 14; 88:7; 92:7; 100:7, 12; 101:1, 3; 103:6; 107:3; 132:15; 133:12; 135:25; 144:5; 145:8; 146:4; 148:18; 151:11, 15; 155:10; 158:15; 161:18, 21; 163:6; 164:2

**stay** 26:11; 27:1; 30:14; 53:21; 19:12; 25:5; 27:15; 114:2, 3; 125:4

**steel-tip** 70:5, 17

**steering** 152:3

**stenographer** 5:12; 6:15

**stenographically** 5:13

**step** 45:3

**stick** 80:17

**still** 27:17; 30:12; 38:13; 49:5; 53:20, 21; 95:7, 13; 99:8; 127:15; 151:15; 152:11; 164:25; 165:9, 13; 167:7

**stipulated** 4:2

**STIPULATION** 4:1

**stolen** 115:14; 143:18

**stones** 81:22

**stop** 105:21; 109:18;

167:9; 88:24; 89:19; 106:9, 20; 109:18; 166:21

**store** 105:1

**straight** 50:3; 60:9

**streak** 54:18

**strict** 93:18

**strictly** 103:16

**strike** 24:13; 26:9; 28:23; 33:25; 39:16; 96:12, 14

**stuff** 32:14

**style** 58:17; 62:2

**subjects** 17:24

**submitted** 83:4

**subside** 102:16

**suffered** 79:6; 90:16; 103:3, 4

**summer** 10:7; 57:21, 21, 22

**Sunday** 31:25

**supervised** 131:2

**supervision** 138:1; 159:10

**supervisor** 67:19; 84:10, 16; 91:20; 92:9, 11, 15, 22; 93:5; 94:23; 95:3; 115:23; 131:12, 14; 139:1, 8, 9; 145:22; 151:6; 159:12; 138:25; 147:22

**supervisory** 131:23

**supplied** 26:6; 70:21; 141:9; 143:14

**support** 11:10; 12:3, 11, 12, 19, 21; 16:22; 50:12, 12; 51:4, 5; 85:11

**supposed** 40:11; 41:3; 55:5, 6; 60:8; 73:19, 20; 104:19; 118:12; 152:20

**sure** 5:14, 17, 21; 6:4; 11:6, 13; 18:5; 22:19; 23:8, 14; 30:22; 31:23; 39:6; 41:18; 48:16; 51:4; 58:20; 59:3; 63:2; 68:5, 13, 14; 71:11; 72:15; 73:14; 78:15; 84:6, 25; 85:21; 86:17; 87:13; 89:3; 90:11; 97:3; 106:8, 17; 107:19; 113:25; 118:11, 20, 23; 125:2, 9; 127:16; 130:2; 131:1; 136:15, 17, 22; 157:1; 163:9; 164:24; 166:5

**surgeries** 79:24; 80:10, 14, 17; 82:5, 10, 18, 19; 83:2; 88:1; 94:10

**surgery** 79:11, 23; 80:5, 19, 25; 81:1, 1, 2, 6; 82:11, 23; 85:12; 88:4, 13, 15, 18; 89:1, 16; 91:15

**suspend** 162:16; 163:2, 11, 12, 15

**swear** 81:10

**sworn** 4:10

**system** 110:9

**talk** 59:11; 90:3, 22; 116:1; 125:6; 165:14; 19:23; 73:23; 82:9, 19; 118:24; 19:20; 23:2, 5; 24:13; 25:10; 41:18; 66:5; 74:12; 82:22; 97:12; 98:2; 136:6; 137:13; 144:6; 156:7

**tall** 50:7

**tape** 23:9; 24:11; 22:6, 10, 18, 20, 23; 23:1, 19; 29:11, 14, 17, 24, 24; 30:2, 24; 31:4, 10

**Teamsters** 107:16

**tear** 81:14; 87:2

**Technically** 142:11

**telephone** 71:14

**telling** 35:24; 52:3; 72:11, 24; 116:14; 120:10; 129:24; 148:13

**tells** 40:21; 42:21

**Tempo** 99:25; 100:1, 2

**term** 6:5; 19:14; 37:1; 42:12; 92:10; 39:1; 6:4; 12:21; 15:1; 33:7; 41:6; 73:20; 74:8; 93:23; 103:7; 128:10; 133:20; 139:4; 162:12

**Terminal** 28:2; 84:10; 115:2; 132:6, 7

**terminate** 161:12, 14; 140:21; 163:14

**TERRY** 4:9, 15, 17; 39:10; 76:1; 78:3

**testified** 4:10

**testimony** 65:21; 125:19; 145:9, 13; 167:19

**therapy** 85:19; 86:20; 88:11, 17, 19, 24, 25; 89:4, 11, 23; 90:1

**third** 11:5; 76:7; 77:8

**though** 68:9; 110:23; 114:14; 158:19

**thought** 51:10; 68:7; 79:17; 122:4

**thousand** 76:17

**three** 9:1, 11; 11:17, 19; 12:17; 49:8; 53:7; 57:1; 60:6; 119:6; 138:8; 144:25; 145:1; 146:7; 147:7, 10

**three-quarters** 12:1

**three-year** 11:19

**threw** 153:13

**throw** 102:8

**tie** 117:1

**Tim** 84:7; 118:12

**times** 33:14, 14; 35:4; 46:14; 97:2; 119:16; 140:9

**tired** 113:8

**tires** 113:3, 13

**title** 132:5; 73:7

**today** 5:5; 6:24; 7:1, 7; 11:18; 39:10; 56:17; 57:16; 63:20; 64:1; 73: 74:6; 79:5; 80:13; 82:1 21; 83:22; 96:15, 21; 1:

**together** 9:8; 38:6, 7

**told** 19:21; 39:17, 19; 67:2, 24; 72:13, 16; 77: 85:20; 106:24; 108:25; 112:13; 123:16; 128:1, 6; 142:5; 149:3; 150:16 151:8; 157:5, 9; 158:5, 20

**took** 15:20; 24:18; 25:1 28:24; 31:1; 51:13; 57:1 58:10; 60:22; 64:3, 6; 7: 16; 102:2; 107:24; 109: 111:2; 123:8

**top** 57:4, 7, 8; 69:10; 78 96:1, 3

**tore** 44:25; 81:9

**torso** 50:3

**total** 147:1

**totally** 64:11, 22; 65:3; 98:8

**touching** 112:6, 24

**towards** 45:16; 46:4, 8; 47:6, 8; 49:10; 52:8, 12; 96:4; 113:3, 3, 13, 14, 15 159:7

**track** 32:12; 37:6; 38:21 22; 40:14; 41:16, 17, 17, 22; 43:9, 12, 13; 72:13; 74:1, 12; 81:20; 92:20; 120:24; 121:6, 6, 10, 11, 22; 133:25; 136:23; 140: 3; 147:4; 158:21; 160:24, 24; 164:20, 21; 36:15, 18 37:4; 38:6, 8; 40:7; 118:1 134:1; 147:1, 3; 157:23; 160:21

**tractor** 43:21; 101:19; 43:7

**trailer** 15:18; 16:14; 18:6 25:13; 27:12; 32:6; 40:3; 42:17; 47:18, 20, 23, 23, 24; 48:6, 12, 13, 18; 49:4, 5, 6, 12, 17, 21, 22, 25; 50:11, 13; 51:10, 14, 15, 17, 19; 52:6, 9, 15, 18, 19, 21, 25; 53:24; 60:19; 62:17, 18; 73:7; 113:3, 4, 14; 122:9, 16; 124:6, 19, 20, 25; 127:15; 142:22, 24, 24; 148:2; 149:22, 23; 150:8; 151:25; 152:16, 17, 19, 21; 15:5, 6; 16:10; 17:9; 33:9; 37:7, 8; 39:8; 41:7; 45:11; 91:16; 92:18, 19; 120:16, 17; 121:13, 14, 18, 23, 24; 122:4, 12; 143:25; 146:9, 10; 148:1; 151:20, 20; 153:2

**train** 33:8, 10; 36:6; 40:6, 12, 22; 41:2, 8, 13, 14; 42:1, 22; 43:8, 16, 16, 17; 67:25; 73:23; 92:21; 120:24; 121:3, 8; 122:14; 139:23; 140:1, 13; 148:3;

Terry Boyd Wilkinson
June 10, 2002

150:6; 152:25; 157:10;
159:2; 164:7, 10, 25;
165:7, 9; 17:12, 14; 19:17,
25; 20:2; 22:2, 4; 24:24;
30:3, 25; 32:14; 37:16;
40:10; 138:14; 139:19;
145:10; 146:25; 167:12

transcribe 5:19, 24

transmission 99:22

transportation 13:25;
14:6

Traverna 136:5

Trevorton 13:7, 9

trial 4:7

tried 58:18; 135:15

trips 86:3

Truck 13:16; 14:9, 11, 22,
24; 15:8, 14, 15; 17:11;
18:15, 21, 25; 19:10, 18,
23; 20:3, 4; 21:6; 25:8;
29:12; 36:10; 43:25; 44:1;
99:20; 141:18; 142:13, 20;
143:22; 144:7, 11; 150:13;
151:22, 23, 24; 152:6;
155:25; 156:2, 3, 11, 12;
13:22, 24; 14:2, 6, 8;
21:17; 14:13; 25:23;
137:5; 139:21

true 133:14; 156:13

try 6:8, 11, 18; 11:14, 16;
60:21; 107:8; 123:19

trying 52:4; 74:13; 89:2;
111:11; 113:20; 114:6;
124:21; 135:13; 150:12,
19; 154:9

Tuesday 31:23

turn 6:18; 115:13; 119:15,
17; 139:9; 152:1

two 9:24; 22:11; 53:3, 5;
56:9; 57:1, 4, 6, 8, 9; 59:8,
23; 61:22; 63:20, 24;
64:10, 15; 65:6; 69:13;
79:12, 24; 80:4, 11, 12;
82:9, 17, 19; 83:2; 85:7,
24; 88:1, 5; 92:13; 106:13;
115:2; 116:15; 117:25;
144:25; 145:1; 146:7;
147:7, 10; 163:11, 19;
164:4

two-foot 25:3, 21, 24;
26:5, 12; 30:12; 36:14;
37:2; 140:25; 142:19

two-thirds 11:24

two-week 28:8, 18

Tylenol 102:18

type 6:23; 7:3; 14:20;
15:13; 16:3; 17:14; 23:24;
30:3, 18, 25; 31:6, 16;
58:23, 25; 59:2, 5, 9;
62:22; 63:2, 10; 66:13, 17,
20, 22, 23; 69:8; 70:2;
71:8, 16; 72:12; 76:21;
88:11; 90:23; 91:1; 96:12;
98:16, 19, 24; 100:3;
101:5; 102:4, 12, 20;
149:4; 5:23; 23:1, 5; 96:11;
99:18; 101:4

typical 31:14

# U

ugly 55:4

unclear 6:3, 6, 7

uncles 14:20

under 19:8; 52:15; 60:22;
69:8; 76:2; 85:4; 131:19;
142:20, 24, 25; 143:8;
152:20

undergo 30:3, 25

underneath 49:4, 21, 22,
25; 51:9, 14, 15; 60:17, 18;
69:13, 14, 18; 142:13;
143:12; 152:16, 19; 153:9

understood 22:21;
111:21; 123:10; 166:21

undertake 22:1

Unfortunately 155:11

union 107:11, 13, 15, 17,
24; 108:1

unit 27:12; 51:25

University 10:9

unless 66:7; 76:17

unload 40:11; 72:14;
121:6, 22, 23; 150:13;
14:13; 32:14, 24; 33:9;
36:7; 37:16; 41:4; 121:7, 9;
139:25; 140:2; 145:11;
148:2; 157:10; 17:9;
140:3; 164:7; 15:17; 23:6

unlock 23:24; 37:18;
38:22; 43:22; 45:3; 66:3;
70:20; 113:2, 6, 20; 114:7;
125:5; 67:8; 114:2; 127:2;
23:7, 20; 25:15; 37:6;
40:14; 41:13; 42:16;
43:18; 46:24; 55:12;
58:19, 22, 23, 25; 59:5, 17,
18, 24; 60:7; 61:21; 65:11,
12, 25; 66:14; 67:14, 24;
73:19; 127:19; 165:6, 7

unpredictable 104:18

up 16:25; 18:2; 23:8; 40:5,
17; 41:20; 45:17; 48:20;
53:19; 64:17; 78:15;
119:12; 150:8; 152:2;
158:25

upper 56:25; 61:24; 62:6,
11, 14

upright 52:2

upswing 62:3

use 11:6; 6:5; 15:7, 21,
25; 16:3, 7; 17:1, 5, 6, 9;
19:14; 24:1; 42:12; 45:19,
23; 62:3; 65:16, 22; 72:12,
24; 73:19; 96:8; 99:3;
101:9; 114:20; 116:10;
117:7, 9; 135:13; 137:4;
141:14, 16; 153:15, 17, 24;
154:20; 157:15, 16, 25;
158:1, 2, 5, 9, 22; 167:1

used 15:12; 16:20; 17:2,
8; 26:10, 12; 27:9; 30:12;
63:10; 70:7; 92:10;

