32
9-23-02
mo

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**TERRY BOYD WILKINSON and
SHARON WILKINSON,**

    **Plaintiffs**

    **v.**

**NORFOLK SOUTHERN RAILWAY
and CONSOLIDATED RAIL
CORPORATION,**

    **Defendants**

    **v.**

**GPS TERMINAL SERVICES, INC.,**

    **Third-Party Defendants**

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL NO.1:CV-01-1146



FILED
SEP 2 3 2002
PER_____
HARRISBURG, PA   DEPUTY CLERK

## M E M O R A N D U M

    Before the court is Defendants' motion for summary judgment. The parties have briefed the issues, and the motion is ripe for disposition.

## I.    Background

    The instant action involves claims by Plaintiffs, Terry and Sharon Wilkinson,[1] against Defendants Norfolk Southern Railway and Consolidated Rail Corporation pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, and Pennsylvania common law. The following facts are undisputed unless otherwise noted.

---

    [1]Mrs. Wilkinson is Mr. Wilkinson's wife. Her sole basis for recovery is a claim for loss of consortium as a result of her husband's injury. The court, therefore, will refer to Mr. Wilkinson as "Plaintiff" throughout this memorandum.

Third-Party Defendant GPS Terminal Services, Inc. ("GPS") employed Plaintiff and paid his wages at all times relevant to this litigation. GPS, under a written contract with Defendants, provided personnel and equipment for unloading and loading of railcars at the Harrisburg Intermodal Yard ("the Harrisburg Yard")[2] located on Industrial Road in Dauphin County, Pennsylvania. Defendants and GPS are separate and distinct entities whose relationship arose out of this contract. In relevant part, the contract provided that GPS, as an independent contractor, would "provide all qualified operating and supervisory personnel" and that GPS would be "solely responsible for employing, supervising and directing all personnel" required to perform its services. (Defs. Ex. C, Art. 2.5 and 10.1.)

GPS hired Plaintiff in 1996. In his capacity as a GPS employee, Plaintiff held several positions: foreman; groundman; packer operator; and jockey truck driver. Each work day, Plaintiff would report to the GPS office at the Harrisburg Yard and would change into his work clothes in the GPS locker room trailer.

On June 15, 1999, Plaintiff arrived for work at the GPS office around 4:00 a.m. Defendants' Programmer, dispatching from a separate location, instructed Plaintiff and the other GPS employees which railcars needed to be unloaded and which trailers were then to be subsequently reloaded onto the empty railcars. Defendants contend that this is the only type of instruction their employees would provide to Plaintiff. (Defs. Stat. Mat. Facts at ¶ 12.) In contrast, Plaintiff contends

---

[2]Intermodal shipping involves the transfer of structural boxes that adapt easily to multiple modes of transportation, such as ocean vessel, rail, and motor carriage. Once the cargo is loaded into the container at its point of origin, it may be transported by sea, rail, or truck to its point of destination without having to be loaded again. This saves shippers and manufacturers the extra cost of having to re-load the cargo each time it switches mode of transportation.

that Defendants trained all GPS employees, including Plaintiff, through safety guidelines and instructional films. (Pls. Resp. to Defs. Stat. Mat. Facts at ¶ 12.) It is undisputed that both Defendants and GPS were parties to the Harrisburg Intermodal Terminal Agreement, which required that all employees must comply with the Intermodal Trailer and Container Securement Manual. This manual is fifty-three pages in length and sets out the requirements for loading and securing trailers and containers. Plaintiff, however, admitted during his deposition that although the manual "looked familiar," he could not state with certainty whether he had ever seen it. (Defs. Ex. A at p. 73, lns. 5-22.) Additionally, Plaintiff avers that Defendants required him to use "certain safety equipment." (Pls. Resp. to Defs. Stat. Mat. Facts at ¶ 36.) Defendants, however, insist that GPS, not Defendants, supplied Plaintiff with reflective clothing and required him to wear it while working. (Defs. Reply to Pls. Stat. Add. Facts at ¶ 36.)