101:18; 108:11, 13;
109:14; 112:24; 113:23,
24; 114:5; 116:10; 117:19;
118:4; 122:15; 142:12, 19;
153:20; 158:1

uses 116:7, 8

using 24:5; 42:10; 53:3;
70:19; 71:6; 97:14; 116:4;
135:21; 142:9

usually 32:21; 33:18;
38:2, 5, 25; 39:1; 42:24;
45:19; 46:4; 52:11; 63:7;
66:21; 77:25; 80:17; 93:6;
122:20; 152:15

# V

vacation 147:14; 29:5;
82:18; 83:1

varies 96:1

vehicles 99:19, 19; 100:3

verbally 26:17, 19; 121:4,
10

versa 5:10

vertically 46:3

vests 70:4

vice 5:10

videos 29:8; 134:8, 8, 9

view 22:3; 29:8, 24, 24;
18:9; 29:17

vision 32:16; 16:18

visit 86:6; 90:12; 102:14

vo-technical 13:12

voice 6:25; 7:7

# W

wages 72:1; 103:3, 16

wait 6:13, 17, 19; 62:5;
64:23; 68:5; 69:21; 133:12

waived 4:5

walk 28:14; 42:23; 43:23;
44:2; 105:18; 81:20

warning 123:25; 149:19,
14

warranted 21:22

watch 17:16

way 6:1; 9:17; 11:11, 16;
26:1, 15, 21; 30:9; 41:11;
48:4; 52:5, 5, 24; 56:12;
66:21; 72:22; 79:3; 83:13;
96:15; 102:2; 119:15, 20;
125:10; 131:9; 158:7, 13,
17, 24; 159:5, 5; 162:16

wear 155:1, 13, 15, 20;
156:6, 14, 19, 25; 157:5;
160:10, 15; 154:24

week 31:22; 87:23; 93:15,
15, 16, 20; 103:19; 137:20;
79:12; 80:4; 163:11, 19

weight 45:24; 97:24;
123:23

weren't 72:24; 91:13;
134:14

what's 6:7; 9:3; 34:16;
37:9; 42:14; 58:15; 68:23;
73:5; 74:21; 75:20; 78:2, 4;
97:8; 103:22; 132:5;
151:23; 160:4, 22

wheel 50:16; 62:19;
152:3; 52:12, 17; 113:16;
152:18

Wheelchairs 100:10

whenever 5:14

whereas 27:15

Whereupon 168:4

wherever 144:10

white-tail 99:1

who's 34:25; 35:1; 37:20

whole 6:5; 117:1; 166:10

whose 134:1, 3; 140:14;
141:12

wife 7:17; 8:24; 99:23, 21

WILKINSON 4:9, 13, 15,
17, 18, 20, 24; 6:23; 7:10,
17; 8:6; 12:25; 31:12;
34:17; 35:14, 15; 37:10;
39:10; 50:7; 56:12, 19, 22,
23, 23; 57:2, 11, 15; 58:12,
12; 63:17, 22; 67:13;
68:20, 23, 24; 71:10;
72:21; 73:2, 5, 6; 74:18,
21, 22; 75:17, 20, 21; 76:1;
78:3, 20; 83:3; 85:16; 89:2;
103:2; 105:3, 10; 148:23;
155:11, 14, 22; 156:22;
158:8; 162:20

William 35:14, 15

winter 101:14

Withdraw 167:3

within 15:1; 94:20;
103:23; 132:8; 145:12;
148:23

without 91:8; 123:25;
140:8

witness 4:9; 61:11, 16

word 26:10; 5:15, 18;
17:14; 26:11, 14; 27:5;
31:15; 32:4; 36:1; 38:25;
42:13; 47:24; 51:22; 66:8;
90:25; 98:12; 110:9;
111:17; 116:25; 150:6;
159:3; 160:1; 162:19

work 13:16; 14:5, 22;
15:13; 17:11; 18:23; 19:6;
20:5, 9, 19, 24; 21:1, 9, 10,
10, 22, 25; 24:15; 25:4;
26:10; 27:20; 28:1, 6, 9,
10, 19, 20; 29:7; 30:8;
31:7, 15, 16, 19; 32:2, 3, 5,
12, 18; 33:21, 22; 34:12,
15, 24; 35:5; 37:13, 18;
38:12, 17, 18, 19; 39:23;
40:1, 8; 41:3; 42:23; 58:2;
78:11, 21; 79:4, 21, 22;
81:15; 82:8, 17, 25; 84:11;
90:22, 23, 25; 91:1, 7, 14;
92:17, 21; 93:4, 17, 20;
94:11, 13; 96:19, 20; 98:2;
100:22; 101:5; 103:20, 22;
104:2; 107:21; 111:24;
122:3, 10; 126:21; 137:10,

18, 20; 138:12, 12, 15, 22;
141:10, 16; 142:6, 10;
143:21; 144:17; 146:2, 8,
23, 24; 147:5, 9, 18, 21;
150:20; 151:8; 157:21;
159:5, 7; 163:18; 13:21;
14:6, 17; 15:8; 18:15, 17;
19:18; 21:17, 19; 25:1;
27:3; 30:17; 31:23; 37:11;
43:11; 84:1, 4, 6, 8; 85:1,
2; 93:13; 103:18; 104:9;
109:23; 140:7, 8, 9;
141:24; 143:22; 144:21,
21; 145:3; 163:14, 16;
14:9; 16:4; 20:17; 21:12;
22:10; 29:12, 16, 25; 30:20;
33:5, 18, 19; 34:1, 12, 18,
20; 35:3, 7, 8, 9; 36:2, 3;
37:23; 38:1; 39:18; 40:5;
41:15; 44:13; 45:1; 45:10;
62:22; 66:5, 23; 72:11;
73:24; 78:14; 84:21;
108:24; 109:1; 129:5;
133:3, 6; 134:15; 139:3;
144:23; 146:19; 147:5;
148:23; 149:8; 150:17;
157:14; 159:12, 16;
160:24; 68:13

workday 145:25

workers 17:16; 34:5

workmen's 79:16

wrenches 119:19

wrestle 102:9

write 68:15; 128:23

writing 26:18; 69:6

written 73:18; 77:6; 160:1

wrong 36:13; 78:1, 2;
112:8; 163:2

wrote 68:18; 69:10; 83:13

# Y

yard 14:24; 15:1, 3, 4;
20:6; 21:11; 58:1; 81:20;
91:16; 92:17; 97:1;
100:19, 22; 101:5; 103:15;
118:15; 122:6; 128:5;
134:3, 5, 15, 16; 136:6, 12;
143:21; 144:10, 18;
146:20; 155:19; 156:4, 8;
159:23; 161:11, 24; 162:4,
6, 6, 7, 15; 163:11

yardman 76:2; 78:3

Yarus 87:24, 24

year 10:10, 11; 11:2;
13:4; 29:20; 57:21; 77:5;
78:16; 89:5, 6, 20; 90:7,
10; 92:4; 98:23; 103:24;
104:14, 16, 22, 23; 111:17,
19; 22:15; 82:3; 101:15;
106:11, 16, 19; 108:6, 8;
109:4; 115:2; 134:17;
143:20; 144:25; 145:1;
146:7; 147:7, 10; 150:22;
155:24; 166:14

yearly 22:14

yell 119:23, 25

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Terry Boyd Wilkinson  &  Sharon Wilkinson   v.
Norfolk Southern Railway Company, et al.

Terry Boyd Wilkinso
June 10, 200

## Z

**Zaleck** 39:5; 83:25;
118:19, 25

SEP 2 1 2002

GROUP A   # 2



GROUP A   # 1



GROUP A   # 4



UPS Logistics Gr

GROUP A   # 3





W. Ikinson

DEPOSITION
EXHIBIT
# 1   6-10-02

GROUP B      #1



GROUP B      #2



-ROUP A      #5



GROUP A      #6



W. Winson

**DEPOSITION
EXHIBIT**

#2   6-10-02



GRouP B    #2



GRouP B    #1



W. Ikinson

DEPOSITION
EXHIBIT
#3    6-10-02



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF LABOR AND INDUSTRY
BUREAU OF WORKERS' COMPENSATION
1171 S. CAMERON STREET, ROOM 103
HARRISBURG, PA 17104-2501
(TOLL FREE) 800-482-2383

**EMPLOYER'S REPORT
OF OCCUPATIONAL
INJURY OR DISEASE**

EMPLOYEE SOCIAL SECURITY NUMBER
`188 38 8391`

DATE OF INJURY
`06 15 1999`
MONTH DAY YEAR

EMPLOYEE FIRST NAME
`TERRY`

EMPLOYEE LAST NAME
`WILKINSON`

STREET ADDRESS
`RD#1 BOX 485`

CITY
`LANDISBURG`
STATE `PA`
ZIP CODE `17040`

COUNTY
`PERRY`
PHONE NUMBER `717`

EMPLOYEE:
MALE ☐ MARRIED ☑
FEMALE ☐ SINGLE ☐

NUMBER OF DEPENDENTS `05`

DATE OF BIRTH
`07 19 1948`
MONTH DAY YEAR

OCCUPATION OR JOB TITLE
`YARD PERSON`

NCCI CLASS CODE (IF KNOWN)

EMPLOYMENT STATUS `FT`
FT = Full-time       SL = Seasonal
PT = Part-time       VO = Volunteer
                     IZ = Other

EMPLOYER
`GPS TERMINAL SERVICE`

STREET ADDRESS
`3501 INDUSTRIAL Rd`

`HARRISBURG`
STATE `PA`
ZIP CODE `17110`

SIC CODE

EMPLOYER FEIN

PHONE NUMBER
`717 237 2544`

COUNTY
`DAUPHIN`

FULL PAY FOR DAY OF INJURY?
YES ☐
NO ☐

TIME EMPLOYEE BEGAN WORK
`04:00` AM ☐ PM ☐

TIME OF OCCURRENCE
`04:15` AM ☐ PM ☐

[barcode] 344 1187-1

LAST DAY WORKED
MONTH   DAY   YEAR

DATE DISABILITY BEGAN
MONTH   DAY   YEAR

DATE EMPLOYER NOTIFIED
`06 15 1999`
MONTH DAY YEAR

DATE RETURNED TO WORK
MONTH   DAY   YEAR

CONTACT FIRST NAME

CONTACT PHONE NUMBER

CONTACT LAST NAME

NOTICE: Report should be clearly completed, (preferably typed)
and original mailed to the Bureau at the address in the upper left
corner and a copy to employee and insurer.