      One of Plaintiff's duties involved unlocking hitches on trailers. A hitch is a metal device that, when raised, holds the pin of the trailer in place; thus preventing the trailer from falling off the railcar during its voyage by train. The hitch must be unlocked in order to remove the trailer from the railcar. To unlock the hitch, a worker inserts a three foot metal rod into a rectangular receptacle located underneath the trailer bed. Once the metal rod is inserted into the receptacle, the worker pulls the metal rod towards himself in a horizontal motion. The pulling unlocks the hitch and allows the trailer to be removed from the railcar.

      On the day in question, Plaintiff began the process of unlocking hitches. Like he had done on numerous occasions, Plaintiff climbed upon the railcar; kneeled over; inserted the metal rod into the receptacle on the lower portion

of the trailer; and began pulling the rod towards his body in a horizontal motion. Instead of releasing the lock on the hitch, the rod unexpectedly popped out of the receptacle. The resulting momentum forced Plaintiff backwards. In order to avoid falling off the railcar, Plaintiff reached out and grabbed onto the trailer above him. This action allegedly caused injury to Plaintiff's shoulder and arm. Afterwards, Plaintiff felt the receptacle located under the trailer and determined that it was "flared out."[3] (Defs. Ex. A at p. 54, ln. 17-24.) Throughout this incident, only GPS employees were present. Additionally, GPS, not Defendants, supplied the metal rod that Plaintiff used to unlock hitches.

Although Plaintiff experienced pain in his arm and shoulder, he finished work that day. Plaintiff later reported the incident to Larry Heckert, a GPS supervisor. Plaintiff also submitted a GPS injury report. On that document, he listed GPS as his employer. Plaintiff did not report his injury to Defendants.

Plaintiff alleges that Defendants had a right to suspend, discipline or terminate him. Accordingly, Defendants required Plaintiff to follow its instructions as communicated to him by Defendants' employees. (Pls. Resp. to Def. Stat. Mat. Facts at ¶¶ 42 and 43.) Although Defendants acknowledge that it expected GPS employees to load and unload trailers in accordance with instructions provided by Defendants' programmer, GPS determined the specifics of how its employees would complete those assignments; *i.e.* which GPS employees would perform which tasks; what equipment would be used, *etc.* (Defs. Reply to Pls. Add. Stat. Mat. Facts at

---

[3]This apparently refers to a defective condition in the hitch's receptacle. According to Plaintiff, the defect arises after the hitch has been constantly unlocked over a period of several years.

4

¶ 42.)  Moreover, Defendants contend that only GPS had any authority to hire, discipline, or fire Plaintiff.  (*Id.* at ¶ 43.)

On May 2, 2001, Plaintiff filed a two-count complaint against Defendants in the Eastern District of Pennsylvania.  By an order dated June 18, 2001, the Honorable Eduardo Robeno ordered the matter transferred to the Middle District of Pennsylvania.  Plaintiff's complaint contains two counts.  In Count I, Plaintiff claims that Defendants are liable to him pursuant to the FELA.  *See* 45 U.S.C. § 51.  In Count II, both Plaintiff and his wife claim that Defendants are liable for common law negligence.  On July 15, 2002, Defendants filed the instant motion for summary judgment.

## II.        Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 249.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in his complaint. Instead, he must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

## III.    Discussion

Defendants contend they are entitled to summary judgment because (1) Plaintiff has failed to adduce evidence establishing that he was Defendants' employee as required under the FELA, and (2) as an employee of an independent contractor, Plaintiff has failed to produce evidence establishing Defendants' liability for negligence under Pennsylvania common law. Because the court agrees with Defendants on both counts, it will grant summary judgment in favor of Defendants.

### A.    Count I: The FELA Claim

The FELA establishes that common carriers are liable to their employees for injuries sustained as a result of the common carrier's negligence. 45 U.S.C. § 51.[4] In order to recover damages under the FELA, a plaintiff must

---

[4]In relevant part, the FELA reads:

(continued...)

establish four elements: (1) that the defendant is a common carrier engaged in interstate commerce; (2) that the defendant employed plaintiff in furtherance of such commerce; (3) that the plaintiff sustained injuries while employed by the carrier; and (4) that the carrier's negligence caused the plaintiff's injury.  *Felton v. SEPTA*, 952 F.2d 59, 62 (3d Cir. 1991).  As to Count I, Defendants argue that summary judgment is appropriate because Plaintiff has failed to produce evidence establishing that he was injured "while employed" by Defendants.  *See* 45 U.S.C. § 51.