LIBC-344  REV 11-97
NFC 6344h (11-97) UNIFORM PRINTING & SUPPLY, INC

(OVER)

Wilkinson
DEPOSITION
EXHIBIT
#4  6-10-0-

'5/98   FRI 15:28 FAX 810 758 8593          GPS BILLING          ON

TX OF INJURY CODE          PART OF BODY AFFECTED CODE          CAUSE OF INJURY CODE ( ENTER CODES, IF KNOWN)

TYPE OF INJURY OR ILLNESS

PUlLEd MUSELCS RUghT SHOULLce

PART OF BODY AFFECTED

Right SHOULdeR

CAUSE OF INJURY

BAR SLiPPed OUT OF HiTCH Lockins Bar

DID INJURY OR ILLNESS OCCUR ON EMPLOYER'S PREMISES
YES ☐
NO ☐

IF OUT OF STATE, SPECIFY STATE OF INJURY
PA

WERE SAFEGUARDS OR SAFETY EQUIPMENT PROVIDED?
YES ☐
NO ☐

WERE SAFEGUARDS OR SAFETY EQUIPMENT USED?
YES ☐
NO ☐

ALL EQUIPMENT, MATERIALS, OR CHEMICALS EMPLOYEE WAS USING WHEN ACCIDENT OR ILLNESS EXPOSURE OCCURRED

Steel Bar To OPen Hitches

HOW INJURY OR ILLNESS/ABNORMAL HEALTH CONDITION OCCURRED  DESCRIBE THE SEQUENCE OF EVENTS AND INCLUDE ANY OBJECTS OR SUBSTANCES DIRECTLY RESPONSIBLE

WAS OPening TRACK ANd BAR SLiPPed OUT OF HiTCH Locking BAR And HuRT SHOulder

IF FATAL, GIVE DATE OF DEATH
MONTH   DAY   YEAR

PHYSICIAN/HEALTH CARE PROVIDER
FIRST NAME                          LAST NAME
STREET
CITY                      STATE        ZIP

HOSPITAL NAME:
STREET
CITY                      STATE        ZIP

POLICY/SELF INSURED NUMBER:

WITNESS FIRST NAME

WITNESS LAST NAME

WITNESS PHONE NUMBER

INITIAL TREATMENT
☐ NO MEDICAL TREATMENT?
☐ MINOR BY EMPLOYEE
☐ CLINIC / HOSPITAL
☐ PANEL PHYSICIAN
☐ EMPLOYEE PHYSICIAN
☐ EMERGENCY CARE
☐ HOSPITALIZED MORE THAN 24 HOURS

POLICY PERIOD FROM
MONTH   DAY   YEAR

POLICY PERIOD TO
MONTH   DAY   YEAR

PERSON COMPLETING THIS FORM:
NAME:
TITLE:
PHONE:

INSURANCE CARRIER OR THIRD PARTY ADMINISTRATOR (IF SELF-INSURED)
NAME:   AIG Claim Services, Inc.
STREET  P.O. Box 899
CITY    Easington,          STATE PA   ZIP 19029
BUREAU CODE:  0157          FEIN

DATE PREPARED
MONTH   DAY   YEAR

344 1197-2

ny individual filing misleading or incomplete information knowingly and with intent to defraud is in violation of Section 1102 of the Pennsylvania Workers' Compensation Act and may also be subject to criminal and civil penalties through Pennsylvania Act 165.



## ASSOCIATION OF AMERICAN RAILROADS



# Intermodal Trailer and Container Securement





**ASSOCIATION OF AMERICAN RAILROADS**



Wilkinson
DEPOSITION
EXHIBIT
H5    6-10-00
516

PENGAD 1-800-631-6989

# Intermodal Trailer and Container Securement Manual

This manual provides the minimum requirements for the safe loading and securement of trailers (including chassis) and containers on intermodal freight cars. This guide is not intended to answer all questions. Should questions arise which are not covered in this guide, you should ask either your supervisor or contact the original equipment manufacturer.

## Table of Contents

| | Page No. |
|---|---|
| A. Summary Table of Major Hitch Types | 2 |
| B. General Hitch Information | 3 |
|   1. Non-Retractable Hitches | 3 |
|   2. Retractable Hitches | 3 |
|   3. Cushioning | 4 |
|   4. Indications of Improper Loading | 5 |
| C. Semi-Automatic Hitches with Rotor Type Top Plates | 6 |
|   1. Retractable | 8 |
|   2. Fixed | 10 |
| D. Semi-Automatic Hitches with Jaw Type Top Plates | 13 |
| E. Hitches with Screw Type Top Plates | 15 |
| F. Container Securement Devices | 21 |
|   1. Interbox Connectors(IBC's) | 22 |
|   2. Non Retractable Pedestals | 23 |
|     a) Latch Type | |
|     b) Helical Automatic Twist-Lock Type | |
|   3. Retractable Pedestals | 24 |
|     a) Dual Fold-Down Type | |
|     b) Single Latch Fold-Down Type | |
|     c) Fold-Down, Multi-Location Type | |
| G.Other Inspection Items | 27 |
|   1. Tandem Assembly | |
|   2. Landing Gear | |
|   3. Container to Chassis Securement | |
|   4. Bottom Container Loading | |
|   5. Clearances | |
|   6. Loading Practices | |
| H. Appendix -Various Hitch Drawings | 28 |

Copyright© 1995 Association of American Railroads. All right reserved.

This publication may not be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, storage in an information retrieval system or otherwise, without the prior written permission of the Associa

# B. General Hitch Information

Trailer hitches are mechanical devices used to support and secure highway trailers on freight cars. Below is a general overview of the major types used on intermodal cars. A more detailed description of hitch operation by hitch type is in the following sections. Consult your supervisor for information concerning hitch types not presented in this manual. In general, trailer hitches are classified as retractable and non-retractable. Further information is available on hitch nomenclature in the Appendix (page 28)

## 1. Non-Retractable Hitches

Non-retractable (fixed) hitches are permanently in the raised or upright position. They are designed for trailers to be loaded and unloaded with an overhead crane or a side loader. Cars equipped with this type of hitch cannot be loaded circus style. Non-retractable hitches are secured to the car deck with either pinned or welded connections at the base of both the vertical and diagonal struts. These hitches are equipped with a semi-automatic type top plate, which locks automatically when loaded but requires a manual operation to unlock.

## 2. Retractable Hitches

### a) Wrench Operated Hitches

Wrench operated hitches are raised and lowered, from the car floor, by turning a long elevating screw with a special hitch wrench. The screw is threaded through a large nut secured inside a yoke which is connected with steel pins to the bottom of the vertical strut. When the hitch is upright, heavy steel hooks, welded to the car deck, engage the vertical strut securing the hitch to the car.

The trailer kingpin fits inside a jaw mechanism in the top plate, and the jaw is closed by turning another heavy screw. After the jaw is closed around the kingpin, a manual mechanical lock is engaged to keep the jaw closed. The position of this lock can be determined by observing the position of the indicator which can be a handle or a pin.

### b) Pull-up Hitches

Pull up or tractor operated hitches are raised with a pull-up hook

## A. Summary Table of Major Hitch Types

| Lock Method | Type Hitch | Manuf. | Fixed vs Retractable | Rigid vs Cushioned | Pull-Up vs Screw |
|---|---|---|---|---|---|
| Rotor | LP-3-SA | PS/Trinity | Retract. | Rigid | Pull-Up |
| Rotor | LP-4-SA | PS/Trinity | Retract. | Cush. | Pull-Up |
| Rotor | NRC-1 | PS/Trinity | Fixed | Cush. | n. a. |
| Rotor | NRC-2 | PS/Trinity | Fixed | Cush. | n. a. |
| Rotor | NR-4 | PS/Trinity | Fixed | Rigid | n. a. |
| Rotor | TT-2 | TTX | Fixed | Rigid | n. a. |
| Rotor | TT-5 | TTX | Fixed | Cush. | n. a. |
| Rotor | LP-10-SA | PS/Trinity | Retract. | Rigid | Pull-Up |
| Rotor | LP-11-SA | PS/Trinity | Retract. | Rigid | Pull-Up |
| Rotor | LP-12-SA | PS/Trinity | Retract. | Rigid | Pull-Up |
| Jaw | Model 6 | ACF | Retract. | Rigid | Pull-Up |
| Jaw | Model 6P | ACF | Retract. | Rigid | Pull-Up |
| Jaw | Model 6-5 | ACF | Fixed | Cush. | n. a. |
| Jaw | Model 6-2 | ACF | Fixed | Cush. | n. a. |
| Jaw | TT-1 | TTX | Fixed | Rigid | n. a. |
| Jaw | TT-2 | TTX | Fixed | Rigid | n. a. |
| Jaw | TT-4 | TTX | Fixed | Cush. | n. a. |
| Jaw | TT-5 | TTX | Fixed | Cush. | n. a. |
| Screw | Model 2 | ACF | Retract. | Cush. | Screw |
| Screw | Model 5R | ACF | Retract. | Rigid | Screw |
| Screw | Model 5C | ACF | Retract. | Cush. | Screw |

raising hitches by pulling up on the hitch top plate hitch must be lifted from the appropriate lift bar or eyes.

The method of lowering depends on the style of hitch. LP-3-SA and LP4-SA hitches can be lowered by depressing the knock-down lever with sufficient force to cause the hitch to retract. LP-12 and ACF Model 6P hitches can be lowered with a special wrench or pry bar while standing alongside the hitch on the ground.

Pull up hitches are secured to the car deck with pin connectors at the base of both the vertical and diagonal struts.

The trailer kingpin is contained in a jaw mechanism that locks automatically when the trailer is properly loaded. A visual indicator shows whether the jaws are in a locked or unlocked position. Unloading requires a manual unlocking of the jaw before the trailer can be removed from the car.

## 3. Cushioning

Both retractable and non-retractable hitches can either be cushioned or non-cushioned. Cushioned hitches are used on intermodal cars equipped with standard draft gears. Non-cushioned hitches are used on single unit intermodal cars with end-of-car cushioning. In general, multi-unit cars are equipped with non-cushioned hitches.

Hitch cushioning is provided by several means depending on the manufacturer. The most common arrangement is compressed rubber, either in the diagonal strut or on the car deck behind the diagonal strut. Hydraulic cylinders in the diagonal struts are also used.

## 4. Indications of Improper Loading

The photographs below show several ways of NOT to set a trailer on a hitch. YOU MUST BE SURE THE KINGPIN IS DOWN INTO THE LOCKING MECHANISM OF THE HITCH, WITH THE TRAILER RESTING ON THE TOP PLATE TO ENSURE THE HITCH IS LOCKED. **IF YOU SEE A TRAILER LOADED AS SHOWN BELOW, DO NOT SHIP THE CAR!**



The kingpin is behind the top plate. The trailer is not secured to the top plate. <u>Do not ship this car</u>



The kingpin is resting on top of the top plate. The trailer must be positioned so it is resting on the top plate and the king pin must be locked into the plate. <u>Do not ship this car</u>



The kingpin is resting on the auxiliary lock. The trailer must move back towards the top plate until it is locked. This trailer is not secured to the hitch top plate. <u>Do not ship this car.</u>



This top plate has a defective auxiliary lock. A trailer should not be loaded on this hitch and the top plate must be repaired. <u>Do not ship this car.</u>

# Rotor Type Top Plate (cont.)

The photographs below show the LP type top plate in both the unlocked and locked position.