In *Kelley v. Southern Pacific Company*, 419 U.S. 318 (1974), the Supreme Court explicitly held that proof of a master-servant relationship is necessary to satisfy the "while employed" clause of the FELA.  419 U.S. at 323.  In making this determination, courts must refer to common law principles defining the master-servant relationship.  *Id.* (citing *Baker v. Texas & Pacific R. Co.*, 359 U.S. 227, 228 (1959)).  In particular, courts should take care to distinguish the difference between a principal-agent relationship – which does not give rise to FELA liability – and a master-servant relationship – which implicates FELA liability.  "The distinction between an agent and a servant is critical due to the liability implications for the principal.  It is a central principle of agency law that '[a] master is subject to

---

[4](...continued)
Every common carrier by railroad while engaging in commerce between the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances . . . or other equipment. . . .

Any employee of a carrier . . . shall, for the purposes of this Act be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this Act.

45 U.S.C. § 51.

liability for the torts of his servants committed while acting in the scope of their employment.' " *Kemether v. Pennsylvania Interscholastic Athletic Ass'n*, 15 F. Supp.2d 740, 748 (E.D. Pa. 1998) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 756 (1998)).  For this reason,  establishing a master-servant relationship – either between GPS and Defendants or between Defendants and Plaintiff – is necessary for establishing Defendants' liability under the FELA.

Where, as here, the plaintiff is nominally employed by a party other than the defendant, there are three types of relationships which establish that a defendant employed a plaintiff for purposes of imposing liability under the FELA. 419 U.S. at 324.  "First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. . . . Second, he could be deemed to be acting for two masters simultaneously. . . . Finally, he could be a subservant [sic] of a company that was in turn a servant of the railroad." *Id.* (citations omitted).[5]

      1.    <u>Plaintiff was not acting as Defendants' subagent when he</u>
               <u>sustained his injuries.</u>

It is undisputed that, at least nominally, GPS employed Plaintiff at the time the injury took place.  GPS paid Plaintiff's wages and supervised his employment.  Thus, a master-servant relationship existed between GPS and Plaintiff. *See* Restatement (Second) of Agency § 2(2) (1958) ("A servant is an agent employed by a master to perform services in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.").  Pursuant to the FELA, a master-servant relationship between

---

[5]Because it is unclear which of the three common law master-servant relationships Plaintiff utilizes for establishing that Defendants employed him, the court will analyze Plaintiff's claim under all three.

Defendants and GPS would also establish a subagent-principal relationship between Plaintiff and Defendants. This is true even though GPS nominally employed Plaintiff. *See Kelley*, 419 at 324. If instead GPS acted as Defendants' independent contractor, then no liability inures to Defendants because the definitions of servant and independent contractor are mutually exclusive. *Accord* Restatement § 2 at cmt. b ("An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal."). Whether GPS acted as a servant or a independent contractor turns on the degree of control that Defendants exercised over GPS. *Compare* Restatement § 2(2) (defining servant) *with* § 2(3) ("An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."); *see also Jones v. Century Oil U.S.A., Inc.*, 957 F.2d 84, 86-87 (3d Cir. 1992) (noting that the difference between a mere agent and a servant depends "not so much on the fact of actual interference or exercise of control by the employer . . . but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor" (quotations omitted)).

There is no dispute that the contract between GPS and Defendants describes GPS as an independent contractor. (Defs. Ex. C at § 10.1.) Yet, that same document requires that GPS perform its services "under the direction of the Terminal Manager and pursuant to Trailer loading program lists for outbound trains provided to it by the Terminal Manager." (*Id.* at § 2.1.)[6] Defendants, however,

---

[6]Although the term "Terminal Manager" is undefined, the court presumes that this refers to
(continued...)