**PULLMAN STANDARD LP-TYPE**
INDICATOR PROTRUDING FROM BACKSIDE OF TOP PLATE
**HITCH UNLOCKED**



**PULLMAN STANDARD LP-TYPE**
INDICATOR MUST BE FLUSH OR SLIGHTLY RECESSED.
**HITCH LOCKED**

## C. Semi-Automatic Hitches With Rotor Type Top Plates.

The hitches with a rotor type top plate are manufactured by Trinity Industries (Pullman Standard). The top plate is shown below both in the unlocked and locked positions.

**TRINITY INDUSTRIES (PULLMAN STANDARD) TOP PLATE**

**ROTOR TYPE - SEMI-AUTOMATIC OPERATION**



INDICATOR PROTRUDING
FROM BACK OF TOP PLATE

ROTOR

**Rotor in the unlocked position**



LOCK INDICATOR FLUSH OR
SLIGHTLY RECESSED
WITH BACK OF TOP PLATE

ROTOR

**Rotor closed and in the locked position**

## Retractable (cont.)

### Pull-up type

**LP-12** - Manufactured by Trinity Industries (Pullman Standard)

**Make sure kingpin is in hitch!**





Top plate yellow lock indicator must be flush or slightly recessed





Auxiliary lock must be in place

Lower diagonal strut must be in position shown.

Hitch lock hook must be in position shown

## 1. Retractable

### a) Pull-up type

**LP-SA Type - Manufactured by Trinity Industries (Pullman Standard)**

**LP-3SA - Non-Cushioned and LP-4SA - Cushioned**

**Make sure kingpin is in hitch!**

Top unlocking handle must be forward.

Top plate yellow lock indicator must be flush or slightly recessed.



Auxiliary lock must be in place

Diagonal strut yellow lock indicator flag must be flush or slightly recessed.

## Fixed Hitches (cont.)
### TT-2 Manufactured by TTX

**Make sure kingpin is in hitch!**





Top plate yellow lock indicator must be flush or slightly recessed.



Auxiliary lock must be in place

## 2. Fixed Hitches
### NRC 1 & 2 - Manufactured by Trinity ...ustries (Pullman Standard)

**Make sure kingpin is in hitch!**



Auxiliary lock must be in place.

Top plate yellow lock indicator must be flush or slightly recessed.



Top locking handle must be forward with the flag down.



## D. Semi-Automatic Hitches with Ja    /pe Top Plates.

ACF manufactures hitches with rotating jaws. All rotating jaw type top plates are a version of the ACF Model 6 head. The sketch below shows a top view of the Model 6 with open unlocked jaws and closed locked jaws.

### ACF MODEL 6 TOP PLATE

### JAW TYPE - SEMI-AUTOMATIC OPERATION



YELLOW INDICATOR PROTRUDING
FROM BACK OF TOP PLATE

JAWS

Jaws shown in unlocked position



YELLOW INDICATOR  FLUSH
OR SLIGHTLY RECESSED WITH
BACK OF TOP PLATE

JAWS

Jaws shown in locked position

The photographs below show the Model 6 top plate both in the unlocked position and locked position.



**ACF MODEL 6**
YELLOW LOCK INDICATOR PROTRUDING
FROM BACKSIDE OF TOP PLATE



**ACF MODEL 6**
YELLOW LOCK INDICATOR MUST BE
FLUSH OR SLIGHTLY RECESSED

## Fixed Hitch (cont.)
## TT-5  Manufactured by TTX Company

**Make sure kingpin is in hitch!**

Top plate yellow lock indicator must be flush or slightly recessed.



Auxiliary lock must be in place





## E. Hitches with Screw Type Top Plates

### Screw Type or Wrench Operated Top Plates

There are two common versions of the screw type top plate in use. Both have the jaw arrangement shown in the figure below.

### ACF Model 5



**ACF MODEL 5 TOP PLATE**
**SCREW OR WRENCH OPERATED**

YELLOW LOCK INDICATOR FLAG DOWN INDICATING LOCKED JAWS

JAWS SHOWN IN LOCKED POSITION

YELLOW LOCK INDICATOR FLAG UP INDICATING UNLOCKED JAWS

JAWS SHOWN IN UNLOCKED POSITION

Retractable
Pull-up type
ACF Model 6P

### Make sure kingpin is in hitch!



Top plate yellow lock indicator must be flush or slightly recessed

Auxiliary lock must be in place.

Diagonal strut lock hooks must be positioned as shown

## Retractable (cont.)
### Screw type
### ACF Model 5 (Non-Cushioned)

**Make sure kingpin is in hitch!**



Movable jaw shown





Movable jaw must be forward with rod passing through holes in both fixed and movable jaws. Yellow lock indicator flag dropped down.

Vertical strut must be secure in hold down hooks.

Bottom movable yoke must be forward.



## ACF Model 5

To lock this hitch, the lock screw must be move.... ...ard to close the jaws around the trailer kingpin. When the jaws are positioned to clamp the kingpin the lock pin handle (A) is lifted and moved inward. The lock pin engages a series of holes in the top plate which locks the movable jaw in place. The yellow lock indicator flag (B) will drop into view when the lock is engaged.

### ACF MODEL 5

Lock pin handle (A) is extended outward and not engaging movable jaw. The yellow indicator flag is in the upward unlocked position.

**HITCH UNLOCKED**

### ACF MODEL 5

Lock pin handle (A) has been moved upward and moved inward, properly engaging movable jaw. Yellow lock indicator (B) has dropped down.

**HITCH LOCKED**



## Retractable (cont.)
### Screw type
### ACF Model 2

The Model 2 top plate can easily be identified by a "T" handle. In order to lock this top plate, the lock screw must first be turned inward to close the jaws around the trailer kingpin. When the jaws are fully closed the lock can slide over to the side, thus preventing the jaws from opening. The following views show the unlocked and locked positions.



**ACF MODEL 2**
"T" HANDLE SHANK FLUSH WITH LOCK PIN STOP. LOCK PIN DISENGAGED FROM JAW ASSEMBLY
**HITCH UNLOCKED**

**ACF MODEL 2**
"T" HANDLE SHANK ON INSIDE OF LOCK PIN STOP AND LOCK PINS ENGAGED
**HITCH LOCKED**

## Retractable (cont.)
### Screw type
### ACF Model 5 (Cushioned)

**Make sure kingpin is in hitch!**



Movable jaw shown

Movable jaw must be forward with rod passing through both sides and yellow lock indicator flag dropped down.

Bottom movable yoke must be forward.

Vertical strut must be secure in hold down hooks.

Bottom of cushion strut must not have white indicator for...

## F. Container Securement Devices

A variety of container securement devices are used on container-on-flat-car (COFC) type cars to support and secure containers during transit. Cars may be equipped with more than one type of container securement device. Consult your supervisor for information concering container securement devices not presented in this manual. When containers are loaded, the following must be verified:

1. The container is sitting squarely on the restraints
2. Hooks or twist locks are engaged and holding the container at all four corners.

This section details the various types of container securement devices as listed below.

1. Interbox Connectors (IBC's)
2. Non Retractable Devices
   a) Latch Type
   b) Helical Automatic Twist-Lock Type
3. Retractable Pedestals
   a) Dual Fold-Down Type
   b) Single Latch Fold-Down Type
   c) Fold-Down, Multi-Location Type

## Retractable (cont.)
### Screw Type
### ACF Model 2

**Make sure kingpin is in hitch!**



Movable jaw shown

Both pins must be engaged in movable jaw and slide plate held in place by "T" handle pin behind lock stop.("T" handle highlighted in white here).




Vertical strut must be secure in hold down hooks.

Bottom movable yoke must be forward.



ACF MODEL 6P
RETRACTABLE HITCH

KING PIN GRIPPING AREA

TOP PLATE

COVER

LIFTING LUG

MOVABLE JAWS

AUXILLARY LOCK

LOCKING HANDLE

DIAGONAL STRUT

LOCKING HOOK ASSEMBLY

VERTICAL STRUT

RELEASE MECHANISM COVER

FRONT PIVOT MOUNT

28

TO LIFT HITCH:
PULL UP AT BOTH
LIFTING LUGS UNTIL
LOCK HOOKS ENGAGE
LOCK BLOCKS

OR LIFT HERE UNTIL
LOCK HOOKS ENGAGE
LOCK BLOCKS



MODEL LP4—SA
CUSHIONED RETRACTABLE
HITCH

KING PIN GRIPPING AREA

TOP PLATE ASSEMBLY

UNLOCKING HANDLE

CUSHION COVER

SLIDE BAR

AUXILLARY LOCK

KNOCK—DOWN LEVER

LOWER DIAGONAL STRUT

CUSHION ASSEMBLY

VERTICAL STRUT

LOCK INDICATOR

UPPER DIAGONAL STRUT

SLIDE BAR GUIDE

TO RAISE HITCH
LIFT HERE AND
PULL HITCH FORWARD
UNTIL LOCKED AND
INDICATOR RETRACTS

FRONT PIVOT MOUNT

29

Case 1:01-cv-01109-SHR    Document 22    Filed 07/11/2002    Page 78 of 107



# MODEL LP12—SA HITCH

TOP PLATE ASSEMBLY

KING PIN GRIPPING AREA

UNLOCKING HANDLE

COVER

AUXILLARY LOCK

LOCKING HOOK

LOCK BLOCK

RELEASE MECHANISM

DIAGONAL STRUT

VERTICAL STRUT

RELEASE MECHANISM COVER

FRONT PIVOT MOUNT

TO ELEVATE; PULL UP AT BOTH LIFTING EYES UNTIL LOCKING HOOK FULLY ENGAGES LOCK BLOCK

LIFTING EYE

LIFTING EYE

30



KING PIN GRIPPING AREA

MOVABLE JAW

FIXED JAW

DIAGONAL STRUT (RIGID)

LOCK PIN HANDLE

TOP PLATE

LOCK SCREW SOCKET

MOVABLE JAW POSITION INDICATOR

VERTICAL STRUT

REAR PIVOT MOUNT

YOKE

TRACK

BASE PLATE

BASE PLATE HOOKS

ELEVATING SCREW

ELEVATING SCREW SOCKET

## ACF MODEL 5R WRENCH OPERATED RIGID HITCH

TO ELEVATE, ROTATE SCREW CLOCKWISE UNTIL VERTICAL STRUT ENGAGES BASE PLATE HOOKS. TO RETRACT, ROTATE SCREW COUNTER CLOCKWISE UNTIL TOP PLATE IS RESTING ON THE DECK.

31

32



KING PIN GRIPPING AREA

FIXED JAW

LOCK SCREW SOCKET

MOVABLE JAW

TOP PLATE

MOVABLE JAW POSITION INDICATOR

DIAGONAL STRUT (CUSHIONED)

"T" HANDLE

LOCK WELDMENT

REAR PIVOT MOUNT

VERTICAL STRUT

ELEVATING SCREW

YOKE

BASE PLATE

TRACK

ELEVATING SCREW SOCKET

BASE PLATE HOOKS

TO ELEVATE, ROTATE SCREW CLOCKWISE UNTIL VERTICAL STRUT ENGAGES BASE PLATE HOOKS. TO RETRACT, ROTATE SCREW COUNTER CLOCKWISE UNTIL TOP PLATE IS RESTING ON THE DECK.