9

argue that it instructed GPS solely as to which trailers should be unloaded and reloaded on a particular day. Plaintiff acknowledges that this was the sole means by which Defendants controlled GPS but that this control directly dictated how and when employees unloaded the trailers. Because Defendants controlled the train schedule, Plaintiff argues, they also controlled when GPS employees could take their breaks and eat their meals.

Even drawing all factual discrepancies in favor of Plaintiff, the evidence is insufficient to establish that Defendants exercised enough physical control over GPS to describe the relationship between the two entities as that of a master and a servant. In *Kelley*, the Court held that although facts indicating that the plaintiff's nominal employer was responsible for unloading operations on behalf of the defendant could establish an agency relationship between the two entities, this did not rise to the required master-servant status. 419 U.S. at 325 ("The finding that the railroad was 'responsible' for the unloading operations is significantly weaker than would be a finding that it controlled or had the right to control the physical conduct of the [unloading entity's] employees in the course of their unloading operations."). Despite evidence establishing an agency relationship and the fact that the plaintiff's employer was a wholly-owned subsidiary of the defendants, the Court refused to find that the defendant railroad employed the plaintiff as a subagent for purposes of imposing FELA liability. The Court held that the contacts between the defendant and the plaintiff's employer indicated "not direction or control, but rather

---

⁶(...continued)
the person occupying the position that both parties refer to as the programmer.

the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation." *Id.* at 330.

In this case, the relationship between Defendants and GPS was even more attenuated. The contract between these two entities explicitly allocated direct control of the unloading operation to GPS, an entity totally unrelated to Defendants. (*See* Defs. Ex. C at § 10.1.) Furthermore, Plaintiff has produced no evidence indicating that, despite the contractual language, Defendants directly supervised and controlled the unloading operations. Although there is some evidence of directives emanating from Defendants as to which trailers should be unloaded and when they should be unloaded, this is insufficient to establish the level of control necessary to deem GPS a servant for Defendants. At best, this evidence is the paradigm example of "the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation." *Kelley*, 419 at 330. This is especially true in the instant case, where the two entities are not related to one another. Because the undisputed facts do not establish a master-servant relationship between GPS and Defendants, Plaintiff cannot be considered Defendants' subagent.

2.    <u>Plaintiff acted as neither a borrowed agent, nor a shared agent, of Defendants.</u>

Regardless of whether Plaintiff acted as a subagent for Defendants, he may still be considered Defendants' employee if the evidence demonstrates that he was Defendants' borrowed agent or an agent shared by both GPS and Defendants. *See Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir. 1991). Thus, use of the subagent principle is unnecessary when there is evidence that a borrowed agent is under the direct control of the railroad. *Id.* at 1350.

11

The Restatement classifies a person as a shared agent of different entities "if the service to one does not involve abandonment of the service to the other." Restatement at § 226. Furthermore, the Restatement's definition of a borrowed servant states that: "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing such services. He may become the other's servant as to some acts and not as to others." *Id.* at § 227.

Before the Supreme Court issued its decision in *Kelley*, the Third Circuit stated that:

> The primary factor to be considered in determining whether a plaintiff was employed by the defendant [under the FELA] is whether the latter had the power to direct, control and supervise the plaintiff in the performance of his work at the time he was injured. Relevant factors to be considered are: who selected and engaged the plaintiff to do the work; who paid his wages for performing it; who had the power to terminate his employment; who furnished the tools with which the work was performed and the place of work.

*Tarboro v. Reading Co.*, 396 F.2d 941, 943 (3d Cir. 1968). Thus, even before *Kelley*, courts have "emphasized the control factor in determining the employer-employee status under the Act." *Williamson*, 926 F.2d at 1350.

In *Williamson*, the district court granted the defendant's motion for judgment n.o.v.[7] in a FELA case because it determined that the plaintiff presented insufficient evidence for the jury to conclude that the defendant employed the plaintiff. On appeal, the Third Circuit reversed, holding that there was sufficient evidence in the record for the jury to conclude that the plaintiff was, at the time his

---

[7] "Judgment n.o.v." stands for judgment *non obstante verdicto* ("not withstanding the verdict"). Black's Law Dictionary 847 (7th ed. 1999). The term now used for this type of motion is "renewed motion for judgment as a matter of law." Such motions are governed by Rule 50(b) of the Federal Rules of Civil Procedure.

injury occurred, either the defendant's borrowed agent or the dual agent of both the defendant and the plaintiff's nominal employer. *Id.* In that case, the plaintiff sued the defendant for injuries that occurred while he transferred cargo, via forklift, from one trailer to another. *Id.* at 1347.