ACF MODEL 2
WRENCH OPERATED
CUSHIONED HITCH

# Order Form

Please send me the following materials (please check all that apply):

☐ 2 copies of the Intermodal Trailer and Container Securement Manual at $15 (English version only)

☐ ____Additional copies at $10 each

☐ ____Copies of the Spanish edition of the Intermodal Trailer and Container Securement Manual at $10 each

☐ ____Copies of the Trailer Hitch Wall Poster at $10 each

☐ A free copy of the AAR Publications and Services Catalog

☐ Information on subscribing to AAR Technical Services Circular Letters

☐ ____Copies of the Container Securement Information Poster at $10 each

☐ ____Copies of the Intermodal Trailer Loading & Securement Video at $30 each

☐ ____Copies of the Intermodal Container Loading & Securement Video at $30 each

(There is a $5 handling charge on all orders and includes one ship-to address. Add $5 shipping for each additional ship-to address.)

Name: _____ Title: _____

Company: _____

Address: _____

City: _____ State: _____ Zip: _____

Phone: _____ Fax: _____



For telephone orders, please call toll free 877-999-8824.
Fax requests (credit cards only) to Publications FAX 719-584-2157

Card#:_____ Exp. Date:_____





**TERMINAL SERVICES, INC.**
1973 - 1998

**Corporate Headquarters**
1240 Win Drive • Bethlehem, PA 18017
800-779-GPSI (4771) • 610-691-6924
Fax: 610-691-1958

To:     All Terminal Services Employees

From: Dave Anthony

Date:  November 13, 1998

Re:     Maintaining a Professional Attitude

The goal of GPS at the railroads it services is to provide professional, courteous service to our customers.  Sharing information with people outside of GPS that may be misunderstood or interpreted incorrectly can cause misunderstandings and create customer dissatisfaction.

Remember that you are paid by GPS, not the railroads. All discussions and instructions between management and employees or among employees are not to be shared or discussed with non-GPS employees or other railroad personnel.

All GPS employees are strongly advised to maintain a professional attitude at all times on and off the work site.  Instructions and information given by management or shared among employees is **not** to be repeated to non-GPS employees.



DEPOSITION
EXHIBIT
#6    6-10-02



QUALITY
VALLEY•USA

*GPS TERMINAL SERVICES*
*BETHLEHEM PA 18017*

Page:

# Employee Class History

February 7, 2002   3:42:02 PM

**Employee:**  **Wilkinson, Terry**
**Job Title:**  YARDMAN
**Department:**  RUTHERFORD

| Courses | Status | Grade | CEU | Class Date | Retraining Required |
|---|---|---|---|---|---|
| Blue Flag and Derail Training | Completed | | 0.00 | 4/11/96 | |
| GROUND PERSONNEL SAFETY TRAINING | Completed | | 0.00 | 4/11/96 | |
| HITCH INSPECTION AND SECURMENT | Completed | | 0.00 | 4/18/96 | |
| CDL LICENSE QUALIFICATION | Completed | | 0.00 | 11/27/96 | |
| HAZARD COMMUNICATION/ RIGHT TO KNOW STANDARD | Completed | | 0.00 | 4/23/97 | |
| HAZARDOUS MATERIALS TRAINING | Completed | 95 | 0.00 | 4/23/97 | |
| Trailer Repair qualified | Completed | | 0.00 | 6/25/97 | |
| Jockey Repair qualified | Completed | | 0.00 | 6/30/97 | |
| Packer Qualified | Completed | | 0.00 | 7/ 1/97 | |
| Groundman Qualified | Completed | | 0.00 | 7/ 1/97 | |
| Jockey Qualified | Completed | | 0.00 | 7/ 1/97 | |
| Blue Flag and Derail Training | Completed | 95 | 484.00 | 10/28/97 | |
| General Safety Rules | Completed | 93 | 0.00 | 11/ 6/97 | |
| GROUND PERSONNEL SAFETY TRAINING | Completed | 100 | 0.00 | 11/11/97 | |
| Lockout/ Tagout Training | Completed | 93 | 0.00 | 2/16/98 | 2/16/99 |
| HITCH INSPECTION AND SECURMENT | Completed | 95 | 0.00 | 2/24/99 | |
| Intermodal Gate Inspection Training | Completed | | 0.00 | 2/ 1/01 | 2/ 1/02 |
| Blue Flag and Derail Training | Completed | | 0.00 | 2/ 1/01 | 2/ 1/02 |
| GROUND PERSONNEL SAFETY TRAINING | Completed | | 0.00 | 2/ 1/01 | 2/ 1/02 |
| HITCH INSPECTION AND SECURMENT | Completed | | 0.00 | 2/ 1/01 | |
| PERSONAL PROTECTIVE EQUIPMENT  POLICY | Completed | | 0.00 | 2/ 1/01 | 2/ 1/02 |
| FIRE EXTINGUISHER TRAINING | Completed | | 0.00 | 8/31/01 | 8/31/02 |
| General Safety Rules | Completed | | 0.00 | 10/31/01 | 10/31/02 |
| HITCH INSPECTION AND SECURMENT | Completed | | 0.00 | 12/31/01 | 12/31/02 |
| HAZARD COMMUNICATION/ RIGHT TO KNOW STANDARD | Completed | | 0.00 | 1/ 2/02 | 1/ 2/03 |



W. Wilson
DEPOSITION EXHIBIT
#7  6-10-02
PENGAD 1-800-631-6989

JUL 02

*B*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRY BOYD WILKINSON and SHARON WILKINSON, husband and wife<br><br>               Plaintiffs<br><br>      v.<br><br>NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED RAIL CORPORATION,<br>               Defendants<br><br>      v.<br><br>GPS TERMINAL SERVICES, INC.<br>           Third Party Defendants | CIVIL ACTION<br><br><br>JURY TRIAL DEMANDED<br><br><br><br>JUDGE SYLVIA H. RAMBO<br><br><br><br>NO. 01-CV-1146 |

**ANSWERS OF THIRD PARTY DEFENDANT, GPS TERMINAL SERVICES, INC., TO REQUESTS OF ADMISSIONS OF NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED RAIL CORPORATION, DEFENDANTS**

Norfolk Southern Railway Company and Consolidated Rail Corporation, Defendants, request that GPS Terminal Services, Inc., Third Party Defendant, within thirty (30) days after service of these Requests make the following admissions for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at the trial:

1.    On June 15, 1999, Terry Boyd Wilkinson was an employee of GPS Terminal Services, Inc.

**ANSWER:**  Admitted.

2.    On June 15, 1999, the only employer with the authority to fire or otherwise discipline Terry Boyd Wilkinson was GPS Terminal Services, Inc.

**ANSWER:** Admitted.

3.    On June 15, 1999, at approximately 4:15 a.m., Terry Boyd Wilkinson was being supervised and directed by GPS Terminal Services, Inc.

**ANSWER:** Admitted although a supervisor may not have been on the scene of the accident at the time of Plaintiff's accident.

4.     On June 15, 1999, at approximately 4:15 a.m., Terry Boyd Wilkinson

was not being supervised or directed by Norfolk Southern Railway Company and/or

Consolidated Rail Corporation.

     **ANSWER:** To the best of the Third Party Defendant's knowledge, admitted.

5.     On June 15, 1999, Terry Boyd Wilkinson was performing work that had

been assigned to him by GPS Terminal Services, Inc. and not Norfolk Southern

Railway Company and/or Consolidated Rail Corporation.

     **ANSWER:** Admitted.

6.     On June 15, 1999, Terry Boyd Wilkinson was using tools, particularly,

an approximately 33 inch bar, to open a trailer hitch, that had been supplied to him

by GPS Terminal Services, Inc. and not Norfolk Southern Railway Company and/or

Consolidated Rail Corporation.

     **ANSWER:** It is admitted that the Third Party Defendant provided to its employees, including Plaintiff, metal bars for use in opening hitches.

3

7.    On June 15, 1999, at approximately 4:15 a.m., there were no Norfolk Southern and/or Consolidated Rail Corporation employees giving instruction to or directly supervising Terry Boyd Wilkinson in the use of the bar set forth in Request No. 6 above or in the work he was performing or the manner in which he was performing it.

**ANSWER:** To the best of the Third Party Defendant's knowledge, admitted.

8.    The selection of Terry Boyd Wilkinson to perform the tasks he was performing at the time of his accident on June 15, 1999, was done solely by GPS Terminal Services, Inc. and not by Norfolk Southern Railway Company and/or Consolidated Rail Corporation.

**ANSWER:** Admitted.

9.     All wages for work performed by Terry Boyd Wilkinson on June 15, 1999, were paid solely by GPS Terminal Services, Inc.

**ANSWER:** Admitted.

10.    On June 15, 1999, at approximately 4:15 a.m., neither Norfolk Southern Railway Company nor Consolidated Rail Corporation exercised any significant supervisory control or direction over Terry Boyd Wilkinson or the manner in which he was performing the tasks assigned him by GPS Terminal Services, Inc. nor in the selection or usage of the tools being employed by him at the time of his alleged accident.

**ANSWER:** Admitted.

11.    On June 15, 1999, at approximately 4:15 a.m., Terry Boyd Wilkinson was solely the employee of GPS Terminal Services, Inc. and not Norfolk Southern Railway Company nor Consolidated Rail Corporation.

**ANSWER:** Admitted.

12.    On June 15, 1999, Terry Boyd Wilkinson was being supervised and directed by GPS Terminal Services, Inc.

**ANSWER:** Admitted.

NAUMAN, SMITH, SHISSLER & HALL, LLP

By: _____

**Craig J. Staudenmaier, Esquire**
**Supreme Court ID# 34996**

200 North Third Street, P. O. Box 840
Harrisburg, PA  17108-0840
Telephone:  (717) 236-3010
Counsel for Norfolk Southern Railway
Company and Consolidated Rail
Corporation, Defendants

Date:  June 6, 2002

## VERIFICATION

I, John deHoll, hereby verify and state that the facts set forth in the foregoing **ANSWERS TO DEFENDANTS, NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED RAIL CORPORATION'S REQUESTS OF ADMISSIONS** are true and correct to the best of my information, knowledge and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn verification to authorities.

Dated: 6/19/02

_____
John deHoll

## CERTIFICATE OF SERVICE

I, Jeffrey B. Rettig, Esquire, hereby certify that I am this day serving a copy of the foregoing document upon the person(s) indicated below by depositing a copy of same in the United States mail, first-class postage prepaid, as follows:

Joseph A. Coffey, Jr., Esquire
Coffey & Kaye
Suite 718, Two Bala Plaza
Bala Cynwyd, PA 19004
*Counsel for Plaintiffs Terry Boyd Wilkinson and*
*Sharon Wilkinson, husband and wife*

Craig J. Staudenmaier, Esquire
200 North Third Street, 18th Floor
P.O. Box 840
Harrisburg, PA 17108-0840
*Counsel for Defendants Norfolk Southern Railway Company and*
*Consolidated Rail Corporation*

HARTMAN, OSBORNE & RETTIG

By: _____
Jeffrey B. Rettig, Esquire
Supreme Ct. I.D. # 19616
126 - 128 Walnut Street
Harrisburg, PA 17101
(717) 232-3046

Attorneys for Defendants
Clifford E. Lee and Butler Trucking Company

Dated: 6/27/02

# TERMINAL SERVICES AND MAINTENANCE AGREEMENT

## HARRISBURG INTERMODAL TERMINAL

THIS AGREEMENT, made as of the _6 th_ day of March 1996, between __GPS__ ("Contractor") having its principal offices at PO Box 1829 Bethlehem PA, 18016__ and Consolidated Rail Corporation ("Conrail") having its principal offices at 2001 Market Street, Philadelphia, Pennsylvania, 19103.