Two factors were crucial to the Third Circuit's conclusion. First, the interrelationship between the two entities – the defendant and the plaintiff's nominal employer – indicated that the entities were not only closely related, but they frequently commingled their functions. *Id.* at 1350-51. Second, the plaintiff presented evidence to the jury that when the injury occurred, the plaintiff was performing an unusual task under the direction of the defendant's damage inspector. *Id.* at 1351.

As to the first factor, the court noted that the plaintiff's nominal employer was a wholly-owned subsidiary of the defendant. Additionally, the two entities shared office space, and the defendant's employees had the power to assign work to the subsidiary's employees or to change work assignments previously distributed by the subsidiary. Both entities were responsible for transferring cargo off damaged trailer beds; the very activity that the plaintiff was performing when he suffered his injury. *Id.* at 1350.

As to the second factor, the plaintiff testified that he considered the defendant's damage inspector to be his supervisor at the time when the injury occurred. *Id.* Although the defendant's employees normally limited their interaction with the plaintiff to assigning him loads to transfer, things proceeded differently on the day he was injured. *Id.* at 1347. Because it was the defendant's responsibility to inspect trailers for damages, the defendant dispatched one of its

13

damage inspectors to deal with the cargo that the plaintiff had been called upon to transfer. *Id.* The plaintiff did not have the power to make a transfer of damaged cargo unless the damage inspector made a determination that the cargo was in fact damaged. *Id.* at 1351. The damage inspector arrived on the scene; made the determination that the cargo must be transferred from one trailer to another; and instructed the plaintiff to shuttle the damaged cargo to another trailer using his forklift. The plaintiff made the transfer and was injured when one of the trailers collapsed on him. The defendant's damage inspector was the only other person present when the injury occurred. *Id.* Although there was also evidence in the record indicating the lack of control necessary to establish an employer-employee relationship, the court held that there was sufficient evidence to sustain the jury's verdict and vacated the district court's order. *Id.* at 1351-52.

In this case, the undisputed facts indicate that none of these circumstances were present. Defendants and GPS are completely separate entities and they do not commingle their functions. Defendants limited its interaction with GPS's employees, including Plaintiff, to giving assignments as to which trailers should be unloaded from the railcars and which trailers should be loaded back on to those railcars. Additionally, Plaintiff admitted in his deposition that Defendants did not make personnel assignments as to which GPS employees would perform which tasks during the loading and unloading process. (Defs. Ex. A at p. 39, lns. 9-15.) Defendants, therefore, did not specifically select Plaintiff to unlock the allegedly defective hitch that caused his injury. Moreover, only GPS employees were present at the work site when Plaintiff sustained his injury. GPS paid Plaintiff's wages and provided him with the equipment that he was using when he sustained his injury.

14

Plaintiff reported his injury to GPS, but not to Defendants. On that report, Plaintiff listed GPS as his employer. Thus, unlike the situation in *Williamson*, Plaintiff did not consider Defendant to be his employer when the accident occurred. The contract between GPS and Defendants allocated all supervisory responsibility to GPS. Plaintiff has not presented a scintilla of evidence indicating that the two entities acted in any manner inconsistent with their contractual obligations. In short, there is no evidence in the record indicating that either Defendants borrowed Plaintiff from GPS or that Plaintiff was serving both GPS and Defendants simultaneously when his injury occurred.