WHEREAS, Conrail is engaged in the provision of rail freight services transporting, inter alia, highway trailers, mounted containers (hereinafter collectively referred to as "trailers", except where otherwise differentiated) upon railroad flatcars;

WHEREAS, Conrail operates the Harrisburg Intermodal Terminal (the "Terminal") located in Harrisburgh Pa. for the purpose of loading, unloading and handling trailers in connection with the transportation of such trailers upon railroad flatcars;

WHEREAS, Conrail desires to engage a party with expert knowledge, special equipment and experience in such matters to perform such operations and other terminal services related to such operations, and to maintain and repair Trailers and certain equipment at the terminal; and

WHEREAS, Contractor has requisite expertise, special equipment and experience and is willing in its general business to perform all such services at the terminal.

NOW THEREFORE, the parties hereto, intending to be legally bound, mutually agree as follows:

## ARTICLE 1 - DEFINITION

Certain terms used in this agreement shall be defined as set forth below:

"AAR Rules" - AAR's Interchange Rules for Trailer/Container-on-Flat car (TOFC.COFC) Service and/or AAR's Trailer and Container Service and Reporting Rules, as the same may be amended from time to time.

"Trailer/Container", In this Agreement, use of the word "Trailer" shall include "Container" and use of the word "Container" shall include "Trailer", except where other use is specifically indicated. All singular uses of these terms shall include the plural and all plural uses of said terms shall include the singular.

"Governmental Requirements" - Any and all applicable Federal, state and local laws, rules, regulations, ordinances, codes, judgments, orders and decrees.

# ARTICLE 2 - TERMINAL SERVICES

**Section 2.1** Subject to the terms and conditions of this Agreement, Conrail engages Contractor to perform and Contractor agrees to perform Lift and other Lift-related services as needed to service Conrail's intermodal operations at the Terminal, as more fully described in Appendix 1 (the "Lift Services"). Yard positioning transfers and flips from chassis to chassis, chassis to ground or ground to chassis or stacking/destacking containers do not constitute lifts for Contractor compensation purposes. Contractor shall perform such Lift Services under the direction of the Terminal Manager and pursuant to Trailer loading program lists for outbound trains provided to it by the Terminal Manager (the "Trailer Programs"). Conrail, at its discretion, may establish priorities in unloading Trailers at the Terminal.

**Section 2.2** Conrail shall pay Contractor for the performance of Lift Services at the flat rate per type of Lift set forth in Appendix 2. If train is late arriving at Terminal and Contractor incurs overtime for one or more employees in order to load or unload train, no additional charge shall be against Conrail.

**Section 2.3** The Terminal Manager and Contractor shall each monitor the condition of the Terminal and the state of operations for the purpose of determining the need at any time for the performance of any Miscellaneous Terminal Services, as described in Appendix 3. Contractor agrees to perform such Miscellaneous Terminal Services as and when the Terminal Manager directs, provided, however, that Contractor's obligation to perform such services is subject to the availability of its personnel and equipment. Conrail shall have the right to contract with any third party to perform Miscellaneous Terminal Services. The Terminal Manager shall have ultimate responsibility for determining whether Miscellaneous Terminal Services are required and to authorize and direct Contractor to perform such required services.

**Section 2.4** Conrail agrees to pay Contractor for the performance of Miscellaneous Terminal Services at the rates set forth in Appendix 4.

**Section 2.5** Contractor shall provide all qualified operating and supervisory personnel, equipment (other than the Conrail Equipment), materials and supplies reasonably and foreseeably necessary for the efficient performance of the Terminal services described in this Article 2 and the maintenance services described in Article 3 in order to adequately support Conrail's scheduled operation" and those unscheduled operations of which Contractor has received proper notice.

**Section 2.6** Contractor agrees to keep all appropriate records and prepare and deliver to Conrail and/or the Terminal Manager all appropriate reports regarding the Terminal services listed in this Article 2, as described in this Agreement or specifically identified in Appendix 5.

**Section 2.7** Contractor shall be responsible for making certain that all trailers loaded onto railcars are properly hitched as described in the AAR Trailer and Container Securement Manual, and shall be responsible for any damage resulting to that or any other trailer, including lading, or to Conrail equipment or property, caused by Contractor's failure to properly hitch the Trailer/Container to a flatcar.

## ARTICLE 3 - TERMINAL AND SHOP EQUIPMENT AND TRAILER MAINTENANCE

**Section 3.1** Conrail and/or Contractor shall provide, (when applicable) as of the effective date of this Agreement, the Terminal and Shop Equipment (Equipment) set forh in Appendix 6. Contractor shall use Equipment solely for the purpose of providing service to Conrail under this Agreement. Conrail may, at its sole option, add, remove or replace such Equipment to adjust for changes in business levels, provided that if there is a significant increase in the number of lifts that Contractor is required to perform at a terminal under this Agreement and such lift equipment than assigned to said Terminal is inadequate to meet the increased service requirements, Conrail agrees to assign sufficient additional lift equipment to that Terminal in order to satisfy the increased lift requirements. Contractor shall not change the principal Terminal location of any Conrail Equipment identified on Appendix 6 without the express written consent of Conrail.

**Section 3.2** Conrail engages Contractor to perform and Contractor agrees to perform, at its expense, all maintenance on Equipment in use at the Terminal, as more fully described in Appendix 7.

**Section 3.3** The parties acknowledge and agree that the flat rate per lift set forth in Appendix 2 includes Contractor's compensation for maintenance and repair performed on all Equipment, as described in Appendix 7. All repair parts added to the equipment shall become part of the equipment. Conrail shall have the right to inspect this Equipment at any time.

**Section 3.4** In addition to the Equipment, identified on Appendix 6, Contractor shall furnish sufficient Yard tractors to be used in performing its operations at the Terminal. This equipment shall be maintained and rrepaired by Contractor, at its sole cost and expense. It is agreed that Contractor's cost of providing and maintaining such equipment shall be included in the Lift Rate. Contractor agrees

3

to assist Conrail in removing and relocating Conrail Yard tractors from the Terminal, including the loading, unloading and towing of such tractors.

Section 3.5  Contractor shall be responsible for promptly repairing all equipment, at its own expense (including parts and materials), all damage to or breakdown of Equipment caused by Contractor's failure to properly perform the ordinary maintenance described in Appendix 7

Section 3.6  Attached hereto as Appendix 7&9 are specifications to which Equipment shall be maintained. Contractor agrees to promptly notify Conrail when Contractor determines that the condition of any Conrail Equipment requires or will require maintenance other than that for which Contractor is responsible hereunder, as specified in Appendix 9, including repair, improvement or replacement, which condition Contractor determines in good faith to be caused by structural deficiencies due to deterioration, defect and/or fatigue or by manufacturer's defect and/or fatigue or by manufacturer's enchancements or modifications, or by any cause other than Contractor's failure to properly maintain equipment or the abuse or misuse of equipment by Contractor personnel. Such notice shall include a description of the condition, the cause to the extent known and an estimated cost for the proposed maintenance, repair, improvement, modification or replacement. Conrail shall have the opportunity to inspect any proposed repairs as well as any replaced part(When Applicable).

Section 3.7  Conrail agrees to pay Contractor for all maintenance, repairs and replacements to Terminal and Shop Equipment approved by Conrail pursuant to Section 3.6 and determined to be Conrail responsibility under Section 3.6, at the rates set forth in Appendix 8.(When Applicable).

Section 3.8  Without limiting Contractor's responsibilities under various provisions of this Agreement, the Terminal Manager shall have overall responsibility to coordinate, order and direct maintenance, repair and replacement for Trailers in use at the Terminal, as described herein and in Appendices 10 and 11. At the Terminal Manager's direction, Contractor shall provide maintenance, repairs and related services for the Trailers, as described in Appendix 10. The Terminal Manager shall provide, along with such direction, all necessary written authorizations for such work as specified in Appendix 10. Notwithstanding the foregoing, the Terminal Manager shall not have, and shall not be deemed to have, any responsibility for the direct supervision of Contractor employees engaged in the performance of any such maintenance, repair or related services, as more fully described in Section 9.1.

Section 3.9  Contractor shall be responsible for repairing, at its own expense (including parts and materials) any damage to Trailers caused by negligence or

4

abuse by Contractor, its employees or agents. In this connection, Contractor shall be responsible for any invoices received by Conrail for services that result from a Contractor caused incident at the Terminal, including, but not limited to, any wrecker service used to raise a trailer as a result of failure to properly engage the landing gear at the time trailer is parked. Conrail agrees to pay Contractor for all other Trailer maintenance and repairs performed by Contractor in accordance with Section 3.8, at the rates set forth in Appendix 12.

Section 3.10  In the event bids are solicited by Conrail for any Trailer maintenance or repair work, Contractor shall be given the opportunity to bid for such work, barring any material or consistent failures by Contractor to perform maintenance and repairs under such bids in accordance with Conrail's specifications.

Section 3.11  Contractor shall perform the Annual Trailer Inspection required by section 49 CFR 396 Inspection, Repair and Maintenance. (FHWA).

Section 3.12  Trailers and their lading shall be deemed to be in the possession, custody and control of Contractor during the time such equipment is handled by contractor pursuant to Appendix 1 - Lift related service, Appendix 3 - Miscellaneous Terminal Services, and Appendix 10 - Trailer Repair and Maintenance.

Section 3.13  In addition to the Yard tractors supplied by Contractor under Section 3.4, the parties may mutually agree that some or all of the Equipment may be supplied by Contractor. In such event, Appendix 6 will identify, as between Conrail and Contractor, the ownership of the Equipment listed thereon. Upon the conclusion or termination of this Agreement, Conrail, in its sole discretion, may wish to purchase some or all of the Equipment supplied by Contractor for continued use at the Terminal or at another intermodal terminal. Accordingly, as part of the consideration for this Agreement, Contractor hereby grants Conrail a right of first refusal to purchase any or all pieces of Contractor's Equipment. The parties agree that the purchase price for Contractor's Equipment shall be equal to fair market value. Contractor shall notify Conrail of the depreciated book value of each piece of Equipment sixty (60) days prior to the termination date of the Agreement and Conrail shall notify Contractor of the pieces of Contractor's Equipment it wishes to purchase, if any, thirty (30) days prior to the termination date of the Agreement. If Conrail elects not to buy some or all of Contractor's Equipment, Contractor will have the right to sell such Equipment to a third party except that Contractor will advise any such third party of Conrail's continuing right to meet whatever purchase price(s) may be offered by such third party.

In the event that the Agreement is terminated for cause, the parties will use their best efforts to accelerate the foregoing process so as to not disrupt the operation of the Terminal.