Plaintiff, however, argues that the court should not grant summary judgment as to his FELA claim because Defendants provided certain training materials to Plaintiff and that Defendants had the right to fire him. However, these factual disputes are neither genuine, nor material. As to the training materials, Plaintiff stated that he could not recall receiving any printed materials from Defendants regarding the procedure for unlocking hitches. (Defs. Ex. A at p. 73, lns. 17-22 ("Q: Were you ever given any kind of printed or written materials about the procedures you were supposed to use as you went along unlocking hitches in terms of how you were supposed to do it? A: Not that I remember.").) Even if Defendants required Plaintiff to watch instructional videos and provided him with printed training materials, as Plaintiff alleges, this does not rise to the level of direct control necessary to deem Plaintiff an employee of Defendants. A simple instructional manual or video does not indicate that Defendants had any ability to supervise and control the manner in which Plaintiff unlocked hitches.

As to the right to fire, once again, this is not a genuine dispute. Plaintiff admitted during his deposition that Defendants did not have a right to terminate him. Rather, they had the power only to bar him from the Intermodal Yard. (Defs. Ex. A at pp. 161-63.) GPS, on the other hand, admitted that it had the sole power to discipline and terminate Plaintiff. (*See* Defs. Ex. B at ¶2.) This is consistent with the terms of the contract between GPS and Defendants, which allocated such responsibility to GPS. Although Defendant had the right to bar Plaintiff from its facility, it could not terminate Plaintiff's employment with GPS.

Even construing these factual disputes in favor of Plaintiff, this evidence is insufficient for a reasonable jury to conclude that Defendants borrowed Plaintiff from GPS or that GPS and Defendants shared direct physical control over Plaintiff. Although these factual assertions may indicate a very general and indirect level of control, they do not indicate the required direct, supervisory control over the manner in which Plaintiff performed the duties which led to his injury. Under the terms of the contract between GPS and Defendants, GPS, alone, bore this responsibility. Plaintiff has not produced any evidence which would establish that the parties acted otherwise. As a result, Plaintiff cannot establish employer liability under the FELA. The court, therefore, will grant Defendants' motion for summary judgment as to Count I of Plaintiff's complaint.[8]

---

[8]Plaintiff also argues that *Rogers v. Missouri Pacific Railroad*, 352 U.S. 500 (1957) stands for the proposition that the court's inquiry on this motion is limited to determining whether Plaintiff has produced evidence indicating that Defendants' negligence played a part in producing Plaintiff's injury. (*See* Pls. Br. in Opp. Defs. Mot. for Sum. J. at 6-7 (quoting *Rogers*, 352 U.S. at 506).) In that case, however, neither party disputed that the defendant employed the plaintiff. Instead, that case dealt with the level of proof required to create a jury question where there is some indication that the plaintiff's own negligence played a part in producing the injury. *See Rogers*, 352 U.S. at 507. Because *Rogers* did

(continued...)

### B.    <u>Count II: Common Law Negligence</u>

In order to establish an action for negligence under Pennsylvania law, a plaintiff must establish that (1) the defendant owed the plaintiff a duty recognized by law, (2) the defendant breached that duty, (3) the defendant's breach proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual loss or damage. *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 n.5 (Pa. 1983); *see also* W. Page Keeton, *et al.*, Prosser & Keeton on Torts, § 30 at 164-65 (5th ed. 1984) . At this stage in the instant matter, the parties principally dispute the issue of Defendants' duty to Plaintiff.

Under Pennsylvania law, an independent contractor's employer is not liable, except in limited circumstances, for injuries to third persons where the employer cedes temporary possession and control over his property to the independent contractor.  *See, Hader v. Coplay Cement Mfg. Co.*, 189 A.2d 271, 277 (Pa. 1963);  *Mentzer v. Ognibene*, 597 A.2d 604, 610 (Pa. Super. Ct. 1991).  There are, however, exceptions to this general rule.  First, the rule does not apply where the employer is a landowner who retains "significant control over the work delegated to the contractor." *Lorah v. Luppold Roofing Co.*, 622 A.2d 1383, 1384 (Pa. Super. Ct. 1993).  Second, the rule does not apply where the plaintiff's work can be considered to pose a peculiar risk of physical injury. *Zinn v. Gichner Sys. Group*, 880 F. Supp. 311, 313 (M.D. Pa. 1995).