## ARTICLE 4 - TERMINAL PREMISES AND FACILITIES

Section 4.1   Conrail hereby grants Contractor license and access, during the term of this Agreement, to use the Terminal area and facilities including the yard, loading areas, parking areas and other outdoor areas in common with other licensees and certain office and maintenance space exclusively, all as more particularly described in Appendix 6 (the "Facilities"), and all at no charge to Contractor, except as specifically sated otherwise herein. Conrail shall have the right to add to, replace, reduce or eliminate or all of the facilities set forth in Appendix 6 in connection with (I) any program to upgrade the terminal facility, (ii) an effort to more accurately scale the terminal facilities to traffic levels at the terminal, (iii) a need to comply with any local, state or federal regulation(s), or (iv) an attempt to meet any other Conrail business needs, provided that any such action by Conrail under this provision shall not impair Contractor's ability to provide Conrail with the agreed upon terminal and maintenance services set forth in this Agreement. If Conrail replaces older Equipment at the Terminal with newer, more modern Equipment, during the terms of this Agreement, thereby making Contractor's operations more efficient and increasing its productivity, Contractor agrees to negotiate new Lift rates that reflect Contractor's productivity increase.

Section 4.2   Contractor, at its own expense, shall be responsible for certain maintenance and repairs of the Facilities, as more fully described in Appendix 13.

Section 4.3   Conrail, at its own expense, shall be responsible for certain maintenance, repairs and replacements of the Terminal facilities, as more fully described in Appendix 14. Conrail may, at its discretion, hire Contractor to perform certain of such services.

Section 4.4   Contractor shall be responsible for (1) the security of all trailers/containers while they are in its possession, as defined in section 3.12 above, including the integrity of the trailer/container seal and lading, and (2) beyond the responsibilities set forth in (1) above for reporting to Conrail any security-related problems that are observed involving trailers/containers lading, while on the terminal premises.

## ARTICLE 5 - TERM, BILLING, AND PRICE ADJUSTMENTS

Section 5.1   Term. This Agreement shall be effective as of the date first written above and shall continue for a term of Three ( 3 ) years (Initial Term), after which, unless terminated as provided herein, it shall be extended for successive terms of six (6) months each (Extended Term) until terminated by either party. This Agreement may be terminated by either party at the end of the Initial Term or any extended term by providing a minimum of (60) days' prior written notice thereof to

6

the other party. The rates and charges in effect hereunder at the end of he Initial Term shall remain in effect during any Extended Term. Upon termination of this Agreement as provided in this or any other section of said Agreement, Contractor shall promptly vacate the terminal facility premises.

Section 5.2  Billing and Payment.  Contractor shall submit to Conrail a weekly invoice for all Trailer maintenance and repair services performed pursuant to Section 3.8, and one weekly invoice for all other services performed hereunder (an Invoice"). The Invoices shall be numbered and dated. Trailer repair and maintenance billing shall be submitted in the existing AAR format and sequence with appropriate support documents and any requisite Conrail approvals. At the end of each calendar month, Contractor shall provide Conrail an Accrual Figure (estimated dollar amount) for all trailer repairs not yet invoiced to Conrail, which Accrual Figure shall be for Conrail accounting purposes only, as well as any other financial reports which Conrail may from time to time reasonably require. For all other services, Contractor shall submit appropriate documentation including (i) for lifts, a lifting, by terminal and type of lift, of the number of Trailers lifted pursuant to this Agreement, (ii) and all other services, a listing of charges by terminal and type of service and a listing by batch number, and (iii) any other documentation which Conrail may reasonably require.

For all services provided hereunder other than trailer repair and trailer maintenance,   Conrail shall pay all submitted invoices within 40 days from receipt of such invoices. Conrail will verify charges billed and shall have the right to reduce or withhold them if, in Conrail's sole judgment it reflects an overbilling to or overpayment by Conrail or otherwise involve a bona fide dispute or services provided under this agreement; provided, however, that Conrail shall advise Contractor, in writing and within 45 days from the day of such withholding notice, of the reason or reasons for the particular withholding. Conrail may withhold only the disputed portion of the invoiced amount until resolution of the dispute.

Section 5.3  Price Adjustment.

A.  The rates set forth in the various Appendices for services provided under this Agreement shall remain fixed during the term of this Agreement.

B.  If, as a result of major technological or operating change at the Terminal, Contractor's terminal operations and costs are significantly affected, the parties agree to renegotiate the affected terms and conditions of this Agreement. During the period of such negotiations, this Agreement shall remain in full force and effect.

## ARTICLE 6 – OTHER CONRAIL OBLIGATIONS

Section 6.1  General.  Conrail shall be responsible for performing the services and providing the information as set forth in Appendix 15.

Section 6.2  Terminal Manager.  Conrail, in its sole discretion, shall appoint or designate a Terminal Manager who shall discharge the management duties set forth in Appendix II.  As used herein, Terminal Manager shall include any person designated by the Terminal Manager to act in his or her behalf.

## ARTICLE 7 – PERFORMANCE REQUIREMENTS; TERMINATION

Section 7.1  A.  Contractor Performance Requirements.

Contractor shall make certain that all trailers checked in at the Terminal gate and in transportable condition prior to the gate cutoff time published by Conrail for connecting to outbound trains are loaded onto rail cars by Contractor, as provided in this Agreement, and that the rail cars are released by Contract prior to the scheduled release cutoff time established by Conrail for such trains.  Contractor agrees to accommodate changes to Conrail's train schedules, including release cutoff times, changes to terminal configuration and lift equipment and other similar modification to the service or facilities, including any train delays.  Contractor shall be evaluated periodically in accordance with the Performance Standards set forth in Appendix 16.

B. Safety Program  Contractor shall have, and shall maintain during the term of this Agreement, an ongoing Safety Program designed to provide compliance with all applicable OSHA regulations and procedures and Conrail safety requirements and to promote safe operating practices at the Terminal, which program shall include regular safety meetings with, and instructions to, Contractor's Terminal personnel.  Conrail's safety rules are contained in Conrail Booklet S7H-R2, "Safety Rules and Procedures", effective September 1, 1993, a copy of which shall be furnished Contractor prior to effective date of this Agreement.  Conrail may amend these rules and procedures from time to time.  Contractor shall operate the Terminal so as to comply with all Conrail operating rules and strive to provide 100% customer satisfaction.

Section 7.2  Conrail Performance Requirements.

Conrail is responsible for the spotting of trains at the appropriate loading/unloading area and prompt delivery of unloading and forwarding instructions to Contractor.

Section 7.3  Termination.  A.  Conrail may terminate this Agreement for "cause" by giving 10 days' written notice to Contractor, in which event Conrail's sole obligation shall be to compensate Contractor for work actually performed and expenses incurred up to the date of termination.

"Cause" shall mean Contractor's failure to regularly perform its obligations under Section 7.1 and Section 9.5 and meet the minimum Performance Standards set forth in Appendix 16, which failure or Beach shall not have been incured within 30 days of written notice thereof from Conrail.

B.  If Conrail, in its discretion and at any time during the term of this Agreement, decides to close the Terminal, it may do so by giving Contractor six (6) months prior written notice of such closing.  Upon the closing of such terminal, Conrail shall have no further obligation to Contractor except to compensate Contractor for work performed up to the time of closing.

C.  Termination of this Agreement shall not release Contractor from any liability which it may have incurred or any obligation which may have accrued to Conrail under any provision of this Agreement prior to the effective date of Termination.

D.  In the event of the sale, merger or aquisition of Conrail, all responsibilities or liability, in whole or in part, specified in this agreement shall continue as to the Purchaser or new entity created by said transaction.

Section 7.4  Suspension of Contractor Service.  Notwithstanding any other provision of this Agreement, if any labor dispute involving Contractor and/or its employees causes, or constitutes a reasonable threat to imminently cause, Contractor to fail to perform any service provided for in this Agreement or otherwise disrupts or threatens to disrupt the operations at the Terminal, Conrail may forthwith suspend all or any part of, Contractor's responsibilities under this Agreement pending resolution of such labor dispute, provided, however, that Conrail will, to the extent circumstance permit, consult with Contractor regarding the disruption or threatened disruption prior to any suspension.

Section 7.5   Failure to Load.   If Contractor fails to load any trailer on a flatcar in accordance with the loading manifest when such trailer is available and ready for loading, and such failure is not due to the fault or negligence of Conrail, Contractor shall immediately arrange to have said trailer drayed by an authorized motor common carrier or contract carrier, at its sole cost and expense, from the Terminal to destination.  Contractor shall also be responsible for, and agrees to indemnify Conrail against, any Customer delivery delay penalty that Conrail is required to pay as a result of Contractor's failure to load, as described above. Also, Contractor will be responsible for chassis loaded as " T " without the written permission  of the terminal managers or his designated representative  Contractor will be responsible

9

for, and reimburse Conrail at a Rate of $10 per day per chassis until the chassis are return to its original terminal.

## ARTICLE 8 – DISPUTE RESOLUTION

**Section 8.1**  In the event any dispute arises in connection with the operation of the Terminal or the interpretation of this Agreement, the parties shall promptly confer in good faith to resolve such dispute.  If the dispute is not resolved within 30 days after it arises, either party may submit it to binding arbitration, as follows:

a. The initiating party shall notify the other that it desires such arbitration shall be held in a mutually agreeable location, in accordance with the rules then obtaining of the American Arbitration Association.  A panel of three arbitrators shall be named, one to be selected by Conrail, one to be selected by the Contractor, and one to be selected by the other two arbitrators.  If the two arbitrators previously appointed by Conrail and Contractor cannot agree upon the third arbitrator within fifteen (15) days, then either party may apply to the presiding judge of any court of competent jurisdiction for appointmen of the third arbitrator.  In the alternative, the parties may agree on a sole arbitrator.

b. Each party hereby consents to the entry of a judgment by any court of competent jurisdiction in accordance with the decision of the arbitration panel.

c. The arbitrators shall have no power to modify any of the contract provisions, and their jurisdiction is limited accordingly.

d. Each of the parties shall be responsible for the expenses incurred by the arbitrator appointed by said party; and the expenses, fees and cost of the third arbitrator, or sole arbitrator, shall be borne equally between the parties.

e. Conrail reserves the right to bar from the Terminal or other Railway Prpoerty  any of Contractors Workers who, in Conrails judgement, have or could  create any risk or disruption of Railway operations.  Conrail  shall not be required to specify the basis or reason for its decision.

## ARTICLE 9 - LIABILITY, INDEMNIFICATION AND INSURANCE

**Section 9.1**  <u>Trailer Damage</u>  Contractor shall repair all damage to Trailers occurring in the Terminal caused by the abuse or negligence by Contractor, its employees or agents, at Contractor's sole expense.  If such damage or destruction is beyond economic repair, Contractor shall pay Conrail the depreciated value of the Trailer as determined under the AAR Rules.  Contractor shall be liable for damage to the contents of a Trailer caused by the abuse or negligence of Contractor, its employees or agent.  If any such damage requires lading in a trailer to be transferred to another trailer, Contractor shall be responsible for any costs resulting from such transfer.