Defendants have moved for summary judgment arguing that it owed Plaintiff no duty to warn of the defective hitch.  Plaintiff, however, argues that

---

[8] (...continued)
not address the quantum of evidence needed to create a jury question as to the threshold inquiry of whether Defendant employed Plaintiff, that case is irrelevant to the outcome of the instant motion.

summary judgment is improper because, as a business invitee, Defendants owed him the duty of making its premises safe for him to complete his appointed task. The court finds that summary judgment is proper in this case. Regardless of whether Defendants exercised control over the area in which Plaintiff suffered his injury, the undisputed facts in this case demonstrate that Plaintiff cannot recover. First, the nature of his work does not qualify for the Peculiar Danger Exception to the rule relieving an employer of an independent contractor for injury suffered by the contractor's employees. Second, Plaintiff has not pointed to any evidence indicating that Defendant knew, or should have known, of the defective hitch.

      2.    <u>Plaintiff does not qualify for the Peculiar Danger Exception to the rule limiting liability for injury to the employees of an independent contractor.</u>

The peculiar risk doctrine is an exception to the general rule limiting a landowner's liability for injury to the employees of its independent contractor. The doctrine is applicable in cases where the landowner cedes control over the contractor's activity. *Id.* This doctrine has been adopted by Pennsylvania and is set forth in the Restatement (Second) of Torts at §§ 416 and 427. Section 416, entitled "Work Dangerous in Absence of Special Precautions," provides that:

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

Restatement (Second) of Torts § 416 (1965). The other half of the doctrine, entitled "Negligence as to Danger Inherent in Work," is found at § 427, which states:

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason

> to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

*Id.* at § 427.

These duties may not be delegated as they impose vicarious liability "upon the one who employs the contractor to do work involving heightened risks of physical harm to third parties." *Colloi v. Philadelphia Elec. Co.*, 481 A.2d 616, 622 (Pa. Super. Ct. 1984). "Whether a peculiar risk exists is a matter for the court to decide before submission to the jury." *Lorah*, 622 A.2d at 1386.

In *Ortiz v. Ra-El Dev. Corp.*, 528 A.2d 1355 (Pa. Super. Ct. 1987), the Pennsylvania Superior Court held that a situation presents a peculiar risk or special danger if (1) the risk is foreseeable to the employer of the independent contractor at the time the contract is executed, and (2) the risk is different from the usual and ordinary risk associated with the general type of work. 528 A.2d at 1358. The court further parsed the second prong into another two-part test. "First, we examine the risk that would be posed by the general type of work to be performed under typical circumstances. . . . Next, we determine whether the circumstances under which the general work is done, *i.e.*, the specific project or task, introduces a different kind or level of risk." *Id.*

In that case, the plaintiff suffered his injury when he fell from a scaffold. The court, in examining whether the plaintiff met the second prong of the exception, held that the general type of work, construction work on a scaffold, was not particularly dangerous because it was "typically [performed] . . . at least a few feet off the ground." 528 A.2d at 1358. The court then determined that the specific

19

task that the plaintiff was performing at the time he suffered his injury – doing construction work on a scaffold located fourteen feet off the ground – "did not pose a risk much greater than that posed by the general work of being a few feet off the ground, and is therefore not specially dangerous." *Id.* Thus, the court held, as a matter of law, that the subcontractor's employer was not liable for the plaintiff's injury under §§ 416 and 427.

In this case, the Peculiar Danger Exception does not apply because neither the general type of activity, nor the specific task, that Plaintiff was performing posed a particularly high risk of physical injury. Additionally, unlocking trailer hitches using a receptacle which is defective cannot be considered as imposing a risk significantly higher than that which Plaintiff faced in the normal course of his duties. Therefore, the task that Plaintiff was performing when he sustained his injury was not particularly dangerous.

Because the general task of unlocking trailer hitches is not specially dangerous and there are no circumstances surrounding Plaintiff's injury which made the work specially dangerous, the court finds that the exception is inapplicable in this case. Plaintiff cannot recover from Defendants based on this theory.

2.    Defendants did not owe Plaintiff a duty to warn of the hitch's defect.

Defendants may still be liable to Plaintiff if they violated any other duty by failing to warn Plaintiff of the defective hitch. Plaintiff suggests that he was Defendants' business invitee at the time he suffered his injury. Thus, Defendants owed him a duty to make safe the area in which he was working. The court, however, has already decided that there is no genuine dispute that the relationship between GPS and Defendants was that of a principal and an independent contractor.