**Section 9.2**  <u>Contractor's Indemnification</u>

Contractor shall release, indemnify, defend and hold harmless Conrail from and against any and all loss, cost or expense, including without limitation reasonable attorney fees, in connection with any claim, action, investigation, proceeding or lawsuit, whether actual or threatened, arising out of any of the following:

    a)    injury or death to any person (including employees of contractor) occurring within or without the Terminal except to the extent injury or death is caused by the sole negligence of Conrail, its employees or agents or by Conrail's breach of its obligations under this agreement, Provided that notwithstanding any of the foregoing, contractor shall release, indemnify defend and hold harmless Conrail against any claims, actions or lawsuits brought by employees of contractor under the Federal Employers' Liability Act and any amendments thereto based on allegations that Conrail failed to correct or guard against an unsafe condition or failed to furnish a safe place to work

    b)    loss, damage or destruction of any property occurring within or without the Terminal caused by the negligence of Contractor, its agents or employees or by Contractor's breach of its obligations under this Agreement, except that where penalties or liabilities for such negligence or breach are specifically set out elsewhere in this Agreement, they shall be the full extent of Contractor's liability therefor;

    c)    material or consistent acts of misrepresentation, fraud, theft or embezzlement by Contractor, its agent or employees;

d) Contractor's failure to comply with any Governmental Require-ments of any governmental entity having jurisdiction over Contractor's operations, including the contractual services provided by Contractor under this Agreement, to the extent such noncompliance was not caused by or requested by Conrail or the Terminal Manager;

e) any discharge, leakage, spill, emission or improper handling, storage or labeling of any hazardous material or pollutant used in Contractor's operations at the Terminal, to the extent not caused by the sole negligence of Conrail, its employees or agents or by the breach of Conrail's obligations hereunder;

f) any discharge, leakage, spill, emission, or improper handling of any hazardous material or pollutant being shipped in any trailer, provided Conrail gave Contractor notice that such Trailer/Container contained hazardous materials or pollutants, or Contractor otherwise knew or should have known of such hazardous material or pollutant contents, to the extent caused by the negligence or abuse of Contractor, its employees or agents.

**Section 9.3   Environmental Hazards:** Contractor, in performing its services under this Agreement, shall at all times comply with all federal, state and local laws, rules and regulations designed to prevent or control the discharge of substances in the land, water or air. In the event of any discharge, leakage, spill or emission of hazardous materials or pollutants of any type at the Terminal, Contractor shall promptly notify Conrail of such occurrence. If the parties are not able to agree immediately on who is responsible for such spill, Conrail shall arrange and pay for the containment and cleanup of such materials escaping from a trailer, and Contractor shall arrange and pay for the containment and cleanup of such materials used in its operations, until responsibility as between the parties is determined. At such time, the responsible party shall reimburse the other party for expenses it incurred and undertake to pay all continuing expenses in connection with the incident, including any cleanup necessary to satisfy all environmental agencies, boards or organizations having jurisdiction over the matter. The liability and indemnification provisions of this Agreement related to hazardous materials and pollutants shall include, without limitation, all fines and penalties assessed by any governmental body.

**Section 9.4**   Notwithstanding any of the foregoing provisions of this Article 9, neither Conrail nor Contractor shall have any liability for any claim by the other of consequential loss or damage to their respective business or business reputation.

Section 9.5   Insurance.   In addition to any other forms of insurance or bonds required under this Agreement and except to the extent that any of the requirements of this section are expressly waived or revised in writing by Conrail, Contractor, prior to the commencement of any work pursuant to this Agreement and throughout the term of this Agreement, shall, at its own cost and expense, maintain insurance of the following kinds and amounts and deliver to Conrail's Director - Insurance and Director - Intermodal Contracts, satisfactory evidence of such insurance, prior to commencement of this agreement and 30 days prior to the expiration date thereafter.

(a)    Workers' Compensation insurance in statutory amounts, as well as Employer's Liability insurance with limits of at least $1,000,000 each accident, $1,000,000 each employee and $1,000,000 policy limit.  Such policy shall include a waiver of subrogation in favor of Conrail.

(b)    General Liability insurance, including contractual liability insurance, with a limit of not less than $2,000,000 combined single limit, bodily injury and/or property damage, for damages arising out of bodily injuries to or death of all persons in any one occurrence and for damage to or destruction of property, including the loss of use thereof, in any one occurrence.

(c)    Motor Truck Cargo Insurance (including coverage for freight in non-owned trailers) with a limit of not less than $250,000 for any one trailer or container.

(d)    The aforementioned insurance shall be effected under standard form policies issued by insurers of financial responsibility, which are rated "A" or better by either Best's Insurance Reports, Standard & Poor's Insurance Rating Service or Moody's Investors Service.  Conrail reserves the right to reject as inadequate, coverage provided by an insurance company rates less than "A" by the aforementioned rating services.  Failure to procure and maintain such insurance in force shall constitute a Breach of this agreement.

(e)    The aforesaid insurance protection shall be enforceable by any legitimate claimant after the termination or cancellation of this Agreement or any attachment hereto, whether by expiration of time, by operation of law or otherwise, so long as the basis of the claim against the insurance company occurred during the periods of time for which such insurance was obtained.

(f)    Contractor shall furnish to Conrail certificates evidencing the

13

insurance outlined in subsections (a), (b), (c) and (d) at least thirty (30) days prior to commencement of this Agreement and the annaversery date of the commencement of this agreement for each year this agreement is in effect. Conrail must be named as an additional insured under insurance outlined in subsections (b) and (c) and (d).

(g)     All insurance must be endorsed to provide that the insurance company shall give thirty (30) days prior written notice to:

Conrail's Director - Insurance,
2001 Market Street, 25A,
P. O. Box 41425,
Philadelphia, PA 19101-1425

with a copy to the:

Director - Intermodal Contracts,
2001 Market Street, 8A,
P. O. Box 41408, Philadelphia, PA 19101-1408,

if the policies are to be terminated of if any changes are to be made which will in any way affect the insurance requirements of this Agreement.

## ARTICLE 10 - PERSONNEL

Section 10.1 Contractor's relationship to Conrail hereunder in that of an independent contractor. Contractor shall be solely responsible for employing, supervising and directing all personnel reasonably required, in its judgment, to perform its obligations under this Agreement, for maintaining all appropriate employment and operating records, and for paying and accounting for all wages, salaries, benefits (including without limitation pension benefits or obligations), employer social security contributions, unemployment insurance, and state, local and federal withholding taxes upon such compensation for its employees. Contractor shall be responsible for all negotiations and other dealings with any labor organization representing its employees, and for any grievances or other labor claims made by its employees or made by a labor organization on their behalf.

Section 10.2 Contractor shall ensure that its employees meet all requirements imposed by law and/or reasonably and uniformly required by Conrail in writing in connection with the performance of its respective obligations under this Agreement. Contractor shall further ensure that its employees are fully informed as to the hazards incident to the operations of a railroad terminal facility, and that they are physically and mentally capable of performing their work under such conditions.

Section 10.3 This section outlines Conrail's Terminal Operating Training requirements for Contractors. The contractor shall ensure that all its employees meet or exceed all requirements of this section.

1. Training requirements will include the following:

    Classroom Training with Written Test. (Required for all new employees without prior terminal operating experience. Employees with operating experience must have On the Job Training with written test), as referred to in item 2 below.

    On the Job training with on the spot supervision. Clerks, Lift Operators, and Jockeys.

    Certification with Vendor's and Employee's signature which states what the employee had to accomplish to qualify for new job by providing a list of what was covered under Classroom and On the Job Training.

    Annual re-certification which should include a job review process and written test.

2. Minimum Topics included in Training Program should include the following:

- Vendor's Safety Program (*)
- Ground Crew (*)
- Hostler
- Crane/Lift Operator (*)
- Hitch Inspection (*)

- Clerical Functions
- Gate Inspection Procedures
- Hazardous Material

    (*) - Training Material must include procedures for safe loading and securement of trailers, chassis and containers on Intermodal equipment as described in the AAR Intermodal Trailer and Container Securement Manual.

3. Training Notification

CR's Terminal Manager must be notified when new employee is hired with a written outline stating all training requirements which must be completed within thirty days.

Upon completion of training Conrail's Terminal Manager must be shown copy of Certification with Vendor's and Employee's signature. Certification should state what the employee had to accomplish to qualify for new job by providing a list of what was covered under Classroom and on the Job Training.

4.    Conrail's Director of Contracts in Philadelphia and Conrail's Terminal Manager must have access to the following:

- Job Definitions and Responsibilities
- All Training Documentation
- On the Job Training Requirements
- Test
- Employee's Certification Records including list of Class room and on the Job Training accomplishments, Test with results
- Instructors' Name, Date & Location of Training, Date of Certification.

## ARTICLE 11 - MISCELLANEOUS

**Section 11.1 Compliance with Law.**    Contractor shall comply with all Governmental Requirements applicable to its operations and services to be performed hereunder, including without limitation the nondiscrimination clauses promulgated by the Federal Railroad Administration, Worker's Compensation and OSHA, and, when required by Conrail, Contractor shall furnish proof of such compliance. Such compliance shall include, without limitation, securing all licenses, permits and approvals necessary to perform its obligations.

**Section 11.2 Confidentiality.**    All information obtained by each party about the business of the other party as a result of the performance of this Agreement is confidential and shall not be disclosed to any person other then the parties hereto, their employees and authorized agents without the prior written consent of the other party.

**Section 11.3 Liens.**  In the event any lien is filed against the property of Conrail by a creditor of Contractor, or its subcontractor, Contractor shall promptly discharge the lien and indemnify, defend and hold harmless Conrail from and against all loss, cost and expense reasonably arising from such lien.

**Section 11.4 Assignment.** Contractor shall not assign, sublet or transfer any of its responsibilities or liabilities (including use of subcontractors), in whole or in part, specified in this Agreement, or any interest herein, without the prior written consent of Conrail.

**Section 11.5 Force Majeure.**    The obligations of either party shall be suspended to the extent that the party is prevented from performing its obligations hereunder as a result of an act of God, unusual natural conditions, ac of government, or any

16

other similar cause beyond the reasonable control of the party. Any party invoking the provisions of this section shall exercise due diligence to eliminate such force majeure occurrence.

Section 11.6  Modification.    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof an supersedes all previous oral or written understanding, agreements, and commitments as to the subject matter hereof. This Agreement and the Appendices hereto may not be modified, changed or altered except by written agreement signed by authorized representatives of the parties. Any Appendix hereto may be amended by the parties signing a revised version of such Appendix and this Agreement will be deemed to be amended thereby.

Section 11.7  Notices.    Any notice, request, demand, or approval to be given hereunder shall be in writing and shall be deemed to be delivered upon deposit with United States mail, postage prepaid, certified or registered mail, return receipt requested, deposit with Federal Express, postage prepaid, telecopying or upon hand delivery, as follows:

Conrail                                    Contractor
Director Contracts - Intermodal
Room 8A, 2001 Market Street
Philadelphia, PA  19101-1408
Either party may change the person to be notified or its address by such notice to the other.

Section 11.8  Waiver    The waiver of a breach of any of the terms or conditions hereof shall be limited to the act or acts constituting such breach and shall not be construed as being continuing or permanent waiver of any such terms and conditions, all of which shall be and remain in full force and effect as to future acts or happenings notwithstanding such waiver.

Section 11.9  Severability.    Each and every clause of this Agreement shall be severable from each other. In the event that any particular clause herein shall be held invalid and null and void in any judicial proceeding, such finding shall have no effect on the remaining clauses.

Section 11.10  Applicable Law. This Agreement is subject to, and shall be construed and enforced in accordance with the laws of the commonwealth of Pennsylvania.

Section 11.11  Benefit of Parties.    Nothing in this Agreement shall be construed to give any person or entity other than Conrail and Contractor, and their

respective successors and permitted assigns, any legal equitable right, remedy, or claim under this Agreement.

Section 11.12  Entire Agreement.          This Agreement, together with all Appendices attached hereto, constitutes the entire agreement between the parties and supersedes all previous understandings relating to the subject matter hereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their proper officials, as of the day and year first herein written.

CONSOLIDATED RAIL CORPORATION

BY: _____

TITLE: _____


CONTRACTOR

BY: _____

TITLE: _____