20

*See, supra* at Part III.A.1.  As the employee of an independent contractor, Plaintiff was privy only to those duties which Defendants owed to the independent contractor, GPS.

Under Pennsylvania law, "[a] landowner owes a duty to warn an unknowing independent contractor of existing dangerous conditions on the landowner's premises where such conditions are known or discoverable to the owner." *Colloi v. Philadelphia Elec. Co.*, 481 A.2d 616, 619 (Pa. Super. Ct. 1984) (citations omitted); *see also* Restatement (Second) of Torts § 343 (1965).  The employer of an independent contractor, however, owes no duty to warn the contractor or its employees of a condition that is at least as obvious to them as it is to the owner.[9]  *See Repyneck v. Tarantino*, 202 A.2d 105, 107 (Pa. 1964).

Plaintiff argues that Defendants had a duty to warn Plaintiff of the hitch's defect.  He bases this contention on two facts: (1) Defendants owned the railcar with the deformed hitch; and (2) the defect in the receptacle was difficult to detect.  Therefore, Plaintiff argues, Defendants knew, or should have known, of the defect.  Although it is undisputed that Defendants owned the railcar with the defective hitch, Plaintiff has presented no evidence establishing that Defendant was in a better position than Plaintiff to detect the defective hitch.  Ownership, alone, is not sufficient to impose a duty to warn of any and all dangers.  Instead, there must be some evidence indicating that Defendant was in a better position to detect the

---

[9]Both the Restatement (Second) of Torts and the case law consistently use the term "employer" to describe a party with whom an independent contractor contracts for services.  The court notes, however, that by its very definition, the relationship between a party who contracts for services and an independent contractor is not that of employer-employee as understood by the law of agency. *See* Restatement (Second) of Agency § 2 at cmt. b; *accord Thomas v. City of Philadelphia*, 668 A.2d 292, 296 n.6 (Pa. Commw. Ct. 1995).

danger. *See, Colloi,* 481 A.2d at 620 ("In sum, whether the owner of premises owes to his independent contractor a duty to warn of dangerous conditions on the premises can be said to turn on whether the owner . . . possesses superior knowledge [of the danger.]"(citations omitted)); *see also, Grace v. Henry Disston & Sons, Inc.,* 85 A.2d 118 (Pa. 1952)). Moreover, Plaintiff himself argues that the defect in the hitch was difficult to detect. Assuming this to be true, then certainly Plaintiff was in a better position to detect the condition where he was the one unlocking the hitch and thus had a chance to inspect it before unlocking it. In any event, the court need not decide who had the better chance to discover the defect. At the very least, on the undisputed facts in this case, Plaintiff was in as good a position as Defendants to detect the problem with the hitch. Defendants, therefore, did not owe Plaintiff a duty to warn of the hitch's defect.

The undisputed facts in this case indicate that Plaintiff was the employee of an independent contractor. Defendants, therefore, only had a duty to warn Plaintiff of dangerous conditions known or discoverable to them. Because Plaintiff has pointed to no evidence indicating that Defendant knew, or should have known of the hitch's defect, Defendants did not violate any duty to warn Plaintiff of this condition.

In summation, the type of work Plaintiff performed does not qualify him for the Peculiar Danger Exception to the general rule limiting liability for employers of independent contractors. Moreover, Plaintiff has not adduced evidence indicating that Defendants violated a duty owed to Plaintiff. As the employer of an independent contractor, Defendants cannot be held liable for injuries resulting out of dangers of which neither party had superior knowledge.

**IV.**        **Conclusion**

In accordance with the foregoing discussion, the court finds that Defendants' motion for summary judgment should be granted on Plaintiff's claims in Counts I and II.  Because a third-party claim remains in this case between Defendants and GPS, the court will delay entry of final judgment pending the scheduling of a conference call with the parties to discuss the status of that claim. An appropriate order will issue.

SYLVIA H. RAMBO
United States District Judge

Dated:  September  *23*  , 2002.

23